UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DOCKET NO. 3:10-cr-238 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | VOLUME I of IV |
| | ) | |
| PARKER ANTRON COLEMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
AUGUST 13, 2012

APPEARANCES:

On Behalf of the Government:

> STEVEN R. KAUFMAN, ESQ.,
> Assistant United States Attorney
> 227 West Trade Street, Suite 1700
> Charlotte, North Carolina 28202

On Behalf of the Defendant:

> NORMAN BUTLER, ESQ.,
> 725 E. Trade Street
> Suite 115 Court Arcade Building
> Charlotte, North Carolina 28202

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1

<u>I N D E X</u>

2

<u>AUGUST 13, 2012; VOLUME I of IV</u>

3
<u>GOVERNMENT WITNESSES</u>:                          <u>PAGE</u>
ALVIS BERGS
4
   Direct Examination By Mr. Kaufman              35
   Cross Examination By Mr. Butler                43
5
   Redirect Examination By Mr. Kaufman            48

6
CHRIS NEWMAN
   Direct Examination By Mr. Kaufman              49
7
   Cross Examination By Mr. Butler                71
   Redirect Examination By Mr. Kaufman            84
8
   Recross Examination By Mr. Butler              89

9
JAMES BRYANT
   Direct Examination By Mr. Kaufman              91
10
   Cross Examination By Mr. Butler               121
   Redirect Examination By Mr. Kaufman           135
11
   Recross Examination By Mr. Butler             138

12
DWAYNE SPEARS
   Direct Examination By Mr. Kaufman             139
13
   Cross Examination By Mr. Butler               157
   Redirect Examination By Mr. Kaufman           174
14
   Recross Examination By Mr. Butler             181

15
DARREN SOLOMON
   Direct Examination By Mr. Kaufman             182
16
   Cross Examination By Mr. Butler               192

17                       * * * * * *

Pretrial Motions                                  4
18
Court's Preliminary Instructions                 12
Opening Statements:
19
        Mr. Kaufman                              18
        Mr. Butler                               32
20
                         * * * * * *

21

22

23

24

25

# E X H I B I T S

GOVERNMENT EXHIBITS:

| NUMBER | ADMITTED |
|---|---|
| 1a-d | 37 |
| 2a-c | 40 |
| 5 | 63 |
| 6a | 58 |
| 6b-e | 61 |
| 7a-d | 69 |
| 9a-u | 152 |
| 10a | 149 |
| 14g | 145 |
| 14h-l | 147 |
| 14m-p | 147 |
| 14a | 150 |
| 14b-e | 151 |
| 15 | 97 |
| 15a | 105 |
| 16 | 97 |
| 16a | 105 |
| 17a | 112 |
| 17b-c | 114 |
| 20 | 188 |
| 22j | 37 |
| 22a | 39 |
| 22g | 60 |
| 22t | 117 |
| 28a | 120 |
| 32a | 108 |
| 41a | 88 |
| 41b | 157 |
| 42a | 190 |
| 42b | 192 |

\* \* \* \* \* \*

P R O C E E D I N G S

(Defendant Parker Antron Coleman present.)

THE COURT:  Good afternoon.

ALL COUNSEL:  Good afternoon, Your Honor.

THE COURT:  We're here in the matter of United States v Parker Coleman for trial.  A number of pretrial matters that are still unresolved.

Mr. Butler filed a motion to reopen jury selection for the purposes of exercising a peremptory strike with respect to a juror who had indicated in answer to questioning that he was familiar with the AUSA, had seen him at a park on several occasions where their children played; didn't have any other interactions with him.  And Mr. Butler indicated that he had intended to strike this juror, but for reasons stated in his motion, did not.

Mr. Butler, I'm going to deny that request.  I satisfied myself that this juror's responses indicated that he could set aside any -- what appeared to me to be minimal contact with the AUSA and decide this case fairly.  I think the government and the defense had a fair opportunity to use their peremptories and I'm not inclined to reopen the selection process.

MR. BUTLER:  If Your Honor, please.

THE COURT:  Yes, sir.

1           MR. BUTLER:  For the record, Your Honor, I would

2      just like to make it clear that my confusion was from the fact

3      that we had passed five people and we needed seven additional

4      jurors, and we had replaced the original 14 with another 14.

5      And the process was a little unusual for me.  And to the

6      extent that I was taken back, so to speak, from the standpoint

7      of, I couldn't determine who was gonna be left.

8           There is a method to -- I think -- to my jury

9      selection in trying to get the people that my client and I

10     have talked about, and I had circled that particular

11     individual.  But I was so confused about who would be where in

12     the jury box, that it almost felt like we didn't really have

13     input on who the jurors were, because --

14          THE COURT:  I'm sorry you felt that way.  We -- I've

15     had -- I think I've had several trials with you.  We've used

16     the same jury selection process every time, and you've never

17     expressed any confusion about that process in the past.  We

18     used the exact same process in this trial that we've had in

19     other cases that you've tried in my court.  And so I thought I

20     was pretty clear on the methodology we were going to use.  And

21     again, it's the same methodology we've always used.  And so

22     I'm not so sure -- I'm not so sure I understand your

23     confusion.  But I take you at face value that you were

24     confused.

25          But in any event, the bottom line is, I think we've

1  chosen a jury comprised of individuals who have indicated

2  their willingness to be fair and keep an open mind and judge

3  the case based upon the evidence and the instructions, and

4  so...

5          MR. BUTLER:  Of course, Your Honor, the last trial

6  we had was about five years ago.

7          THE COURT:  No.

8          MR. BUTLER:  Oh yes.

9          THE COURT:  Was it that long ago?

10         MR. BUTLER:  Yes, it was so.

11         THE COURT:  Well --

12         MR. BUTLER:  But in any event, that's for the

13 record.  Thank you.

14         THE COURT:  All right.  Thank you.

15         With respect to the Government's 404(b) notice, I

16 think I indicated earlier that I was inclined to permit the

17 government to put in the defendant's prior conviction in

18 Mississippi.  Because I do think it's relevant to show the

19 connection between the defendant and a co-conspirator, his

20 probation officer -- his probation officer at the time of the

21 alleged conspiracy.  Having studied the matter in more detail,

22 and the responses of the attorneys, I'm confirmed in that

23 view.

24         And, so, Mr. Kaufman, I'll allow you to introduce

25 the prior conviction in Mississippi for 6.7 kilograms of

1    marijuana.

2         I'm not going to let you go into the discharge of

3    the firearm in 2008.  I don't believe that comes within the

4    more -- what I perceive to be the more restrictive approach of

5    404(b) that the Fourth Circuit seems to be taking in *McBride*,

6    *Johnson*, *Hawkins* and other cases.  I don't believe that it

7    meets the time matter, pattern of conduct limitations of those

8    cases.  And so, yes, as to the prior conviction.  No, as to

9    the discharge of a weapon.

10        Also looked at the --

11        MR. BUTLER:  If Your Honor, please.

12        THE COURT:  Yes.

13        MR. BUTLER:  For the record, we would object to his

14   prior conviction.

15        THE COURT:  All right.  Then I've also looked at the

16   motion in limine filed with respect to the three conversations

17   between Milton Adams and Stephanie Peppers.  The government

18   seeks to introduce them as 801(d)(2)(e) statements.  The

19   defense objects that they're hearsay, not admissible for any

20   proper purpose.

21        I do think the statements of Adams are -- as

22   proffered, as I've studied the transcript, would come in as

23   801(d)(2)(e) statements.  I think the statements of Peppers,

24   though not a conspirator at the time of phone calls, would be

25   admissible for the limited purpose of putting in context the

1  statements of Adams.  So I'm going to allow the government to

2  play the recordings that they have indicated in their motion

3  in limine.

4         MR. BUTLER:  Note our objection, Your Honor.

5         THE COURT:  Yes, sir.

6         MR. BUTLER:  And if I didn't object to the ruling on

7  jury reopening --

8         THE COURT:  Oh, I think you've more than preserved

9  that.

10         MR. BUTLER:  Thank you very much.

11         THE COURT:  Mr. Kaufman.

12         MR. KAUFMAN:  Your Honor, thank you.  If I just may

13  comment on a couple of things.

14         I take in heed of Your Honor's comments in the past

15  about expediting the presentation of evidence.  At this point

16  I don't anticipate presenting our case in chief meaning,

17  wiretap recordings with Mr. Adams and Ms. Peppers.

18         With regard to the prior conviction of Mr. Coleman.

19  As we mentioned in a supplemental filing last week, we also

20  intend, consistent with that prior conviction, Ms. Peppers

21  will be testifying that she met Mr. Coleman because she was

22  his probation officer for that offense.  And the nature of

23  that offense helped to influence her decision to provide him

24  seed money to restart the conspiracy.  And in fact, she

25  believed he knew the business based on that prior conviction.

1    And in fact, herself became a co-conspirator actively

2    distributing marijuana, acting as courier and as a

3    facilitator.

4              THE COURT:  Very well.

5              MR. KAUFMAN:  Thank you, Your Honor.

6              THE COURT:  Mr. Butler, I believe you filed a motion

7    to compel discovery today.

8              MR. BUTLER:  Yes, Your Honor.

9              THE COURT:  It appears to me that it deals with --

10   you want the government to provide a copy of a tape that

11   depicts a potential witness and the defendant engaged in

12   certain sexual acts.  And the basis for that production is

13   that you believe that a tape was shown to another person who

14   became a cooperating witness, in part, as a result of that

15   tape.

16             All that seems to be grist for cross-examination.  I

17   don't know that I understand the relevance of the -- or the

18   necessity of compelling discovery.  It seems like if you have

19   a basis for asking those kind of bias questions on cross,

20   you're entitled to do that.  But I'm not going to compel the

21   government to produce a tape.

22             MR. BUTLER:  Very well, Your Honor.  Note our

23   objection.  We have, we believe, a good faith basis for asking

24   for the tape.  We -- based on the information and belief that

25   was relayed by Ms. Peppers to a third person, she was -- she

1  indicated that she was shown the tape.  That it depicted

2  Mr. Coleman and Ms. Shaunda McAdoo.

3        THE COURT:  I think the relevance would be right

4  that it shows a reason for Ms. Peppers to be testifying

5  against Mr. Coleman.

6        MR. BUTLER:  Yes, sir.

7        THE COURT:  And so it seems like that's proper on

8  cross-examination.

9        MR. BUTLER:  And the reason I'm asking for it, Your

10  Honor, is because I'm anticipating that Ms. Peppers may have a

11  lapse of memory.  She may not remember.

12        THE COURT:  Well, that would be extrinsic anyway.

13  You're entitled to ask, but you wouldn't get very far on

14  wanting to show any such tape to the jury.  And so I think you

15  may have a basis for inquiring on cross-examination, but

16  that's where it will end.

17        MR. BUTLER:  Very well.

18        MR. KAUFMAN:  Your Honor, I just note for the record

19  that we have made discovery of 10 boxes of material available

20  to Mr. Butler over the last couple years.  In fact, I stayed

21  late on Friday night to provide an additional 17 disks

22  containing downloads of phones which I think may include the

23  material that Mr. Butler's referencing.

24        I should note that our understanding from my review

25  of the numerous reports, is, that there was a reference in a

1  debrief with Ms. Peppers that she saw on one of Mr. Coleman's

2  phones, I believe it was photographs with women and calls with

3  women and she confronted him with it.

4          With regard to sex tapes, I'm not aware of her

5  having seen any such sex tape.

6          We do from Ms. McAdoo's phone, which we don't

7  believe Ms. Peppers ever saw -- we believe that there was some

8  sort of sexual content on a phone.  It was unclear who the

9  participants were.  But that's the long and short of it, Your

10 Honor.

11         THE COURT:  All right.  I've heard more than I think

12 I need to on this subject.  To the extent it's relevant to

13 show bias on cross, I'll give you some leeway, Mr. Butler.

14         Any reason we shouldn't call the jury at this time?

15         MR. KAUFMAN:  We're ready, Your Honor.

16         THE COURT:  We're missing --

17         COURT SECURITY OFFICER:  One.

18         THE COURT:  Yeah, I guess I told the jurors to be

19 here at 1:00.  I don't think we have a full complement, so

20 we'll stand in recess until 1:00.

21         (Recess at 12:45 p.m. until 1:00.)

22         THE COURT:  We ready for the jury?

23         MR. KAUFMAN:  Yes, Your Honor.

24         MR. BUTLER:  Yes, Your Honor.

25         THE COURT:  Call the jury.

1    (The jury was returned to the courtroom.)

2    THE COURT:  I was going to say good morning, but I

3 shouldn't do that.  Good afternoon.  Appreciate you all coming

4 so promptly.  And at this point, Madam Clerk, would you

5 impanel the jury.

6    COURT CLERK:  (Complies.)

7    (Fourteen jurors were selected and passed by the

8 Government and the Defendant.  Two alternate jurors were

9 selected and passed by the Government and the Defendant.  All

10 fourteen jurors were duly impaneled.)

11    THE COURT:  So now that you've been sworn and

12 impaneled, I want to give you some preliminary instructions to

13 help guide your participation in the trial.

14    I said earlier to you, it will be your duty to find

15 from the evidence what the facts are.  You and you alone are

16 the judges of the facts.  You will then have to apply to those

17 facts which you find, the law as the court gives it to you.

18 And nothing that the Court may say or do during the trial is

19 intended to indicate in any way what your verdict should be.

20    The evidence from which you will find the facts will

21 consist of testimony of witnesses, documents and other things

22 received into the record as exhibits, and any facts that the

23 lawyers agree to or stipulate to, or that the court may

24 instruct you to find.

25    There are certain things that are not evidence and

1   should not be considered by you as such, and they include

2   things like statements, arguments and questions by the

3   attorneys.  Objections to questions are not evidence.  The

4   lawyers have an obligation to their clients to object to

5   things they believe are improper -- being improperly admitted

6   under the rules of evidence.  Should not be influenced by the

7   objection.  If it is sustained, you should ignore the

8   question.  And if it is overruled, you should treat the answer

9   like any other answer.

10          There may be times when an item of evidence is

11  received for a limited purpose and the court instructs you

12  accordingly and you should follow that instruction.

13          Any testimony that the court tells you to exclude or

14  disregard is not evidence.

15          And then anything you may have seen or heard outside

16  the courtroom is not evidence.

17          Now during the jury selection I informed you that

18  the government had charged the defendant by bill of

19  indictment.  I also indicated to you that the bill of

20  indictment was not evidence, but merely the notice to the

21  defendant that brought him here to this trial.  And the

22  accusations in the indictment are not evidence but they

23  present the issues for you for your determination.

24          But having said that, the government has alleged

25  that the defendant, Mr. Parker Coleman, conspired with others

1    not on trial today, to distribute and possess with intent to

2    distribute marijuana.

3          And the government has alleged that that occurred

4    between time periods of 2009 forward, in Mecklenburg County

5    and elsewhere.

6          And the defendant is also charged with conspiring to

7    conduct financial transactions with the proceeds of

8    distributing a controlled substance, which is commonly

9    referred to as money laundering.

10          In addition to those charges, the defendant is

11   charged with possessing with intent to distribute marijuana on

12   November 2nd, 2010.  And possessing a firearm in furtherance

13   of that offense, and after being convicted of a felony, or

14   aiding and abetting those offenses.

15          And finally the defendant is charged with possessing

16   a firearm in furtherance of a drug trafficking offense on

17   November 16, 2010 after being convicted of a felony.

18          Now I will give you more detailed instructions on

19   the law at the end of the case, and a copy of the indictment

20   to take with you back to deliberate on the case.  But those

21   are, in brief, the allegations against the defendant.

22          Now as the court has said, you are the sole judges

23   of the credibility of the witnesses, and the weight their

24   testimony deserves.  And while there is no absolute or

25   arbitrary guide or measure by which you shall determine the

truthfulness or untruthfulness of a witness, there are some general principles which may assist you in the determination of the credibility of the witnesses.

Those factors include such things as whether the witness has any motive or reason for being truthful or untruthful; the witnesses' interest, if any, in the outcome of the case; whether there has appeared from the witnesses' attitude or conduct, any bias, prejudice or feeling which may cause that person's testimony to be influenced; whether the testimony bears the earmarks of truthfulness; to what extent, if any, it is corroborated or confirmed by other testimony which is not questioned, or by known or admitted facts.

And also you may consider the intelligence and mental capacity of a witness, and the witness's opportunity to have accurate knowledge of the matters to which the person testifies.

I instruct you that you may believe all that a witness says, or none of it. You may believe part and disbelieve part. It's up to you to decide.

Now a few words about your conduct as jurors. First, I instruct you that during the trial you are not to discuss the case amongst yourselves or with anyone else. Nor should you permit anyone to discuss it with you. Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about the case.

1   And if anyone should try to talk to you about it, you should

2   bring it to the court's attention promptly.

3        Second, do not read or listen to anything touching

4   on the case in anyway.

5        Third, do not try to do any research or make any

6   investigation about the case on your own.

7        Your duty to follow these instructions is a serious

8   responsibility and a failure to follow it may result in being

9   found in contempt of court.  So until you retire to

10  deliberate, you simply are not to discuss the case, research

11  the case, or do any investigation on your own.

12       Now all of us use electronic media in the daily

13  course of our lives, but you may not use any such device

14  including telephone, cellphone, smart phone, iPhone,

15  Blackberry or computer; the Internet, any internet service, or

16  any text or instant messaging service; any internet chat room,

17  blog, or website such as Facebook, My Space, Linked In, You

18  Tube or Twitter.

19       You can't use any of those devices to communicate to

20  anyone any information about the case, conduct any research

21  while you're serving as jurors.

22       Now you may take notes if you wish to take notes,

23  but I want to say to you that any notes that you take are

24  simply an aid to your own memory and not a substitute for your

25  memory.  And so if you choose to take notes, consider it for

that purpose.  And if you choose not to take notes, whether you take notes or don't take notes, you need to rely upon your own memory of the evidence as it comes forward.

So the case is about to begin.  And first the government will make its opening statement, which is simply a forecast of what the government believes the evidence will be. Next the defendant -- the defense attorney may, but does not have to make an opening statement.  I remind you that opening statements are not evidence.

After the opening statements the government will present its witnesses, and counsel for the defendant may cross-examine those witnesses.  And following the government's case, the defendant may, if he chooses, present witnesses whom the government may cross-examine.

After all the evidence is in and I've given you general instructions, the attorneys will present their closing arguments to you.  Then the court will come back and instruct you on the specific counts in the indictment, the law that's alleged to have been violated, and the essential elements which the government must prove beyond a reasonable doubt as to each count in the indictment.

So that's the process that we're going to follow. We will start each day at approximately 9:30; take a morning and afternoon break; a break for lunch, most likely between 1:00 and 2:00, and we will end each day around 6:00 at night.

1    And that's the schedule and the process.  And at this point

2    we're ready to start the case.

3              Is the government prepared to make its opening

4    statement?

5              MR. KAUFMAN:  Yes, Your Honor.

6              THE COURT:  When you're ready you may do so.

7              MR. KAUFMAN:  Thank you, Your Honor.

8              May it please the Court, counsel, ladies and

9    gentlemen of the jury.  Good afternoon.

10             THE JURY:  Good afternoon.

11             MR. KAUFMAN:  Good afternoon.

12             THE JURY:  Good afternoon.

13             MR. KAUFMAN:  Ladies and gentlemen, this is going to

14   be jam packed evidence coming to you.  I imagine that we'll be

15   asking for your services until about Wednesday or so.  But

16   ultimately, at the conclusion of the evidence, we submit that

17   we will have proven beyond a reasonable doubt that that man,

18   Parker Antron Coleman, was the leader of the Charlotte side of

19   an enormous marijuana trafficking and money laundering

20   conspiracy.

21             Now ladies and gentlemen, where do we start?  Let's

22   go back to January 9 of 2009.  You're going to be hearing

23   evidence that Stephanie Peppers -- and there's going to be a

24   lot of names that come up.  During the trial you'll see

25   photographs of these people, you'll start to become familiar

1    with them.

2         But Stephanie Peppers was asked by a man named

3    Gerren Darty -- now Gerren Darty was a key link between

4    Charlotte and Los Angeles.  The source of supply out in

5    California, Milton Adams, had the connect with the Mexican

6    source of supply.  So he knew Gerren Darty.  And Gerren Darty

7    put Parker Coleman in touch with Milton Adams.

8         On January 9th -- or actually it was in December

9    leading up to the January events, Gerren Darty had wanted a

10   rental vehicle.  Mr. Coleman asked Ms. Peppers to rent a

11   Caliber from Enterprise.  Which, she did, for Mr. Darty.

12        You're going to hear that Mr. Darty eventually

13   picked up hundreds of pounds of marijuana that was in a crate

14   on January 9, 2009.  Inside of this enormous crate there were

15   a couple of barrels.  Inside of those barrels was the

16   marijuana.

17        What they did is, you'll hear there was a masking of

18   the scent of marijuana.  Because marijuana has a strong

19   distinctive smell.  And they used manure, among other things,

20   to try to cover that smell.

21        Now, that Caliber, you'll see records and you'll

22   actually be hearing sworn testimony from Ms. Peppers who is

23   now what is called a "cooperating defendant."  She has agreed

24   to cooperate with the law enforcement investigation and, yes,

25   in fact, the United States prosecution of Mr. Coleman and

1    others.

2          And you're going to hear that when she rented that

3    Caliber, she had to provide -- she had to provide a reference.

4    And one of those references was Mr. Coleman.  And that was at

5    the time the only way that Mr. Coleman was in any way on the

6    radar screen.

7          Fast forward now from January of 2009 to July of

8    2010.  You'll be hearing from Officer Carlos Lopez from

9    Charlotte-Mecklenburg Police Department, CMPD.  He's a K-9

10   officer among other things.  And you'll be hearing that he was

11   involved in stop of Mr. Coleman.  Mr. Coleman was driving his

12   white Porsche Cayenne SUV.

13         And you'll hear that the K-9, the narcotics

14   detection dog.  That's what we often call a K-9.  You'll hear

15   that the K-9, that he alerted to the back portion of the

16   vehicle.  And in the back of Mr. Coleman's vehicle there was a

17   box that was intended for a money counter.  And inside they

18   found approximately $42,000 in cash.

19         Now when I talk about an alert -- I believe I used

20   that term -- you'll hear testimony from Officer Lopez and

21   actually another K-9 Officer Chris Newman who is also with

22   CMPD.  And you'll hear that an alert is when a dog gives an

23   indication that they detect the distinct smell of controlled

24   substances.  They're trained for that purpose.  You'll hear

25   testimony about that.

1          Now that's July of 2010.  You'll hear based on other

2   information, law enforcement then, in November -- well,

3   actually late October of 2010, went to the area of 5425

4   Closeburn Road.  There was information that Parker Coleman

5   lived at that address.

6          So there was surveillance in October.  They saw Mr.

7   Coleman in that vicinity, and, in fact, going to the apartment

8   complex.  You'll hear that 5425 Closeburn Road is right around

9   the corner from South Park Mall.  It's right at the corner of

10  Park Road when you take that left hand turn towards South Park

11  Mall, it's right there on the corner.

12         You'll be hearing about various addresses that are

13  relevant to this case.

14         But, on November 2nd, during surveillance, you'll

15  hear that a man named Jerry Davis -- who you'll hear was one

16  of the primary distributers for Mr. Coleman -- you'll hear

17  that Jerry Davis went into the apartment complex at Closeburn

18  Road.  He had maybe a small bag for fast food or something,

19  and he went inside, and then within a short while, just a

20  matter of minutes later, came back out and he was wheeling a

21  suitcase.

22         Now these suitcases are crucial.  Because this is

23  how the conspiracy did what they did.  And you may be shocked

24  about some of the details about it.  But, ultimately Mr. Davis

25  was stopped by Officer Newman, the other K-9 officer that I

1  had mentioned.  And in fact, Officer Newman and the other

2  officers involved in the stop found 30 pounds of marijuana in

3  his car.

4          You'll hear that Mr. Davis agreed to cooperate with

5  law enforcement, and was, among other things, providing

6  information and also agreed to what's -- to make what's called

7  consensually recorded calls.

8          This is when law enforcement is supervising an

9  individual who wants to cooperate, and they will watch and

10  listen as that person makes calls to co-conspirators in an

11  attempt to sting them, or get them to make either a delivery

12  or an acknowledgment of some sort of past historical part in a

13  conspiracy.

14          You'll hear that Mr. Davis called Mr. Coleman.  And

15  in that call -- please listen very carefully -- Mr. Coleman

16  raises the issue of a search and is concerned over K-9s and

17  his concern over "the".  Now does he say the word marijuana?

18  You're gonna hear that drug traffickers use coded language,

19  just as a natural course.  They get used to doing that because

20  they don't want to be detected.  No one is 100 percent sure if

21  law enforcement is watching, listening.  So they're safe.

22  What is "the".  "The" is the marijuana that was seized.

23          MR. BUTLER:  Objection.

24          THE COURT:  This is a forecast of the evidence.

25          Overruled.

1          MR. KAUFMAN:  Shortly after that, you'll hear

2   Shaunda McAdoo, that she called Mr. Davis.  There will be

3   about various links showing Shaunda McAdoo's connection to Mr.

4   Coleman, things on her phone such as a photograph of Mr.

5   Coleman sleeping.  You'll see a hand holding what's called a

6   bud of marijuana.  You'll see connections between Ms. McAdoo

7   and one of the couriers involved in this case who you'll

8   actually be hearing testify.

9          Anyway, Ms. McAdoo calls Mr. Davis.  Is everything

10  all right?  Everything's cool.  Okay.

11          What happens after that?  Ms. McAdoo leaves in a

12  Lexus.  You'll hear that this silver Lexus belongs to

13  Ms. Peppers.  Ms. McAdoo is with two other individuals, a man

14  named Davon Harris whose nickname is Poppa and Christopher

15  McKneely, whose nickname is Esco.

16          When the police were stopping the car, the front

17  passenger was making motions that was consistent with trying

18  to put something in the glove box.  And low and behold, what

19  did law enforcement find, but $21,000 in cash.

20          So what happened after that.  November 2nd is a very

21  busy day, ladies and gentlemen.  After that, based on

22  information from Mr. Davis and everything that had happened to

23  that point, law enforcement went to the court, obtained a

24  search warrant for Mr. Coleman's residence at 5425 Closeburn

25  Road in apartment -- in Unit 115.

1     You will get to hear testimony from officers who
2 were present for the search. Mr. Coleman was there, by the
3 way. He was alone. You're gonna hear that there's really
4 no -- we submit that after you hear the evidence, that this
5 was his residence, all of his clothes were there. And what
6 did they find? They found a lot of evidence. You're going to
7 see bag fulls, literally, of evidence. Among that evidence is
8 information connecting Mr. Coleman to the residence.

9     You're going to find money wrappers, like paper
10 money wrappers, ones that you would see coming from a bank.
11 You'll see numerous, numerous rubber bands. You'll hear
12 testimony from the agents that this is consistent with the way
13 that someone would bundle money. And you'll also see
14 packaging materials that's consistent with somebody who's
15 trying to package marijuana.

16     Again, it's very important to avoid detection and
17 the smell of marijuana is one of the weak points when you're a
18 marijuana trafficker.

19     But importantly you're also going to find that under
20 Mr. Coleman's bed, he had a Glock handgun. Now, that Glock
21 handgun, there's a few issues with that that I want to touch
22 upon very quickly. First of all you're going to hear that
23 Ms. Peppers had provided him with that handgun, and there's a
24 very important reason why she bought it for him.

25     If I can take a step back you're going to hear that

1    Mr. Coleman is in fact a convicted felon.  He's not permitted

2    under the law to carry a firearm.  Convicted felons cannot do

3    it.  That's the law and you'll be hearing Judge Conrad explain

4    that to you later on.

5            In addition to that, you're going to hear that

6    Ms. Peppers was Mr. Coleman's probation officer for his prior

7    conviction related to felony possession of marijuana.

8            You're going to hear that Mr. Coleman convinced

9    Ms. Peppers and -- well, when I say convinced -- Ms. Peppers

10   and Mr. Coleman got into a personal relationship.  You're

11   going to hear that Ms. Peppers resigned her position as a

12   probation officer within a matter of weeks.  She'll tell you

13   that it was just -- she knew it was wrong, and it was the

14   right thing to do was to resign.

15           But she knew that Mr. Coleman had the connections.

16   He knew the business.  And she's the one who actually provided

17   Mr. Coleman with her tax refund to give him the seed money to

18   start up the conspiracy that he was dying to start up again.

19   You'll hear her testimony about him talking about it, how he's

20   constantly trying to build the connections to start up the

21   business again.

22           That's also the reason why she in fact felt so

23   confident in his abilities that she herself became involved,

24   first as a courier for him, and also as a facilitator and was

25   distributing drugs on his behalf.

1          Now with regard to that firearm, you're going to be
2   able to see that firearm.  We've got it in court, you'll be
3   able to see it.  And in addition to the firearm you're going
4   to find in that same master bedroom in the closet, Mr. Coleman
5   had installed a safe in the closet which is filled with an
6   incredible amount of clothes and shoes.  You'll even see the
7   $495 price tag on one of those many pairs of shoes, numerous
8   watches.  But in that safe, law enforcement found over $92,000
9   in cash.  Those are drug trafficking proceeds.
10          You're going to hear about a lot of money going into
11  bank accounts.  That's why we've got money laundering for a
12  few reasons.
13          You'll hear testimony about money that was going
14  into bank accounts.  You'll be hearing money that was being
15  hided -- I'm sorry.  Money that was being hidden in carry-on
16  baggage -- conceal and disguise is a term that Judge Conrad
17  will describe to you during jury instructions, I don't want to
18  go into law at this point -- but -- that was being hidden in
19  carry-on baggage to go to California.
20          Now, maybe I should take this point, ladies and
21  gentlemen, and just to explain very briefly the way that they
22  operated.  In the very beginning the conspirators here in
23  Charlotte, Mr. Coleman and others, would have to bring money
24  and pay upfront for the marijuana.  That was for a few trips.
25  And then they would get the product back.  Smaller amounts of

money. But very quickly, you'll hear, after a few trips, there was almost a standard methodology. They would have $50,000 or thereabouts, sometimes a little bit more. You'll hear about a couple of seizures which actually happened on November 2nd. I'll get back to that.

But about $50,000 or more was going on carry-on baggage on the airline to California. The couriers would be dropped off at the airport here, picked up by facilitators on the other side. You will be hearing from one of the, William Pierce who will be testifying for you. You'll be hearing from a lot of these couriers from Charlotte, such as Stephanie Peppers as I mentioned. You'll be hearing from Harold Manigault. You'll be hearing from Samantha Schmidlin. You'll be hearing from Nolan Robertson. These are all couriers, and they have a little bit of different details to describe. We're not going to ask you to listen over and over to the same thing. There are different details you'll be hearing from them.

But ultimately when they got to California, the facilitator there would bring the person back to either Milton Adams, nickname Turtle. He's the key connect to the source of supply in California, or some other stash house. They would count the money. They would then get the marijuana consistent with the agreement that they had with Mr. Coleman. And then they would eventually, sometimes the same day, but usually a

1   day or two later, bring that courier back to the airport.

2           Now you might be saying, how did they do it?  Okay.

3   What did they have?  They had, generally speaking, they had

4   two suitcases.  Each suitcase had 50 pounds of marijuana.  So

5   each trip by each of these numerous couriers, had 100 pounds

6   of marijuana.

7           Well they had somebody on the inside.  Anybody know

8   TSA?  Well that's the airport security folks.  They had an

9   insider.  You will actually hear that they eventually had more

10  than one insider.  This was an enormous conspiracy.

11          Ladies and gentlemen, what was going under that

12  plane?

13          Almost fortunately, one might say, in this case,

14  you'll hear the testimony that there was marijuana that was

15  actually being circumvented security and going on those planes

16  back here to Charlotte.

17          Now I think I mentioned Nolan Robertson.  I had

18  skipped a little detail about November 2nd.  At the time it

19  happened, law enforcement didn't realize the connection.  But

20  early in the morning on November 2nd, you're going to hear

21  that there were two people who were stopped at Charlotte

22  airport, and they just happened to have been booked, to be

23  sitting next to each other on the airplane.

24          One of them was Leah Davis, and she had roughly

25  $54,000.  Ladies and gentlemen, if I'm off or make a mistake,

the facts will govern.  Leah Davis had over $50,000 in her
baggage, and Nolan Robertson had over $60,000 in his baggage.

Now, as I mentioned, Shaunda McAdoo had a record on
her phone for a flight that she had booked for Mr. Nolan
Robertson.  You will hear a lot of interconnections here,
ladies and gentlemen.  It's like a web.  I see that there's
some note takers here, which is good.  Because the evidence is
going to be interconnected, and it's going to be helpful for
you to be able to put them altogether.  I'll try to do that in
my closing argument.

So, we had that money that was seized and ultimately
that was connected to Parker Coleman as well.  So that's all
on November 2nd.

What else?  You've heard that the indictment also
returned charges related to November 16th.  You're going to
hear, first of all, that on November 2nd there was some
marijuana that was in Mr. Coleman's house after Mr. Davis got
caught.  And again, there was a conversation with Mr. Coleman
when he was concerned, Ms. McAdoo when she was concerned,
there was another amount of marijuana that they brought down
out of the apartment to the Cayenne, Mr. Coleman's Porsche,
the SUV.

You're going to hear that Poppa, Davon Harris had
the key to the car and he hid it.  But ultimately they never
found the key again.  So they had to, later on, break into the

1    window of the SUV, get the marijuana, and get it out of there.

2            You're going to hear that the car was then brought

3    to Hendrick Porsche.  You'll get to see in this case, business

4    records from Hendrick Porsche and numerous other business

5    records and bank records, but the Hendrick records will show

6    you various times that Mr. Coleman had brought his vehicle in

7    to be serviced.

8            But, ultimately on the 16th was when the car was --

9    the SUV was going to be ready.  Law enforcement was aware of

10   that, had been coordinating with them.  And was waiting for

11   Mr. Coleman to arrive so that they could arrest him.  You'll

12   hear that he had already been charged.

13           So, they had already got there.  And in fact, they

14   had obtained information that Mr. Coleman had kept firearms in

15   a non-factory installed compartment behind the passenger seat.

16   And low and behold law enforcement was there when people who

17   worked for Hendrick Porsche opened up that compartment and

18   found, facing each other, two firearms, two more handguns.

19           Ladies and gentlemen, those were, you'll hear, the

20   evidence were Mr. Coleman's firearms.  And when he -- what

21   happened was, he went -- he went into Hendrick Porsche to

22   collect the keys for the vehicle, and for whatever reason

23   he -- oh, by the way, ladies and gentlemen, he showed up with

24   Gerren Darty.  Remember, he was the key connect between

25   himself and the source of supply, Mr. Adams.

1      So, Mr. Darty drove them in Mr. Darty's Volkswagen
2  to the dealership.  Mr. Coleman goes in, gets the keys to his
3  SUV.  For whatever reason, gives the keys to Mr. Darty to get
4  into the Porsche.  He gets into the Volkswagen to head out.
5  Law enforcement stops them, and that's when they're arrested.
6  So that's the basis for some of the charges, those firearms in
7  Mr. Coleman's vehicle on November 16.

8      I'm not going to go through every detail of the
9  case.  Let me say that we also have a recorded call that Mr.
10 Coleman plays to another individual on April 13th.  What he
11 does in that call is, he talks about what's called a "reverse
12 proffer".  And in fact, on that date, November 13th, you'll
13 hear testimony that Agent MacDonald and I did one of these
14 reverse proffers, when the government lays out the facts for
15 the defendant as to why he should plead and cooperate.

16     In that call he describes it, you'll hear him talk
17 about how it's overwhelming.  That at that point all he could
18 do was to try to get a better deal.  And he'll say, and I
19 apologize, ladies -- this is what you'll hear, ladies and
20 gentlemen, this is in Mr. Coleman's own words, what he said.
21 He said, "they got me by the balls."

22     So, ladies and gentlemen, at the conclusion of the
23 evidence, we are confident that you will be returning a
24 verdict of guilty.

25     Thank you.

1          THE COURT:  Mr. Butler.

2          MR. BUTLER:  Thank you, Your Honor.  May it please

3    the Court, Mr. Kaufman.  Good afternoon, ladies and gentlemen

4    of the jury.

5          THE JURY:  Good afternoon.

6          MR. BUTLER:  The evidence in this case will show a

7    lot of things.  But it will not show beyond a reasonable doubt

8    that Mr. Coleman is guilty of any of these crimes.

9          The evidence will show that back when Mr. Coleman

10   met Ms. Peppers, he was 21.  She was 13 years older than him.

11   The evidence will show that back then there was a person by

12   the name of Amhed Daniel Crockett who was the connection for

13   Milton Adams out in California in the drug business.  The

14   evidence will show that these people were the big players in

15   this case.

16         The evidence will also show that Jerry Davis knew

17   Milton Adams in California.  The evidence will show that

18   Parker Coleman is not from California.  The evidence will show

19   that Gerren Darty is from California, Milton Adams is from

20   California, William Pierce is from California, Davon Harris is

21   from California.  Those are the players.  The evidence will

22   show that the Porsche Cayenne, wasn't Mr. Coleman's Porsche.

23   It was like a community car for the drug dealers, for -- the

24   government's attorney said Mr. Pierce had the keys to it.

25   Well, how many of you all let other people have keys to your

1  car?

2         The evidence in this case will show, ladies and

3  gentlemen, that the weapons that were in the Porsche Cayenne

4  were swabbed for DNA.  Mr. Coleman's DNA is not on the weapon.

5  Jason Banks' DNA is on it.

6         The evidence in this case is about people who are

7  looking for a deal.  Guilty people who are looking for the

8  best bargain that they can get.  It will be about the

9  inconsistencies in the evidence, how a lot of them did not

10  have any involvement at all.  Don't know what you're talking

11  about.

12         One thing will be absolutely consistent, and that

13  is, they want to get the best result that they can by saying

14  whatever gets them there.  I want you to listen to them.  I

15  want you to scrutinize their testimony.  The evidence will

16  also show that some of the people that the prosecutor talked

17  to you about, you won't see them up there on the witness

18  stand.  They're not going to come in here and testify.  They

19  won't be subject to cross-examination.  So I want you to think

20  about that as we go throughout this trial.

21         The evidence will show that the Closeburn apartment

22  was leased by Stephanie Peppers.  The evidence will show that

23  the silver Infiniti was in the name of Stephanie Peppers.  You

24  will hear about the execution of this search warrant.  You

25  will also hear about Jerry Davis saying well, you know, I just

1    left and I have this 30 pounds of marijuana and there's more

2    marijuana in the apartment.

3           Well, of course, now, law enforcement has the

4    apartment under surveillance.  Okay.  When they go in and

5    search it, you know how much marijuana they find?  Less than a

6    gram.

7           So ladies and gentlemen, now you're going to hear a

8    whole lot of evidence, but you must decide for yourself

9    individually and collectively, whether or not there's proof

10   beyond a reasonable doubt.  And I submit to you that it is not

11   and it will not be that what is required in a case like this.

12          I'd ask on behalf of my client, Mr. Coleman, and his

13   family, my interns, and myself, that you keep an open mind

14   throughout the course of this trial.  That you give

15   Mr. Coleman a fair trial, and that you consider all the

16   evidence that will be presented in this trial.  And if you do

17   that, there's only one verdict, and that is not guilty.  And

18   at the close of all the evidence I will come back and show you

19   all of the reasonable doubt in this case, and ask you to do

20   your duty and find my client not guilty.

21          Thank you very much.

22          THE COURT:  Call your first witness.

23          MR. KAUFMAN:  Yes, Your Honor.  We call Special

24   Agent Alvis Bergs.

25              ALVIS BERGS, GOVERNMENT WITNESS, SWORN

1        DIRECT EXAMINATION

2   BY MR. KAUFMAN:

3   Q    Good afternoon.

4   A    Good afternoon.

5   Q    Sir, if you could, state your full record (sic) and spell

6   it for the record.

7   A    Yes.  My name is Alvis Bergs.  A-L-V-I-S.  B-E-R-G-S.

8   Q    Where do you work?

9   A    I'm a special agent with Homeland Security

10  Investigations.

11  Q    How long have you worked as a special agent?

12  A    Since 2003.

13  Q    I would like to turn your attention to November 2nd of

14  2010.  Were you involved in any stops at the airport on that

15  date?

16  A    Yes.

17  Q    Would you describe what happened?

18  A    Yes.  We were notified by TSA that during a security

19  screening, they encountered two passengers traveling on the

20  same flight from Charlotte to Dallas, and then also scheduled

21  to fly the same flight from Dallas to Los Angeles.  They both

22  had large amounts of currency.

23       We have a memorandum of understanding with TSA that they

24  notify us regarding any bulk cash coming through their

25  checkpoints.  So that's typically some of the investigations

1    that I work at the airport.

2    Q    And just in case the folks in the jury don't know, what's

3    TSA?

4    A    Transportation Security Administration.

5    Q    What's their job?

6    A    They do security screenings at the airport and other

7    locations, but typically at the airport.

8    Q    Are you familiar with the names Leah Davis and Nolan

9    Robertson?

10   A    Yes.

11   Q    How are you familiar with those names?

12   A    I spoke to both Nolan Robertson and Leah Davis.

13   Q    Were those the two individuals who were stopped?

14   A    Yes.

15   Q    And you mentioned that they were booked on the same

16   flight.  Do you recall where they were located in reference to

17   each other?

18   A    On the aircraft they were scheduled to sit, at least on

19   the same row.  Information we got initially was that they were

20   seated next to one another.

21   Q    What specifically was seized from each one of them?

22   A    Leah Davis, we administratively seized approximately

23   $54,000 in U.S. currency, and Nolan Robertson we seized

24   approximately $63,000.

25   Q    Like to show you -- and for the time being something

1  everyone but unfortunately the jury can see -- what has been

2  marked for identification purposes as 22j.  Do you recognize

3  this?

4  A    Yes, it's Leah Davis.

5           MR. KAUFMAN:  Your Honor, at this time we would seek

6  to have 22j admitted and published.

7           THE COURT:  Any objection?

8           MR. BUTLER:  Objection.

9           THE COURT:  Basis?

10          MR. BUTLER:  At this point I don't think they

11 established a proper foundation to admit that photograph.

12          THE COURT:  Overruled.

13          (Government's Exhibit No. 22j was received into

14 evidence and published.)

15 Q    I would like to show you next what's been marked as

16 Exhibit 1a, 1b, 1c, and 1d.  Do you recognize those photos?

17 A    Yes.  Those were all from Leah Davis' bag, the blue bag.

18 And that was the currency that was located inside the bag.

19 Q    And are all four photographs a fair and accurate

20 representation of what you saw on November 2nd?

21 A    Yes.

22          MR. KAUFMAN:  Your Honor, we seek to admit and

23 publish all four.

24          MR. BUTLER:  Objection.

25          THE COURT:  Overruled.

1    (Government's Exhibits No. 1a, 1b, 1c and 1d were

2  received into evidence and published.)

3  Q    Going back to 1a.  What's that?

4  A    That's Leah Davis' bag.

5  Q    One-b.

6  A    The inside of her bag as we unzipped it, that's what we

7  saw.

8  Q    One-c.

9  A    As we removed out a layer of clothing, we saw the

10 currency there so we took a photo.

11 Q    One-d.

12 A    And that's the currency spread out on the floor.

13 Q    Now, was the money counted?

14 A    It was.

15 Q    And how was that done?

16 A    We do that through Brinks.  What we do is, once the money

17 is seized we seal it in a bag which is witnessed by another

18 agent or several agents.  Then the currency is just taken to

19 Brinks and they count it with their counting machines.

20 Q    Is that standard operating procedure?

21 A    Yes.

22 Q    Now showing you what's been marked as Government's

23 Exhibit 3.  When you go to Brinks, is there any kind of

24 documentation that you receive from them?

25 A    Yes.

1    Q     And do you recognize Exhibit 3?

2    A     Yes.  This is the receipt.  Once they count the money,

3    they create this receipt for us, which we turn into our

4    forfeiture, penalties and fines office.  And that's a receipt

5    that Brinks gave us.

6              MR. KAUFMAN:  Your Honor, we seek to have Exhibit 3

7    admitted and published.

8              THE COURT:  Any objection?

9              MR. BUTLER:  Objection, Your Honor, yes.

10             THE COURT:  Basis?

11             MR. BUTLER:  Well, Your Honor, it hadn't been a

12   connection between how much money was seized and how much

13   money --

14             THE COURT:  I'll sustain the objection at this point

15   subject to a later foundation.

16   Q    (Mr. Kaufman) Now with regard to Mr. Robertson, I would

17   like to show you what's been marked as 22a for identification

18   purposes.

19   A     Yes, that's Nolan Robertson.

20             MR. KAUFMAN:  Seek to admit and publish, Your Honor.

21             THE COURT:  What's the exhibit number, 22a?

22             MR. KAUFMAN:  Yes, Your Honor.

23             THE COURT:  Let it be admitted.

24             (Government's Exhibit No. 22a was received into

25   evidence and published.)

1   Q    Now I would like to show you what's been marked for ID as

2   2a, 2b, 2c.

3   A    Yes, it's all in Nolan Robertson's bag and clothing, and

4   the currency was rolled up inside these pieces of clothing.

5   Q    Are these three photographs fair and accurate

6   representations of what you saw on November 2nd?

7   A    Yes.

8        MR. KAUFMAN:  Seek to admit and publish, Your Honor.

9        MR. BUTLER:  Objection.

10       THE COURT:  Let it be admitted.  You may publish.

11       (Government's Exhibits No. 2a, 2b and 2c were

12  received into evidence and published.)

13  Q    Two-a is --

14  A    Nolan Robertson's bag.

15  Q    What's 2b.

16  A    Clothing that was inside the bag.

17  Q    And 2c.

18  A    And individual bundles of currency located inside the

19  various shirts there.

20  Q    And outside of the jury's ability to view, I'm showing

21  you what's been marked as Government's Exhibit 4 for

22  identification.  Do you recognize that?

23  A    Yes.  That's a receipt from Brinks regarding Nolan

24  Robertson's currency.

25  Q    Is that in fact the money that you personally provided to

1   Brinks?

2   A     Yes.

3   Q     Now after you had done the stops, done the seizures, what

4   if anything did you do next?

5   A     After the interview we called in CMPD,

6   Charlotte-Mecklenburg Police Department K-9 officer.  And with

7   his K-9 we conducted a sniff of the currency, and basically we

8   placed four boxes in a row, one of which had individually Leah

9   Davis' currency in one box, and then after that the dog ran on

10  that.  The dog alerted positively --

11          MR. BUTLER:  Objection.  Move to strike.

12          THE COURT:  Overruled.

13          THE WITNESS:  The dog alerted positively to the odor

14  of narcotics on the --

15          MR. BUTLER:  Well, objection.

16          THE COURT:  Overruled.

17          THE WITNESS:  -- on the box had Leah Davis' currency

18  in it.  That box was removed.  We placed Nolan Robertson's --

19          MR. BUTLER:  I object, Your Honor.  He has not

20  established whether or not he has expertise to determine what

21  the dog did.

22          THE COURT:  You may testify as to what you observed.

23          THE WITNESS:  Yes, sir.

24          We took that box away, placed Nolan Robertson's

25  currency in another box, introduced that box to the four box

1   lineup, and then I observed the K-9 officer run his dog on

2   those four boxes.  The dog alerted to the box that had Nolan

3   Robertson's currency in it.

4            MR. BUTLER:  Objection to the term "alerting," Your

5   Honor.

6            THE COURT:  Overruled.

7            What do you mean by the term "alerting"?

8            THE WITNESS:  Indicated positively to the odor of

9   narcotics.

10           MR. BUTLER:  Objection.

11           THE COURT:  What do you mean, "indicated

12   positively"?  What did you see?

13           THE WITNESS:  I saw the dog scratch the box and then

14   sit.

15   Q    (Mr. Kaufman) I would like to move your attention to

16   later on November 2nd.

17           Did you in fact have other amounts of money that you

18   received that were to be counted?

19   A    Yes.

20   Q    Can you tell us about that?

21   A    There was other seizures made that day, and this is

22   November 3rd, the next day.  I checked out of evidence,

23   several other currency seizures related to the investigation.

24   Q    Okay.  I would like to show you what's been marked as

25   Government's Exhibit 47 for identification.  Do you recognize

1    this document?

2    A    Yes.

3    Q    What is it?

4    A    It's a chain of custody document with my signature on it

5    for November 3rd.

6    Q    And under acceptance chain of custody, how many lines

7    down is your signature?

8    A    Second line.

9    Q    And turning now to page two of Exhibit 47.

10   A    That's also another seizure I took to Brinks that day.

11   That second line is my signature, November 3rd.

12   Q    Next I would like to show you what's been marked as

13   Government's Exhibit 8.  Do you recognize this?

14   A    Yes.  That's the receipt from Brinks for that.

15              MR. BUTLER:  Objection.

16              THE COURT:  Overruled.

17              THE WITNESS:  That's the receipt from Brinks that we

18   received for that first seizure, chain of custody form issued.

19   Q    (Mr. Kaufman) And Exhibit 13, do you recognize that?

20   A    That's a receipt from Brinks and from the second seizure

21   chain of custody, it shows --

22              MR. KAUFMAN:  No further questions, Your Honor.

23              THE COURT:  Any cross?

24              MR. BUTLER:  Yes, Your Honor.  Thank you.

25                        CROSS EXAMINATION

1    BY MR. BUTLER:

2    Q    Good afternoon, Agent Bergs.

3    A    Good afternoon.

4    Q    Now, are you -- you just testified about Government's

5    Exhibit, I believe it was 13; is that right?  Can you put it

6    back up for him to see?

7    A    Yes.

8    Q    Okay.  Now, well, is there anything on it that says it's

9    a Brinks' receipt or whatever it is?

10   A    No.

11   Q    Okay.  Now, well, what about the other exhibits that you

12   referred to as being from Brinks?  Can you put those up?

13   A    Yes, it's-- they give us a deposit ticket, which is, in

14   this case, laid over the other deposit detail.

15   Q    Okay.  But my question is, there's nothing to indicate

16   Brinks on the top where it says "deposit detail," does it?

17   A    Not on the deposit detail, but it does on the deposit

18   slip there, it says "Brinks" on it.

19   Q    Okay.  Now, you indicated that you were -- were you

20   stationed at the airport or were you called to the airport?

21   A    They called us.  I was at home and I drove to the

22   airport.

23   Q    Okay.  And at that point -- at some point you seized some

24   money; is that right?

25   A    Yes.

1  Q    But you didn't count it, correct?

2  A    Correct.

3  Q    And now, you don't know of your own personal knowledge

4  who was in possession of the money; is that correct?

5  A    I do individually for Leah Robertson and Nolan -- or Leah

6  Davis and Nolan Robertson, I do.

7  Q    Well, you were familiar with this investigation with the

8  California connection; is that right?

9  A    Yes.

10 Q    And you are aware that there was allegedly a TSA agent

11 out at LAX, Los Angeles International Airport that was

12 supposedly passing marijuana through the planes; is that

13 right?

14 A    I had heard something of that effect after my involvement

15 with these seizures.

16 Q    But you don't know if that was true, right?

17 A    I don't, no.

18 Q    Now on this particular occasion you were -- did you

19 interview Leah Davis?

20 A    Yes.

21 Q    Now did you interview Nolan Robertson?

22 A    Yes.

23         MR. BUTLER:  If I may have a minute please, Your

24 Honor.

25         THE COURT:  You may.

1              (Pause.)

2    Q    Well, do you recall -- were you present -- were you

3    present when Nolan Robertson told law enforcement --

4              MR. KAUFMAN:  Objection, Your Honor.

5              THE COURT:  Sustained as to what Nolan Robertson

6    told law enforcement.

7              MR. BUTLER:  Well, I was asking if he was present

8    when he told him, he's law enforcement.

9              THE COURT:  Right.  I'll sustain any -- I'll sustain

10   a hearsay objection as to what he was told to him out of

11   court.

12   Q    (Mr. Butler) Were you ever present when Nolan Robertson

13   was interviewed?

14   A    Yes.

15   Q    Were you present when he was debriefed?

16   A    Yes.

17   Q    And a debriefing is when a person wants to cooperate with

18   law enforcement; is that right?

19   A    Let me correct that.  I wasn't present during any

20   debriefing, just the initial interview of Nolan Robertson at

21   the airport.

22   Q    I'm sorry.  Your voice faded at the end.

23   A    I was only present during the initial interview of Nolan

24   Robertson at the airport that day.

25   Q    Okay.  Well, do you know Agent MacDonald?

1   A     I do.

2   Q     Is that him seated next to the prosecutor?

3   A     Yes.

4   Q     So you were never with him when he interviewed Nolan

5   Robertson?

6   A     Later on in the investigation I was with Agent MacDonald

7   and at least one other agent.  We went to Nolan Robertson's

8   house.  But when they spoke to him I wasn't present during

9   that investigation -- or that interview.

10  Q     And where did Nolan Robertson live since you said you

11  went to his house?

12  A     Union County.

13  Q     Okay.  Now you didn't see where Nolan Robertson or Leah

14  Davis was seated on the airplane, did you?

15  A     At the time we had their boarding passes, but I don't

16  recall right now.

17  Q     Okay.  Well, you didn't go on the airplane?

18  A     No.  No.

19  Q     Okay.  You don't know who -- you don't know if Nolan

20  Robertson knew Parker Coleman or not, do you?

21  A     I don't.

22          MR. BUTLER:  If I could have a moment please, Your

23  Honor.

24          THE COURT:  You may.

25          MR. BUTLER:  Thank you.

1        (Pause.)

2        MR. BUTLER:  I have no further questions.

3        THE COURT:  Any redirect?

4        MR. KAUFMAN:  Yes, Your Honor.

5                    REDIRECT EXAMINATION

6   BY MR. KAUFMAN:

7   Q    Agent Bergs, you were asked some questions about the

8   Brinks receipts.

9        Did you personally take all four of these different

10  groups of money from the evidence room directly to Brinks?

11  A    Yes, I did.

12  Q    And were you present while the Brinks personnel did the

13  count?

14  A    Yes.

15  Q    And did you personally receive the receipts that you

16  viewed in these four exhibits?

17  A    Yes.

18        MR. KAUFMAN:  Your Honor, at this time we would move

19  to have Exhibits 8 and 13 -- 8 showing on the screen now, Your

20  Honor, and 13 admitted and published.

21        MR. BUTLER:  Objection.

22        THE COURT:  Sustained.

23  Q    (Mr. Kaufman) Now you were asked a question about the TSA

24  insider by Mr. Butler.

25        Are you aware of whether that's part of the continuing

1    investigation?

2    A    I'm not aware.  Actually there was something in the news

3    about it, I believe.

4    Q    You were also asked about debriefing with Mr. Robertson.

5         Are you aware of how many times Mr. Robertson debriefed

6    with law enforcement?

7    A    No, I have no idea.

8              MR. KAUFMAN:  Nothing further.

9              THE COURT:  You may step down and be excused.  Call

10   your next witness.

11             MR. KAUFMAN:  Thank you.  Officer Chris Newman.

12             CHRIS NEWMAN, GOVERNMENT WITNESS, SWORN

13                       DIRECT EXAMINATION

14   BY MR. KAUFMAN:

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    If you would please state your full name for the record,

18   spelling it as well.

19   A    Christopher Todd Newman.  N-E-W-M-A-N is the last name.

20   Q    And where do you work?

21   A    I work at Charlotte-Mecklenburg police department.

22   Q    What are your duties?

23   A    My duties are, I'm assigned to the Vice and Narcotics

24   Division as a K-9 handler on the Federal Task Force Division.

25   Q    And when you say Federal Task Force, what do you mean?

1   A    I'm assigned to the local -- the federal agencies that

2   are here locally, to assist them in drug investigations as

3   throughout the Charlotte region.

4   Q    Are you familiar with the term, "Organized Crime Drug

5   Enforcement Task Force?"

6   A    I am.

7   Q    Or OCDETF?

8   A    Yes.

9   Q    Is that the task force you're referencing?

10  A    Yes, I'm assigned to that task force.

11  Q    How long have you been in law enforcement?

12  A    I've been in law enforcement approximately, right at 13

13  years.

14  Q    How long have you been at CMPD?

15  A    I've been at CMPD since January '06.

16  Q    Before that where were you?

17  A    Prior to that I spent six and a half years at the

18  Cabarrus County Sheriff's Office.

19  Q    In terms of being a K-9 officer, what training was

20  involved in that?

21  A    I've gone to approximately, say about 200 hours of K-9

22  training.  When you first initially get the K-9, you go to

23  school for 80 hours.  You're introduced to the dog, and you

24  and the dog go into training together.  And then from there

25  you're deployed to the streets, either put on -- into the work

1    aspects and then you continuously receive training.

2         I've gone to a week-long school in Meridian, Mississippi

3    for K-9 training.  And I constantly train with the dog on a

4    weekly basis, sometimes daily.  And then we receive training

5    and certifications throughout the year.

6    Q    What's the name of your dog?

7    A    My dog's name is Ice.

8    Q    How long have you been working with Ice?

9    A    I've been working with Ice for about four and a half

10   years now.

11   Q    When you say that there's weekly training, can you

12   describe what that involves?

13   A    Basically, I'm -- my -- Ice is a narcotics K-9 detection.

14   I'm assigned to narcotics.  Then I'm issued to meet the

15   training dog.  And myself and other officers will take the

16   narcotics and hide them.  In training scenarios we'll use

17   houses, vehicles, any areas that -- buildings, businesses that

18   allow us, we'll hide the narcotics, one officer will hide and

19   then we'll run our dog through and let them find the

20   narcotics.

21   Q    You also have to go -- in addition to the weekly

22   training, do you have certification courses that you have to

23   go through?

24   A    Yes.  We have certifications about, approximately one

25   time a year.  There's several -- several K-9 organizations

1   that come and certify your dog.  And what they do is they'll

2   have the -- sometimes they're in High Point, Raleigh,

3   Greensboro, sometimes Charlotte.

4         What we'll do is, we'll go -- they'll have the dogs set

5   up -- the narcotics will be set up and we'll come into the

6   environment and we'll be -- we'll find the narcotics.  How

7   ever we score will be certified by that certification body.

8   Q    During those certifications, are you aware of where the

9   narcotics are being hidden?

10  A    No, it's all blind.  We have no idea where the narcotics

11  are at.  We're basically -- the way it works, we'll come in

12  and they'll give us three rooms.  And they'll say one of the

13  rooms is loaded.  "Loaded" meaning that there's narcotics

14  hidden in there.  And your dog will be presented through

15  three -- once you receive a positive alert or indication from

16  your dog, you'll tell the instructor, I believe it's in this

17  area or this bookshelf, whatever it may be that your dog's

18  alerting to.  And then he'll say, "good job".

19            MR. BUTLER:  Objection.

20            THE COURT:  Overruled.

21            MR. BUTLER:  To the hearsay.

22            THE COURT:  Overruled.

23            THE WITNESS:  And then they'll be -- they'll certify

24  you by you finding the narcotics.

25  Q    (Mr. Kaufman) Have you or Ice ever failed to be certified

1  in any course you've ever gone to?

2  A    No, we've never failed.

3  Q    How accurate is Ice at detecting the presence of

4  narcotics?

5  A    She has a 99 percent accuracy.

6  Q    Now, if we could take a step back.  Why does law

7  enforcement use a dog for narcotics detection?

8  A    K-9s or the dogs, per se, have a much better sense of

9  smell than humans.  Their olfactory sensory are much more

10 advanced than ours.  They can smell probably about 100 times

11 more than we can.

12           MR. BUTLER:  Object.  Move to strike to "probably".

13           THE COURT:  Move to strike, pardon me?

14           MR. BUTLER:  "Probably."  He said "probably."

15           THE COURT:  Overruled.

16           THE WITNESS:  K-9s smell with their -- not only with

17 their nose, but also their mouth.  And K-9s are used in

18 numerous things for searching for people, searching for

19 narcotics, and searching for explosives.  And they're very

20 helpful in that sense because they can cover a large area in a

21 short amount of time.

22 Q    (Mr. Kaufman) Now when you're training with Ice, what kind

23 of materials do you use?

24 A    When I train with Ice I use the narcotics, but I also use

25 cloth.  Because I put, like, cloth, or I use patches of cloth.

1    And what happens is, I keep that cloth in the narcotics box

2    with, say, the marijuana or the cocaine, and that odor

3    transfers over.  And then we hide those things sometimes to

4    have the dog learn how to find the odor.  They're not finding

5    the product, they're finding the odor.  That's what they're

6    smelling for.  And so they find the odor.

7         Once they find the odor, that's when they are taught

8    after repetition in their initial stages to -- K-9s can be

9    taught three different ways, basically.  They can be a passive

10   or aggressive alert.  Ice is a passive alert dog.  Meaning she

11   sits down next to and usually stares at where she smells the

12   odors at that she's trained to smell.

13   Q    Does she ever scratch at the area?

14   A    Sometimes.  Because aggressive means that they scratch at

15   it.  So what you do is, you train the dog initially to be

16   aggressive, and then you train them to be passive.  So it's an

17   extra step of training.

18        And if she gets overexcited, it's because she knows she

19   gets to go play afterwards as a reward.  She'll sometimes

20   scratch at it a little bit depending on how worked up she is.

21   Q    You mentioned that you, in addition to drugs, you

22   actually use cloth.  Do you use any other materials?

23   A    I use -- I have some U.S. currency that I use, that I

24   keep in some of the narcotics boxes as well.  It's -- I got it

25   from the Federal Reserve down the road here, and I keep it in

1  there to train the dog on every aspect of the job that I

2  incur.

3  Q    Why money?

4  A    Well, money -- because in the narcotics business, money

5  is the driving factor.  And so there's a lot of cases where

6  money come -- becomes involved in narcotics cases.  And so I

7  train the dog with everything that I might be coming in

8  contact with.

9  Q    Is there anything in particular about the material used

10 to make currency?

11 A    Well, U.S. currency is made basically from cotton fibers.

12 That's why it doesn't tear apart when you wash it in the

13 washing machine.  It's made of cotton fibers.  And so that's

14 why it stays together.

15      Well, cotton fibers are like clothing fibers, the odor

16 sticks to that.  And so I use that as well, because it's part

17 of the job that I incur.  So I need to train the dog in those

18 aspects.

19 Q    I'd like to turn your attention to November 2nd, 2010.

20 Were you called to the airport to assist in a drug related

21 investigation?

22 A    I was.  I was called to -- in reference a money seizure

23 at the airport.

24 Q    What happened?

25 A    I was requested by Agent Bergs to come out to the airport

1    in reference to a money seizure.  Once I got there they

2    requested that they do a lineup on the money.  Basically

3    lining the money up in five separate containers.  And one --

4    four of the containers being negatives, meaning the suspected

5    narcotics money not being involved in the one container.  And

6    then run the dog on it blindly to see if there's an alert.

7    Q    When you say "blindly," were you aware of which box

8    contained anything?

9    A    No, that's what I mean when I say blind, I'm not aware of

10   anything.  I instruct them to set up the boxes, and then we

11   space them out along -- in a pretty good distance, probably 5,

12   6-feet away from each other.  Then I present the dog to those

13   boxes and see what she does.

14   Q    How many times did you do such a blind review of boxes

15   that day?

16   A    That day I did two.

17   Q    And did Ice alert to any of the boxes?

18   A    Ice alerted to a box and then I was told at that time

19   that was the box.

20              MR. BUTLER:  Objection.

21              THE COURT:  Overruled.

22              THE WITNESS:  I was told at that time that's the box

23   that contained the currency.  Those are for my

24   documentation --

25              MR. BUTLER:  Objection.  Move to strike.

1          THE COURT:  Overruled.

2    Q    (Mr. Kaufman) And you said that happened with one of the

3    sets of five boxes.  Can you -- what happened with the other

4    set of five boxes?

5    A    The same thing on the second set of money.  I guess it

6    was two different packages of money that were detained that

7    day.  And I explained to the agents to set it up, and then it

8    was done again.

9    Q    Later on that same day were you called to assist in an

10   investigation that Agent MacDonald and Detective Beaver were

11   conducting?

12   A    I was.

13   Q    Tell us what happened.

14   A    I was requested to conduct a traffic stop on a Chevy

15   Tahoe.  I actually just happened to be right down the road

16   from the location that they were at.

17   Q    Where were you at the time?

18   A    I was at the parking lot for the DEA office on Fairview

19   Road.  And as I was in the office, I got -- received a phone

20   call requesting my assistance to conduct a traffic stop.  I

21   asked where they were at.  They said we're on Fairview going

22   northbound passing South Park Mall.  I was actually, I said,

23   I'm right here.

24        As I pulled out onto Fairview Road, the vehicle had drove

25   by me.  And at that time I seen the vehicle and I think one or

1    two other undercover cars that I know from working with law

2    enforcement.

3    Q    Like to show you what's been marked as 6a for

4    identification purposes.  Do you recognize it?

5    A    Yes.  This is the gray in color Chevy Tahoe.

6              MR. KAUFMAN:  Move to admit and publish, Your Honor.

7              THE COURT:  Any objection?

8              MR. BUTLER:  No, sir, Your Honor.

9              THE COURT:  Let it be admitted.  You may publish.

10             (Government's Exhibit No. 6a was received into

11   evidence and published.)

12   Q    (Mr. Kaufman) What happened during the traffic stop?

13   A    I was trying to catch up to the vehicle.  The vehicle was

14   in the number one lane.

15        To explain the lanes, number one being the far left, two

16   being in the middle, three being -- as I was trying to catch

17   up to it, we was going down Fairview.  Just as we came up to,

18   I believe it's Connelly Road, the vehicle had no traffic was

19   ahead of it, and immediately went from -- in about a 50-yard

20   time -- area distance, it went from lane number one, shot all

21   the way across three lanes of travel and turned into the

22   apartment complex just before you get to that intersection.

23        Actually if you look on the picture, you can see the

24   roadway back behind there.  It turned immediately, whipped

25   into there and then turned into this parking spot.

1    Q    What happened next?

2    A    Once it turned into this parking spot, I positioned my

3    vehicle behind it.  I had activated my lights as I turned into

4    this, and I approached the driver on the driver side of the

5    vehicle.

6    Q    Who was the driver?

7    A    The driver was a Jerry Davis.  I started speaking with

8    him.  I told him that I was conducting an investigation

9    reference him shooting across those three lanes of travel.

10   That was a traffic violation of unsafe movement that I seen

11   him conduct.

12        Talking to him, as I was standing there talking to him, I

13   smelled the odor of fresh marijuana coming from the vehicle.

14   So once I did that, I got his ID and I went back and got into

15   my car and notified the detectives that were around me and

16   called for a backup car.

17   Q    What happened next?

18   A    After that I re-approached Mr. Davis and asked him to

19   exit the vehicle.  Mr. Davis is a very large man.  Asked him

20   to exit the vehicle.  Once he exited the vehicle, I said I

21   smell marijuana in your vehicle.  You know, I'm going to be

22   cooperative with you, just be cooperative with me.  I don't

23   want to have to tussle or fight with you.  He was very

24   cooperative.  I put him in handcuffs.  Had to put him in

25   actually two pairs of handcuffs because his shoulders are so

1   broad.  And then once I got him in handcuffs, I said I smell

2   marijuana.  That's when he told me there was some --

3           MR. BUTLER:  Objection.

4           THE COURT:  Sustained.

5   Q   (Mr. Kaufman) Like to show you what's been marked as

6   Government's 22g for identification.  Do you recognize that?

7   A    That's Mr. Davis.

8           MR. KAUFMAN:  Your Honor, seek to admit and publish.

9           THE COURT:  Any objection?

10          MR. BUTLER:  No, Your Honor.

11          THE COURT:  Let it be admitted; may publish.

12          (Government's Exhibit No. 22g was received into

13  evidence and published.)

14  Q   (Mr. Kaufman) So what did you find?

15  A    Search of the vehicle I found a suitcase in the back

16  cargo area that contained approximately 30 pounds of

17  marijuana.

18  Q    I would like to show you 6b, 6c, 6d, and 6e.  Do you

19  recognize those photographs?

20  A    Yes.  That is in the -- those photographs, that's the

21  black suitcase that I found in the back cargo area.  Inside

22  those is the marijuana that was inside.

23  Q    So you recognize those.  Are they fair and accurate

24  representations of what you saw after stopping Jerry Davis'

25  car?

1    A    Yes, it is.

2    Q    Or his Tahoe?

3    A    Yes.

4              MR. KAUFMAN:  Your Honor, we seek to admit and

5    publish 6b through e.

6              THE COURT:  Any objection?

7              MR. BUTLER:  Yes, Your Honor.

8              THE COURT:  Basis.

9              MR. BUTLER:  Insufficient foundation at this point.

10             THE COURT:  Overruled.  Let them be admitted.  You

11   may publish.

12             (Government's Exhibits No. 6b, 6c, 6d and 6e were

13   received into evidence and published.)

14   Q   (Mr. Butler) Six-b is what?

15   A    Six-b, this the suitcase.

16   Q    Six-c.

17   A    This is the suitcase that's opened.  There's the bags of

18   marijuana down inside.

19   Q    Six-d.

20   A    This is the suitcase after the marijuana's been removed,

21   and these are some dryer sheets that's commonly placed with

22   marijuana to mask the odor from the dog.

23   Q    And six-e.

24   A    And this is the marijuana laying on the -- this is the

25   table at the Law Enforcement Center just outside the property

1    control where we turn evidence in.

2         MR. KAUFMAN:  Your Honor, at this time I seek to

3    read a stipulation to the jury.

4         THE COURT:  Very well.

5         MR. KAUFMAN:  Thank you, Your Honor.

6         Now comes the United States of America, by and

7    through the United States Attorney for the Western District of

8    North Carolina, as represented by Assistant United States

9    Attorney Steven R, Kaufman and Norman Butler, Esquire, counsel

10   for Defendant Parker Coleman, and advise the Court that they

11   have entered into a stipulation that the green substance

12   seized in this case that was suspected to be marijuana was

13   tested by an expert forensic chemist and determined to be in

14   fact marijuana.  In making this stipulation, the defendant is

15   not admitting that he conspired to distribute or to possess

16   with intent to distribute marijuana or any controlled

17   substance.  In other words, the defendant merely agrees that

18   the laboratory tests prove that the marijuana seized is

19   marijuana.  The defendant specifically denies the other

20   elements of the drug charges in this case.

21        And will Your Honor be instructing the jury at a

22   later time about stipulations?

23        THE COURT:  I will.

24        MR. KAUFMAN:  Thank you, Your Honor.

25        And Your Honor, consistent with the stipulation that

1   the marijuana itself would be admissible, we have here

2   what's -- the bag containing all of this material is

3   Exhibit 5.  And we would seek to have this admitted and

4   published as well, at this time, Your Honor.

5            THE COURT:  Any objection?

6            MR. BUTLER:  No, Your Honor.

7            THE COURT:  Let it be admitted.  You may publish.

8            MR. KAUFMAN:  Thank you, Your Honor.

9            (Government's Exhibit No. 5 was received into

10  evidence and published.)

11           MR. KAUFMAN:  I'll just place the material on the

12  edge of the desk here.

13           THE COURT:  Members of the Jury, you will not be

14  taking the marijuana back to the deliberation room.

15           MR. KAUFMAN:  Your Honor, may I ask Officer Newman

16  to come down from the witness stand to observe the material

17  that's on counsel table.

18           THE COURT:  If necessary, I mean, it's pretty

19  observable from the stand.  If there's a reason to come down,

20  you certainly can ask him to do that.

21           MR. KAUFMAN:  Let me ask you, if I may approach,

22  Your Honor?

23           THE COURT:  You may.

24  Q    From the exhibit, the exhibit that's just been admitted,

25  do you recognize these materials?

1   A    I do.  This is the marijuana that was in the suitcase.

2   Q    And do you notice any differences between them?

3   A    The difference is, this is a higher grade marijuana here.

4   It's -- if you look at the bags, it's a more of a bud form.

5   This is commonly --

6            MR. BUTLER:  I would object at this point.  I mean,

7   he hadn't been qualified as an expert in marijuana.

8            THE COURT:  You can testify to any visual observance

9   that you made, but beyond that I'll sustain the objection.

10           THE WITNESS:  Yes, sir.

11           This marijuana is what I'm trained in, is to be more

12  potent.

13           MR. BUTLER:  Objection.

14           THE COURT:  I'll sustain the objection.

15           You can look at the marijuana and describe any

16  physical differences.

17           THE WITNESS:  Yes, sir.

18           MR. KAUFMAN:  I believe you stated in the smaller

19  package you just looked at, that's in bud format?

20           MR. BUTLER:  Well, objection to the -- by the

21  prosecutor.

22           THE COURT:  Pardon me?

23           MR. BUTLER:  Well, I mean, I was objecting, Your

24  Honor, because the prosecutor was testifying, at this point.

25           THE COURT:  I think he was testifying as to the --

1   well, I think he was asking a question based upon previous

2   testimony, but I'll sustain as to form.

3           Go ahead and ask another question.

4   Q   (Mr. Kaufman) With regard to the other substance on here,

5   how does it compare, in terms of its appearance, to you?

6   A   This is harder compressed in brick form marijuana.  This

7   is bud type, more loosely packaged marijuana.

8   Q   Let me ask you, how many marijuana-related investigations

9   and arrests have you taken part in?

10  A   A couple hundred.

11  Q   That's dealing solely with marijuana?

12  A   Yes, solely with marijuana.  Hundreds.  I don't keep the

13  exact count, I'm sorry.

14  Q   And are you familiar with the different types of

15  marijuana?  Like, have you seen what you just described as bud

16  like marijuana?

17  A   Yes, I have.  I've seen that numerous times.

18  Q   Are you also familiar with, based on your training and

19  experience and law enforcement as a narcotics detention

20  officer, the compressed style?

21  A   Yes, I have, numerous times.

22  Q   And have you developed a familiarity with the differences

23  between types of marijuana?

24  A   Yes, I have.

25  Q   So with regard to the brick type format.  What is your --

1  based on your training, how does that differ from the bud like

2  format?

3           MR. BUTLER:  Objection.

4           THE COURT:  Sustained.

5  Q    Now did you also conduct another traffic stop on November

6  2nd, 2010?

7  A    Yes, I did.

8  Q    And can you describe what happened?

9  A    Things were kind of busy at that time.  I was requested

10 to stop a vehicle right there in the same area of Fairview and

11 Barclay Downs Road.

12 Q    What happened?  Did you in fact stop the vehicle?

13 A    I did.  It was -- the vehicle was occupied by -- driven

14 by a black female.  It was occupied in the passenger seat,

15 there was a black male.  And then in the back seat there was a

16 black male.  It was occupied three times.

17      The vehicle actually pulled off the roadway down into

18 Barclay Downs into the parking lot of Bank of America branch

19 office that's right there at the corner of Fairview Road and

20 Barclay Downs.

21 Q    Do you recall approximately how long it was between the

22 stop of Jerry Davis and the stop of this other vehicle of

23 three people?

24 A    Approximately maybe two hours.  I don't know the exact

25 time, but about two hours.  It was that same day, but it was

1  after the traffic stop of Jerry Davis.

2  Q    While you were stopping the vehicle with the three

3  people, the second stop, what were you able to observe, if

4  anything, happen inside the vehicle?

5  A    I was dealing with the black female.  I actually asked

6  her to exit the vehicle.  She was standing in front of my

7  vehicle.  I was speaking with her.  At the time I knew there

8  was some undercover detectives that were around me.  And they

9  observed and related to me over the radio --

10          MR. BUTLER:  Objection.

11          THE COURT:  Overruled.

12          THE WITNESS:  -- that the front passenger was doing

13  something down in the center --

14          MR. BUTLER:  Objection to furtive conduct.  Hearsay.

15          MR. KAUFMAN:  It goes to what the --

16          THE COURT:  I'll overrule it.  Present sense

17  impression exception.

18          You may testify.

19          THE WITNESS:  Was reaching down into the floorboard

20  area of the car.  Didn't know -- it's a traffic stop, we're

21  doing a drug investigation.  So at the time felt it necessary

22  to detain these subjects and take them into custody because

23  didn't know if they were going for a gun or something.

24          So at that time I went over to the passenger side

25  and immediately took the driver at the same time the

1    undercover detectives exited their vehicles and approached as

2    well, and I took both the passengers into custody at that

3    time.

4    Q   (Mr. Kaufman) What if anything did you find inside the

5    vehicle?

6    A    While observing inside the vehicle, what it appeared, the

7    center console -- not the center console, but the glove box is

8    to the right of the center console, there was a -- it was

9    trying to be shut back and money was bulging out of it.  It

10   was like money was trying to be shoved down in there and it

11   was closed.  That's what he was -- we come to find that he was

12   messing with trying to get that glove box to close back.

13   Q    Were you able to see during the traffic stop and what

14   happened thereafter?  Were you able to see the money that was

15   in the glove box?

16   A    Yes, I mean --

17   Q    Could you tell how much money there was?

18   A    I don't know exactly how much it was.  It was more than

19   would fit in that glove box.  It was a pretty good bit.

20   Q    All right.  I'd like to show you what's been marked as

21   Government's Exhibit 7a, 7b, 7c.

22            MR. BUTLER:  I can't see anything.

23            MR. KAUFMAN:  Sorry.  Let me go back.

24   Q    Let me ask you, do you recall what kind of vehicle it

25   was?

1  A     It was a gray in color, two-door sports car.

2  Q     Showing you what's been marked as 7d for identification.

3  I'll go back to 7a, 7b, and 7c.  Do you recognize all four

4  photographs?

5  A     Yes.  These are the people that were there that day at

6  the traffic stop.

7  Q     Are they a fair and accurate representation of what you

8  saw that day?

9  A     Yes, they are.

10         MR. KAUFMAN:  At this time we seek to admit and

11  publish 7a through d.

12         THE COURT:  Any objection?

13         MR. BUTLER:  No objection.

14         THE COURT:  Let them be admitted.  You may publish.

15         MR. KAUFMAN:  Thank you, Your Honor.

16         (Government's Exhibits No. 7a, 7b, 7c & 7d were

17  received into evidence.)

18  Q     Starting with 7d.

19  A     This is the traffic stop -- the vehicle that I conducted

20  traffic stop on after it pulled into the PVA.  That's actually

21  me behind the vehicle and that's my patrol car to the right.

22  Q     You mentioned PVA, what does that mean?

23  A     I'm sorry.  That's the parking lot.  Public vehicle area.

24  That's the parking lot of Bank of America there at Barclay

25  Downs.

1    Q    All right.  And 7a, who is that?

2    A    This is the female that was driving the vehicle.

3    Q    And is that you on the right side of the car?

4    A    That's me there to the right, yes.

5    Q    And 7b.

6    A    This is one of the passengers.

7    Q    And 7c.

8    A    This was the other passenger.

9    Q    And just off the top of your head, do you recall the

10   names of any of those three?

11   A    One's name is Shaunda and one was named Mr. Harris, and I

12   believe a McAdoo.  I don't remember the names right off hand.

13   I'm sorry.

14   Q    About how many traffic stops have you done since November

15   2nd, 2010?

16   A    I do many, many traffic stops.  I -- probably a couple

17   hundred since then, maybe even more.  I'm not really sure.

18   Q    All right.  Did you at any point take possession of the

19   money that was in the vehicle?

20   A    No.  It was removed and turned over to the detectives

21   that were there at the scene.

22   Q    All right.  Just off the top of your head, do you

23   remember who received the money?

24   A    Agent MacDonald.  I remember he was at the scene.

25   Q    And just to confirm, do you recognize what's been

1    admitted as Exhibit 5, the actual marijuana as the marijuana

2    that you had seized from Jerry Davis' vehicle?

3    A    Yes, that was in the suitcase, yes.

4              MR. KAUFMAN:  No further questions, Your Honor.

5              THE COURT:  Any cross?

6              MR. BUTLER:  Yes, Your Honor.  Thank you.

7                         CROSS EXAMINATION

8    BY MR. BUTLER:

9    Q    Good afternoon, Officer Newman.

10   A    Good afternoon, Mr. Butler.

11   Q    Officer Newman, you worked with this K-9 Ice; is that

12   right?

13   A    Yes, sir.

14   Q    And you indicated that the K-9 was trained, among other

15   things, to detect controlled substances such as marijuana; is

16   that right?

17   A    Yes, sir.

18   Q    And now the dog is not perfect, is it?

19   A    Nobody's perfect.

20   Q    Well, we're talking about the animal, not the person.

21   A    The animal.  Nobody is perfect, no, sir.  Nothing's

22   perfect.

23   Q    Okay.  So from time to time the dog has some -- Ice has

24   some false alerts; isn't that correct?

25   A    Not in any controlled environment and certification.

1    Q    Okay.  Well when -- okay.  Well, I thought you said the

2    dog was 99 percent accurate?  Where is that 1 percent?

3    A    In that -- the 1 percent that you're talking about in

4    certifications one day, me and the dog will act as a team.

5    And when I took her into the room to present the room to her,

6    it is my job to present everything to that dog.  And it was

7    my -- and that day I didn't present everything to her.

8    Q    Okay.

9    A    And we missed it.

10   Q    Okay.  Well, so the dog then depends on you, is that what

11   you're saying?

12   A    We work together as a team.

13   Q    Okay.  So you basically help the dog do what it does; is

14   that right?

15   A    The dog is a tool.  And I make sure that I use that tool

16   in the way that I'm supposed to, presenting everything to her.

17   Q    Okay.  Now, on the occasion -- strike that.

18        I thought you indicated initially that certain dogs are

19   passive, correct?

20   A    Yes, sir.

21   Q    And if they're not passive then they're what?

22   A    They can be trained two different ways in my training,

23   passive or aggressive.

24   Q    Okay.  And passive is when they just go and sit down; is

25   that correct?

1    A     Passive is when they get into the odor of the narcotics,

2    they work it, and once they come to the resolution in their

3    mind that they're looking for what they've been trained to,

4    they will sit passively next to the narcotics.

5    Q     Okay.  So ultimately a passive K-9 sits down?

6    A     Yes, sir.

7    Q     Okay.  And an aggressive K-9 scratches or barks or do

8    those type of things; is that right?

9    A     Yes, sir.  That's right.

10   Q     Now on the occasion at the airport --

11   A     Yes, sir.

12   Q     -- when I believe you indicated that there was a lineup

13   of boxes; is that right?

14   A     Yes, sir.

15   Q     And do you recall how many boxes there were?

16   A     I believe there's five boxes that day, cause I try and

17   keep everything the same.  Sometimes finding boxes at the

18   airport -- that day there was five boxes.

19   Q     Okay.  And is it your testimony that Ice alerted

20   passively or aggressively?

21   A     Passively.

22   Q     Okay.  So if Officer Bergs said it was -- they started

23   scratching and acting aggressively, that's not correct?

24   A     What will happen is, in their training is, they're

25   trained aggressively, as I stated earlier, and then they're

1  switched to passive.  The dog will sniff, smell, scratch at

2  the box, do something.  Then once it comes to resolution, it

3  sits passively.  These dogs are very high strung dogs.  That

4  get very excited, and then they sit.  That's what they're

5  indication is, to sit.  They don't keep digging or do any --

6  tear up stuff.  That's why we go through the extra effort to

7  train the dog to be passive, so it doesn't tear up stuff like

8  a car or something like that.

9  Q    Okay.  So, sir, my question is simple.  Now --

10        MR. KAUFMAN:  Objection.

11        THE COURT:  Overruled.

12  Q    Is Ice passive or aggressive?

13  A    She's a passive dog.

14  Q    Okay.  Now on the occasion at the airport, did you, as a

15  result of this passive alert, discovered any controlled

16  substances?

17  A    No I did not.  I wasn't the investigator.

18  Q    As a result of the alert by Ice, I mean, did you actually

19  see what was the content of the box?

20  A    Yes.  I saw the money afterwards.

21  Q    Now on the occasion later on that day when you stopped

22  Mr. Davis, you had a mobile video camera in your police car,

23  did you not?

24  A    Yes, sir I did.

25  Q    And it was recorded; is that right?

1    A    At that time that was November, we got a new -- I had an

2    old VHS system that the CMPD was currently swapping out.  And

3    I hadn't received a new video camera system, so mine was

4    inoperable.  I received a new digital video camera system that

5    following month.  At that time -- that day there was no camera

6    recording.

7    Q    So are you saying nobody recorded it; is that right?

8    A    As far as I -- I don't know what somebody else did with

9    the recordings.  But in my vehicle it wasn't being recorded.

10   Q    Okay.  Okay.  So you've never seen the recording of that

11   stop?

12   A    Not, no.  Not as I --

13   Q    Now, but do you recall -- didn't you sit Mr. Davis on the

14   ground?

15   A    Yes, I did sit him on the ground.

16   Q    All right.  And some other officers arrived?

17   A    Yes.

18   Q    -- at the location?

19   A    There was one other backup officer.  I think he parked

20   behind me.

21   Q    And at some point Agent Bryant arrived.  Do you remember

22   him arriving?

23   A    Yes, sir, I do.

24   Q    Okay.  Now in regards to the marijuana that was displayed

25   here in the courtroom this afternoon, you have no personal

1    knowledge as to where it came from, correct?

2    A    No, sir.  No, sir.  I know it came from that vehicle.

3    Q    Okay.  And where exactly was it in the vehicle?

4    A    It was in the back cargo area.

5    Q    And as soon as Mr. Davis rolled his window down, was --

6    was it -- when you were approached, was it up or down?

7    A    I think it was down.  He was rolling it down as I walked

8    up to the vehicle.

9    Q    And you detected the odor of marijuana; is that right?

10   A    Yes, fresh marijuana.

11   Q    Okay.  So it was fresh, is that what you're saying?

12   A    Yes, fresh.

13   Q    Okay.  And when you say fresh, can you tell the ladies

14   and gentlemen of the jury what you mean by that?

15   A    It wasn't burnt marijuana like someone had been smoking.

16   It was fresh.  The bud like marijuana has a -- is a very, very

17   strong odor to it; very, very fresh strong odor.  And so

18   that's the odor I was smelling.  There was 30 pounds of it,

19   it's hard to hide that odor.  But the bud marijuana is usually

20   what's the very strong odor marijuana.

21   Q    Now, well, did you -- did you search Mr. Davis?

22   A    Yes, sir.  I patted him down, searched him, handcuffed

23   him and then sat him down.

24   Q    Okay.  Did you seize anything other than the marijuana?

25   A    I believe some -- the detectives -- Mr. Bryant came up

1    there to seize some of his phones and stuff, some stuff he had

2    on him.

3    Q    Did you -- were you present when law enforcement

4    officials went to Mr. Davis' house?

5    A    No, I was not.

6    Q    And so you don't know whether they seized more marijuana?

7    A    I know I went to the residence later that evening.

8    Q    Yes, sir.

9    A    But I didn't go into the house or anything, and I knew

10   that there was some other marijuana located as well.

11   Q    Well, did you know it was about 40 more pounds of

12   marijuana in his house?

13   A    I didn't know the exact number, but I went to that

14   location and then we all turned it in together.  So I knew

15   there was more found that night in the investigation.  But I

16   wasn't involved, actively, in that part of the investigation.

17   Q    Okay.  Well, now, did you label the marijuana in any

18   particular manner to be certain that this is the same

19   marijuana that you took out of that -- was it a Chevy Tahoe?

20   A    Well, it was photographed.  That's why we photograph it

21   so I can attest to what I saw that night.

22   Q    Okay.  But so -- so the photograph should look just like

23   this; is that right?

24   A    Yes.

25   Q    And the containers are in the same condition as when you

1   saw it on that occasion; is that right?

2   A    Yes.  The suitcase and everything that was in the

3   photograph.  That's why we photograph it.

4   Q    Okay.  It's not in the suitcase now, is it?

5   A    No, it wasn't.  It was laid out.

6   Q    Now you were subsequently called out to this public

7   vehicle area at the bank, I think you said, at Fairview and

8   where?

9   A    Barclay Downs.

10  Q    Okay.

11  A    Fairview Road at South Park Mall area.

12  Q    All right.  And of course that was the stop of the three

13  individuals of the black females and two black males that were

14  depicted on the government exhibits; is that right?

15  A    Yes, sir, that's correct.

16  Q    And was it your video camera that recorded that situation

17  or somebody else?

18  A    I didn't.

19  Q    You didn't?

20  A    No.

21  Q    Okay.  And but you all -- you were -- you got her out of

22  the car and you talked to her about her driver's license; is

23  that right?

24  A    Actually, I -- I actually got her out of the car, yes,

25  and I was talking to her.  And while I was talking to her is

1    when the other detectives, officers on the scene observed the

2    front passenger do --

3    Q    Okay.  And I can appreciate that.  But I'm just concerned

4    about what you did, okay?

5    A    Okay.

6    Q    Now at some point you get out of your vehicle; is that

7    right?

8    A    Yes, sir.  I always do when I do a traffic stop.

9    Q    Now, were you in a -- just a regular patrol car, or were

10   you in the type of -- SUV type of K-9 unit?

11   A    In the picture you'll see my patrol car.  It was a

12   regular typical Ford Crown Victoria marked with CMPD stripes,

13   the same as all the other cars are.

14   Q    Okay.  Now, you -- you had conversation with all three

15   individuals in that vehicle; is that right?

16   A    Yes, sir, I believe so.

17   Q    And you were concerned, obviously, for officer safety?

18   A    Yes, when he was reaching into the floorboard area,

19   center of him down into the floorboard area.

20   Q    And at some point you were given a consent to search the

21   vehicle, or at least law enforcement were; is that correct?

22   A    I -- well, I developed PC at the time for officer safety

23   purposes.

24   Q    Okay.

25   A    Once it was relayed over the radio and about the same

1  time I seen detectives getting out of their vehicles

2  approaching, I went over to the passenger side and -- to see

3  what he was doing, and that's when we took him into custody.

4  Q    So when did you see this money that you said wouldn't fit

5  in the glove box?

6  A    After he was taken out of the vehicle, and I investigated

7  what he was doing while I was on the traffic stop --

8  Q    Okay.

9  A    -- for officer safety purposes, hiding a gun, whatever.

10 That's when the money was found.  I searched the immediate

11 area around that front passenger.

12 Q    And of course now you -- you didn't see my client

13 Mr. Parker Coleman out there, did you?

14 A    No, sir.

15 Q    And one of those individuals claimed the money, did they

16 not?

17 A    I do not recall.

18 Q    You don't recall that?

19 A    I'm not the investigating officer.

20 Q    I understand who you are.  I do.  Okay.  But you don't

21 recall that?

22 A    I didn't ask that question.

23 Q    Okay.  And wouldn't it be fair to say that the

24 detectives, as you called them, they were not dressed

25 necessarily in a blue police uniform like you are?

1   A    No, they wasn't.  Some of them had their tach gear on it,

2   like police vests over top.

3   Q    And they had what appeared to be, what I'm going to

4   describe and correct me if I'm wrong, looked like machine

5   guns, didn't it?

6   A    No, they didn't have machine guns.

7   Q    What kind of guns did they have?  They had long guns?

8   A    They had their guns, yes.  I don't know who was carrying

9   what.

10  Q    Okay.

11  A    I do know that when I work with them, they do have their

12  weapons.

13  Q    Right.

14  A    I can't attest who had what.

15  Q    You can't recall?

16  A    I can't attest -- it's not that I don't recall, I just

17  don't know what they carry, they're individuals.  I know what

18  I carry.

19  Q    Well, okay --

20  A    So, I mean, you're asking me to recall something that I

21  don't know.

22  Q    Let me ask you another question.

23  A    Okay.

24  Q    They had their weapons drawn, whether they were short

25  weapons or .40 caliber like you had; is that right?

1  A    Yes, sir.  They had their weapons out.

2  Q    Do you recall how many of them were there?

3  A    I have no idea.  I mean, there's detectives around me.  I

4  knew there was probably at least four or five.

5  Q    Do you remember if Agent Todd Elmore was there?

6  A    Yes, I believe he was there, yes.

7  Q    Okay.  Now, and other than this money, did you find

8  anything else?

9  A    No, sir.

10  Q    Were you able to determine whose vehicle it was, if you

11  recall?

12  A    I believe the vehicle came back to the female that was

13  driving.  I'm not exactly sure, but I don't really recall

14  exactly.

15  Q    Well, now typically in a traffic stop you run the tag,

16  don't you?

17  A    Yes, sir.

18  Q    That determines who the vehicle is registered to?

19  A    Exactly.  And I did that day, but I don't remember who it

20  came back to.

21  Q    Now did you have an occasion on the second of November of

22  2010 to go to 5425 Closeburn, Apartment 115?

23  A    Yes.  That's the apartment the search warrant was done.

24  Yes, sir.  I went there.

25  Q    And you went there too?

1   A     Yes, sir.

2   Q     You take your dog with you?

3   A     Yes, sir.

4   Q     And did you walk down the hallway?

5   A     Yes, sir I did.

6   Q     Anything unusual about -- as you walk down the hallway?

7   A     No just a typical hallway.  I think it had red carpet.

8   Q     Had red carpet?

9   A     Yeah, I believe so.  I remember it was very nice, a very

10  nice apartment.

11  Q     Okay.  Now during this search warrant of the Closeburn

12  unit, do you recall where any marijuana was seized?

13  A     I don't recall.  I do recall there was an odor of

14  marijuana with the residence.

15  Q     In the residence?

16        Do you recall which individual claimed the money that was

17  in the glove box?

18  A     No, I do not.

19  Q     Okay.

20        MR. BUTLER:  If I could have a moment, please, Your

21  Honor?

22        (Pause.)

23        MR. BUTLER:  Thank you very much for answering my

24  questions.

25        THE COURT:  Any redirect?

1    MR. KAUFMAN:  Yes, Your Honor.

2                 REDIRECT EXAMINATION

3    BY MR. KAUFMAN:

4    Q    Officer Newman, you used the term that you had

5    established PC.

6         For the jury, can you explain what the acronym PC stands

7    for and what that means?

8    A    It's probable cause.  In a vehicle, there's like a

9    expectation of privacy under the Fourth Amendment, in my

10   training.

11        When somebody's doing something, other than just sitting

12   there when I'm on a traffic stop -- traffic stops are

13   inherently dangerous and they have been proven so.  The

14   numerous traffic stops have been done by numerous officers

15   over numerous years, since vehicles have been around.

16        When it was observed that something was going on, if you

17   have reason to believe that they might be trying to do

18   something.  So that's the reason the determination was made to

19   go and take them into custody.  Not arrest them, but detain

20   them for safety purposes.

21        I'm there by myself, as far as they know.  Other officers

22   there were backing them up, but they weren't seeing the

23   officers.  They weren't a visible presence.  So once they're

24   taken out of the vehicle, I did a search of the immediate area

25   to where they was at.

1         THE COURT:  All right.  Listen carefully.  The

2 question was, "For the jury, can you explain what the acronym

3 PC, what does that mean?"

4         This has been a pretty long answer, so ask your next

5 question.

6         MR. KAUFMAN:  Yes, Your Honor.  We can move on.

7 Q    You were asked about the -- to whom the Lexus was

8 registered.  Is there anything that would be able to refresh

9 your recollection?

10 A    The printouts that, you know, from the DMV.

11 Q    Is there anything else in addition to that?

12 A    Any -- anything that I ran that day through the computer

13 system, if it was documented.

14         MR. KAUFMAN:  Your Honor, I'm showing a report

15 that's been provided to the defense previously in discovery,

16 and I'm marking --

17         MR. BUTLER:  Thank you.

18         THE COURT:  Doing it for refreshed recollection

19 purposes?

20         MR. KAUFMAN:  That's correct, Your Honor.

21         THE COURT:  You may do that.

22         MR. KAUFMAN:  Thank you, Your Honor.

23         THE COURT:  Go ahead and mark it, you know, refer to

24 it, at least, by a number.

25         MR. KAUFMAN:  Yes, Your Honor.

1    And I'm marking it as Government's Exhibit 62 for

2  identification purposes only.

3  Q    Officer Newman, if you could review this report, without

4  reading from the report itself, if you could let us know if it

5  refreshes your recollection as to the registered owner of the

6  Lexus?

7  A    The vehicle came --

8         THE COURT:  The question is, does that refresh your

9  recollection.

10         THE WITNESS:  Yes, it does.  I'm sorry, Your Honor.

11 Q    (Mr. Kaufman) Okay.  I've now retrieved Government's

12 Exhibit 62 for identification.

13    If your recollection is still refreshed, if you could

14 state who the Lexus was registered to?

15 A    To Shaunda Peppers.

16 Q    I'm sorry.  To --

17 A    Peppers, that's what I read.

18 Q    The last name is Peppers?

19 A    Peppers, yes.

20 Q    Now when you seized the marijuana, is there any kind of

21 paperwork you have to fill out?

22 A    Yes.  We have inventory property sheets that we fill out

23 and then we turn the marijuana in.

24 Q    When you turn the marijuana -- so there's a property

25 sheet.  What kind of information do you include on that?

1    A    The case numbers, the name of the defendant, date, time

2    the marijuana was seized.  And then you have a inventory list,

3    you write down the package number, how much it weighed, and

4    then everything is out and listed in order and documented.

5    Q    Okay.  Now --

6    A    It's on a --

7    Q    Government Exhibit 5 that's been admitted.  If the bag

8    has the control number 201032338, would you expect that same

9    control number to be on the property report?

10   A    Yes.  Those are the -- when it's turned into property,

11   those are the numbers that are assigned to that evidence when

12   it's turned in.

13   Q    And that's a control number.  And would you expect the

14   complaint number which is indicated on Exhibit 5 as

15   20101102132601, would you expect that on your property report?

16   A    Yes.

17   Q    Like to show you what's been marked for identification as

18   Government's Exhibit 41a.

19        Do you recognize this document?

20   A    Yes.  This is our property sheet or property reports --

21   Q    Do you recognize this particular one?

22   A    Yes.  This is the one I filled out for that evening.

23        MR. KAUFMAN:  And at this point, Your Honor, we'd

24   seek to admit this and publish it to the jury.

25        THE COURT:  Any objection?

1    MR. BUTLER:  No, Your Honor.

2    THE COURT:  Let it be admitted and may publish.

3    (Government's Exhibit No. 41a was received into

4  evidence and published.)

5  Q    If you look at the control number in box two, on the top

6  line, complaint number in box three.  Is that in fact -- are

7  they the same numbers that are on the bag into which you

8  placed the marijuana seized?

9  A    Yes.  The complaint number is the same.  And then the

10  control number that's issued by property control is the same.

11  Q    And in the middle of this form 41a, do you recognize the

12  signature?

13  A    Yes.  That's my signature right in the middle to the

14  right, offset a little bit.

15  Q    Okay.  So based on chain of custody, are you -- how

16  confident are you that the marijuana that's here in court in

17  Exhibit 5 is the same that you seized according to 41a?

18  A    I'm very confident that's -- Majority of that writing

19  there in the center is my handwriting.

20    MR. KAUFMAN:  Nothing further, Your Honor.

21    THE COURT:  You may step down and be excused.  Call

22  your next witness.

23    MR. BUTLER:  Judge, I have a question I would like

24  to --

25    THE COURT:  You have a recross on something new in

1   redirect?

2          MR. BUTLER:  Sir?

3          THE COURT:  Do you have something new that was

4   covered on redirect that hasn't been covered on cross?

5          MR. BUTLER:  Yes, Your Honor.

6          THE COURT:  All right.  Very briefly.

7          MR. BUTLER:  Thank you.

8                    RECROSS EXAMINATION

9   BY MR. BUTLER:

10  Q    Officer Newman, you recall it wasn't a Lexus, was it,

11  this vehicle that you stopped?

12  A    I -- I don't --

13         MR. BUTLER:  May I approach and see if it refreshes

14  his recollection, Your Honor?

15         THE WITNESS:  Which vehicle are you talking about?

16         THE COURT:  Well, ask him -- I mean, you can ask him

17  if he recalls, then you can refresh recollection.

18  Q    (Mr. Butler) Do you recall whether it was a Lexus or not?

19  A    A Lexus or what?

20  Q    Do you recall whether it was a Lexus or some other type

21  of vehicle, sir?

22  A    No, sir.  I don't recall.  I remember it was a silver

23  sports -- it was pointed out to me by detectives.  It was

24  right there in the area, and I was guided to it through the

25  radio communication.

1      MR. BUTLER:  Now may I approach him, Your Honor?

2      THE COURT:  You may.

3      MR. BUTLER:  Thank you.

4    Q    Let me just show you Government's -- I think it's 62 --

5    and ask you to look right there and just read it to yourself,

6    please?

7    A    Point for me one more time.

8    Q    (Indicating.)

9    A    Okay.

10   Q    Okay?

11   A    Yes, sir.

12   Q    All right.  Now, does that refresh your recollection as

13   to what type of vehicle it was?

14   A    Yes, sir, it does.

15   Q    And what type was it?

16   A    It says in that report there, Infiniti.

17   Q    I'm sorry?

18   A    It says in the report, Infiniti.

19   Q    And on the property sheet you indicated that it was about

20   26 pounds of marijuana that you turned in?

21   A    Yes, sir.

22   Q    Okay.  It wasn't 30 pounds?

23   A    No, sir.

24   Q    But 26.

25   A    That was what it weighed out to.

1  Q    Okay.  And so in regards to the probable cause that you

2  explained to the ladies and gentlemen of the jury, you stopped

3  the Infiniti without probable cause, didn't you?

4  A    I stopped it because other detectives were asking me to

5  stop it.

6  Q    Okay.

7  A    They had developed it.  I was assisting them.

8  Q    Okay.  So, but you don't know what they developed.  They

9  just told you to stop it and you did?

10  A    That's correct.  Yes, sir.

11        MR. BUTLER:  I don't have any further questions.

12  Thank you.

13        THE COURT:  You may step down, be excused.

14        Call your next witness.

15        MR. KAUFMAN:  Special Agent James Bryant.

16        JAMES BRYANT, GOVERNMENT WITNESS, SWORN

17                  DIRECT EXAMINATION

18  BY MR. KAUFMAN:

19  Q    Good afternoon.

20  A    Good afternoon.

21  Q    Could you introduce yourself to the jury, please?

22  A    James Bryant.  Special agent with Homeland Security

23  Investigations.

24  Q    How long have you been in law enforcement?

25  A    Twenty years.

1   Q    How many of those years with Homeland Security

2   Investigations and its predecessors, it had prior names?

3   A    Fifteen years.

4   Q    And those first five years, were with?

5   A    Fayetteville Police Department in Fayetteville, North

6   Carolina.

7   Q    Of those 20 years, how many years were related to the

8   investigation of drug trafficking?

9   A    At least 18.

10   Q    Can you give an approximation as to how many drug-related

11   investigations and arrests you've taken part in?

12   A    Hundreds.  Several dozen hundreds.  It's hard to say,

13   numerous.

14   Q    Let me ask you, are you familiar with the term

15   "cooperator"?

16   A    Yes, sir.

17   Q    What does that mean to you?

18   A    It's a term used where someone in trouble, indicted, in

19   custody, however you want to word it, that's assisting law

20   enforcement with the ongoing investigation.

21   Q    Now what are some of the ways they can do that?

22   A    Make telephone calls, contact other targets or

23   face-to-face meeting.  They can go to different locations that

24   we, as in law enforcement might not be able to, and report

25   back to us, several different ways.

1 Q    In your experience, are firearms ever involved in your

2 investigations?

3 A    Yes, sir.

4 Q    Why is that?

5 A    It's just part of the trade.  It's kind of a protection

6 type thing with the drug trade and it's just part of it.

7 Q    And when you say it's part of the trade and it's for

8 protection, protection from what?

9 A    Drugs.

10 Q    I'm sorry.  Protection from what?

11 A    Other drug dealers, drug traffickers, to protect your

12 business, sort of, from someone coming in or taking over what

13 you might have established.

14 Q    And just from drug dealers?

15 A    I'm sorry.  Say again?

16 Q    Is it protection just from drug dealers?

17 A    Well, I would say it's used against law enforcement as

18 well.

19          MR. BUTLER:  Objection.  Move to strike.

20          THE COURT:  Overruled.

21 Q    (Mr. Kaufman) And when you say tool of the trade for

22 protection, you said from whom.  But what is the purpose?

23 What would a drug trafficker be possessing a firearm to

24 protect?

25 A    His drugs.

1   Q    And is that it?

2   A    Property, drugs, just whatever else you would need for

3   protection.

4   Q    I would like to turn your attention to November 2nd of

5   2010.  Did you assist CMPD Chris Newman with a traffic stop?

6   A    Yes, sir.

7   Q    Can you describe what happened?

8   A    That particular day surveillance was set up on a location

9   off Fairview Road.  A vehicle had left a location over there.

10  Officer Newman, at the instructions of the case agent,

11  followed that vehicle out, observed a traffic violation,

12  conducted a traffic stop on the vehicle.

13  Q    What happened next?

14  A    At that particular time I pulled into an apartment

15  complex and was witnessing the traffic stop, kind of staying

16  out of sight.  I observed Officer Newman remove the subject

17  from the vehicle.

18       I observed him approach the vehicle first.  At some point

19  in time he came back on the radio said he smelled marijuana.

20  He went back to the vehicle.  He removed the subject from the

21  vehicle and detained him.

22  Q    And do you recall the name of the subject?

23  A    I'm sorry.  Say again?

24  Q    Do you remember the name of the person?

25  A    Yes, sir.

1   Q    What's the name?

2   A    Jerry Davis.

3   Q    And did you come on scene and speak with Mr. Davis?

4   A    Yes, sir.

5   Q    What happened?

6   A    At that particular time I went, met with Mr. Davis.  I

7   placed him in my vehicle.  He had agreed to cooperate with the

8   ongoing investigation.  He had made statements that he sort of

9   knew --

10            MR. BUTLER:  Objection.

11            THE COURT:  I'll sustain as to what Davis said.

12  Q    (Mr. Kaufman) Without going into the details of what he

13  told you, based on what he told you, what did you do next?

14  A    Based on what he told me we set in my vehicle and started

15  recording the telephone calls.

16  Q    Are you familiar with the term "consensually recorded

17  calls?"

18  A    Yes, sir.

19  Q    What's that?

20  A    That's where the cooperator agrees to record the phone

21  call.  And he will record any phone call placed or received on

22  his phone.

23  Q    Are there certain procedures that you follow when you

24  make a consensually recorded phone call with a cooperator?

25  A    Yes, sir.

1    Q    Can you describe those for the jury?

2    A    Well, the procedure is, before or after the phone call is

3    made you place a time stamp or header on it, and that will

4    give you agent's name, date, time, the telephone number, and

5    certain information as to what the call was about.

6    Q    And did in fact Mr. Davis make a consensually recorded

7    call to anybody?

8    A    Yes, sir.

9    Q    Do you remember how many calls that he had while he was

10   with you?

11   A    He received a couple phone calls and he made at least two

12   or three phone calls.

13   Q    Did he make -- sorry.  Did he make a phone call to a

14   person that he identified as the person from whom he had

15   received the marijuana?

16          MR. BUTLER:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes, sir.  He did.

19   Q   (Mr. Kaufman) All right.  Like to -- and let me ask you,

20   after placing the call to that person, did he receive an

21   incoming call from a female as well?

22   A    Yes, sir, he did.

23   Q    All right.  Like to -- I'm showing defense counsel what's

24   been provided previously in discovery, what have been marked

25   for identification purposes at this point as Exhibits 15 and

1   16.

2            MR. BUTLER:  Thank you.

3   Q   (Mr. Kaufman) Showing the you disk.  Do you recognize it?

4   A   Yes, sir.

5   Q   How do you recognize it?

6   A   It's a disk where a digital translation was placed on

7   some recorded calls, and that's my signature at the bottom, my

8   initials at the bottom.

9   Q   And does -- by initialing it, were you indicating that it

10  was a fair and accurate recording or a copy of the recording

11  that you made on November 2nd, those two calls we just

12  discussed?

13  A   Yes, sir.

14           MR. KAUFMAN:  Your Honor, at this time we'd seek to

15  admit 15 and 16, and with one more issue, then I'll seek to

16  have it published.

17           MR. BUTLER:  Objection.

18           THE COURT:  Overruled.  I'll admit them.

19           (Government's Exhibits No. 15 & 16 were received

20  into evidence.)

21  Q   (Mr. Kaufman) Agent Bryant, did you have an opportunity to

22  review transcripts of those two calls in Exhibits 15 and 16

23  which are now in 15a and 16a?

24  A   Yes, sir.

25  Q   And were they accurate transcripts of the recordings?

1  A     Yes, sir.

2            MR. KAUFMAN:  Your Honor, at this time we seek to

3  have Exhibits 15a and 16a published.  And 15 and 16, just to

4  aid the jury in their review of those two phone calls, we

5  would like to have them played alongside them.

6            MR. BUTLER:  Objection.

7            THE COURT:  Basis?

8            MR. BUTLER:  Well, Your Honor, at this point

9  Mr. Davis is in custody and we would contend --

10           MR. KAUFMAN:  Objection.  Objection, Your Honor.

11 First of all that's untrue --

12           THE COURT:  Hush.

13           Members of the Jury, we're going to take our

14 afternoon break at this time.  And this is the first break

15 during the trial so I'm going to tell you what I will say to

16 you over every break, and that is, that you should not talk

17 about the case even amongst yourselves, and definitely not

18 with anyone else.  It's important to the integrity of the

19 process that you don't talk about the case until you begin

20 your deliberations at the end of the case.  The other thing

21 that I would tell you is that you should keep an open mind

22 because you haven't heard all the evidence or the instructions

23 of the Court.  So keep an open mind until all the evidence is

24 in and you've heard the instructions of the Court.  So with

25 those two instructions we'll take our afternoon break and

1   we'll see you in 15 minutes.

2            (The jury was escorted from the courtroom.)

3            THE COURT:  I will instruct counsel that when I ask

4   for an objection, that you not testify.  And when you're

5   responding to an objection, that you don't also testify.  You

6   two are too experienced to be doing that.  And so I hope

7   that's the last time we have that conversation.

8            With respect to these exhibits Mr. Butler, what is

9   your objection?

10           MR. BUTLER:  If Your Honor, please, I apologize, but

11  I was trying to anticipate -- most of the time when I object,

12  Your Honor, you ask me for a reason.

13           THE COURT:  Yeah, but the reason is not for you to

14  tell the jury who and who's not in custody.  I mean, that's a

15  totally improper thing to do.

16           MR. BUTLER:  Well, I apologize for that.

17           My -- but the grounds for my objection is that

18  Mr. Davis was in custody.  Officer Newman had put him in

19  custody.  He was handcuffed, two sets of handcuffs.  Then

20  Agent Bryant came out of the area and began to talk to him.

21           THE COURT:  And what rule of evidence does someone

22  being in custody in handcuffs implicate?

23           MR. BUTLER:  Your Honor, my objection was

24  basically --

25           THE COURT:  Your objection has to be grounded in a

1  rule of evidence.  And so when I ask you for the basis of an

2  objection, that's what I'm asking you for.

3              MR. BUTLER:  Yes, sir.

4              THE COURT:  What is it?  I still don't know what it

5  is?

6              MR. BUTLER:  At that point, Your Honor, we would

7  contend that because he was in custody, he was not an active

8  participant in the conspiracy.

9              THE COURT:  So your objection is that it's not an

10  801(d)(2)(e) statement?

11              MR. BUTLER:  Exactly.

12              THE COURT:  That's an easy thing to do, and I

13  understand completely if you would say that to me.

14              So what's your response?

15              MR. KAUFMAN:  Your Honor, the reason why it's

16  admissible is because it's a statement of the defendant.  It's

17  not hearsay.  And the statements made by Mr. Davis are solely

18  to put into context the statements made by the defendant.

19              THE COURT:  Well, so what is -- I have no idea what

20  Government's Exhibits 15 or 16 are at this point.

21  Mr. Butler's talking about Mr. Davis, you're talking about the

22  defendant, and so the Court is clueless as to what these

23  exhibits are.

24              MR. KAUFMAN:  Yes, Your Honor.  The statement on

25  Exhibit 16 -- I'm sorry, Exhibit -- Exhibit 16 is the phone

1  call that Mr. Davis placed to Mr. Coleman.  So there's a

2  direct conversation with Mr. Coleman on that.

3           THE COURT:  And what's your objection to that,

4  Mr. Butler?

5           MR. BUTLER:  Well, Your Honor, we would object on

6  the ground that one, it's irrelevant.  They're not talking

7  specifically about marijuana.  And number two, we would

8  contend that there is no admission by Mr. Coleman.  There's a

9  conversation, and that's all.  I would ask the Court to listen

10  to it before you make a ruling.

11          THE COURT:  Can I see the transcripts?

12          MR. KAUFMAN:  Yes, Your Honor.

13          THE COURT:  I'll make a ruling after the break.  So

14  we'll take a 15-minute break at this time.

15          (Recess at 3:10 until 3:25.)

16          THE COURT:  All right.  I've reviewed the

17  transcripts which are 15a and 16a.

18          I find 15 is admissible as a telephone conversation

19  between Jerry Davis and what appears to be Shaunda McAdoo.  Of

20  course it's up to the jury -- it's up the government to tie

21  this in later, and up to the jury to assess whether the people

22  speaking are correctly identified.  But I think it's relevant

23  to showing -- having some tendency to show the existence of a

24  conspiracy.  And I will allow 15a into evidence.  Mr. Davis --

25  you're right, Mr. Butler, Mr. Davis appears to be cooperating

1   with law enforcement at this time, and so his statements are

2   not 801(d)(2)(e) statements, but they are admissible to show

3   the context of the statements of Shaunda McAdoo.

4          I also think 16 is admissible as both statements

5   against interest and 801(d)(2)(e) statements, relevant to show

6   the existence of the conspiracy.

7          And certainly if the government is able to establish

8   the speaker is the defendant, Mr. Davis is stopped with

9   30 pounds of marijuana, calls the defendant.  The defendant

10  asks whether the police searched the car.  Asked about K-9s.

11  I think all of that is admissible, both as defendant

12  admissions and as 801(d)(2)(e) statements.  So I'll overrule

13  the objections to both 15 and 16.  I'll give an instruction on

14  the use of transcripts, but I'll permit the government to

15  offer them at this time, subject to linking it up later on in

16  the trial.

17         MR. KAUFMAN:  Thank you, Your Honor.

18         And what we anticipate doing is admitting it, but I

19  will not publish it until I call a subsequent witness who will

20  be identifying the voices.

21         THE COURT:  That's fine.

22         MR. KAUFMAN:  And, Your Honor, if I may take up one

23  other issue.  And I realize that I didn't lay it out for the

24  Court, but I also know that Your Honor doesn't want speaking

25  descriptions when admitting evidence.  But with regard to the

1  Brinks records in Exhibits 3, 4, 8 and 13, we do have a proper

2  902.11.

3          THE COURT:  Why didn't you say that?

4          MR. KAUFMAN:  Your Honor, I have to say that I'm

5  very careful not to say too much in front of the jury.

6          THE COURT:  If you'd say to me, these are offered

7  pursuant to 902.11 affidavits, then the hearsay objection is

8  gone.

9          MR. KAUFMAN:  I understand, Your Honor.

10          And so we have that certification.  My understanding

11  is that the certification is not an exhibit on to itself.

12  It's a --

13          THE COURT:  Right.  Instead of my thinking we had a

14  hearsay exhibit, if you told me there's a 902.11 certificate,

15  then I would have ruled in your favor at that time.

16          MR. KAUFMAN:  Thank you, Your Honor.

17          And so at this time, with that known to all the

18  parties and to the Court, may we then when starting at an

19  appropriate time so it makes sense to the jury --

20          THE COURT:  Any objection?

21          MR. BUTLER:  May I see them?

22          MR. KAUFMAN:  (Handing paper writing to Mr. Butler.)

23          MR. BUTLER:  Well, Your Honor, we would object.

24  It's not really clear on the certificate.  They have an e-mail

25  attached to it, but I'm not sure if the certificate refers to

1   the checks or the deposit slips.

2          THE COURT:  Help me out on that, Mr. Kaufman.

3          MR. KAUFMAN:  Your Honor, the certificate is for all

4   four Brinks receipts.  The e-mail is simply a description of

5   when Detective Beaver went to Brinks to obtain the

6   certification, presented all four of the documents --

7          THE COURT:  Let me see the certification.

8          MR. KAUFMAN:  Yes, Your Honor.  (Handing paper

9   writing to the Court.)

10         THE COURT:  The e-mail refers to the money seizures

11  that occurred on 11/2/2002.  The question for the Court is

12  whether the government has established that the exhibits in

13  question are what they appear to be.  There certainly has been

14  foundational testimony by the seasoned officer.  There appears

15  to be a 902.11 certificate that comports with Federal Rule of

16  Evidence 902.11.  And so the finding of the Court is that the

17  government has established a foundation for the admission of

18  Government's Exhibits 3, 4, 8 and 13.  I'll overrule the

19  defense objection on hearsay grounds.

20         MR. KAUFMAN:  Your Honor --

21         THE COURT:  Are we ready for the jury?

22         MR. KAUFMAN:  We are, Your Honor.  I just note that

23  for the business records and bank records throughout this

24  case, we do have similar certifications.

25         THE COURT:  All right.  And if you would, in making

1   the proffer of admission, if you would refer to the

2   certificates and have -- has counsel for the defendant been

3   shown the 902.11 certificates?

4           MR. KAUFMAN:  We have provided them all to the

5   defense in discovery, Your Honor.

6           THE COURT:  All right.

7           MR. BUTLER:  Along with about 50,000 other

8   documents.

9           THE COURT:  It's hard being a defense attorney;

10  isn't it, Mr. Butler?

11          MR. BUTLER:  (Nodding head.)

12          THE COURT:  All right.  Are we ready for the jury?

13          MR. KAUFMAN:  Yes, Your Honor.

14          THE COURT:  Call the jury.

15          (The jury was returned to the courtroom.)

16          THE COURT:  Mr. Kaufman, you may proceed when ready.

17          MR. KAUFMAN:  Thank you, Your Honor.

18          And Your Honor, we renew our motion to admit 15

19  (sic) and 16 (sic) for identification as Government's 15 and

20  16 to be published to the jury at a later time in trial.

21          THE COURT:  Very well.  Let them be admitted.

22          MR. KAUFMAN:  Thank you, Your Honor.

23          (Government's Exhibits No. 15a & 16a were received

24  into evidence and published.)

25  Q    Agent Bryant, on November 2nd, 2010 after you're making

1  consensually recorded calls and speaking with Jerry Davis,

2  what happened next?

3  A    After that some -- around that time some marijuana -- he

4  informed us of some marijuana that he had inside of the

5  vehicle which was discovered and taken into custody.

6  Throughout the evening we proceeded to record additional

7  calls.  We traveled to another location, retrieved some

8  additional marijuana and --

9  Q    What was that location?  For example, was it somebody's

10  residence?

11  A    Yes, sir.

12  Q    Whose residence?

13  A    It was Jerry Davis' apartment.

14  Q    Approximately how much marijuana was it?

15  A    It was approximately 30 or 40 pounds.

16  Q    All right.  Next I'd like to turn your attention to

17  November 16th of 2010.  Were you involved in investigating

18  aspects of this case on that date?

19  A    Yes, sir.

20  Q    Tell us what happened?

21  A    That particular day we had planned on taking Mr. Coleman

22  in custody.  We had received information that he would be

23  picking up a vehicle at a car dealership off of Independence

24  Boulevard.  We set up surveillance in the area and waited for

25  him to show up.

1   Q    Do you recall which car dealership it was?

2   A    It's a Porsche dealership off Independence Boulevard.

3   Q    So what did you do as part of the surveillance and

4   arrest?

5   A    I, myself, had entered the dealership, made contact with

6   an associate or manager of the dealership.  He had already

7   kind of knew what was going on --

8             MR. BUTLER:  Objection.  Motion to strike.

9             THE COURT:  Overruled.

10            THE WITNESS:  He spoke with Special Agent MacDonald,

11  and I hung out inside of the business provided the other

12  agents and officers outside what was going on.  And we kind of

13  sat and waited for Mr. Coleman to show up.

14  Q   (Mr. Kaufman) All right.  Did you receive information

15  while waiting that caused you to do anything?

16  A    Yes, sir.

17  Q    What was that?

18  A    We received information that some weapons were inside of

19  the vehicle.

20            MR. BUTLER:  Objection.  Move to strike.

21            THE COURT:  Sustained.  Ask that the jury disregard

22  that last statement.

23  Q   (Mr. Kaufman) Based on the information you received, what

24  did you do?

25  A    We searched the vehicle and located --

1   Q    And can you describe what happened specifically, who did

2   what?

3   A    Myself and the associate or manager, we pulled off the

4   back panel of the passenger seat and located some weapons.

5   Q    What type of weapons?

6   A    Two semi-automatic pistols.

7   Q    Like to show you what's been marked as Government's

8   Exhibit 32a for identification.  Do you recognize this

9   photograph?

10  A    Yes, sir.

11  Q    What is it?

12  A    It's the weapons that were located on the back passenger

13  seat inside of the -- after we removed the panels, this is

14  what we observed.

15  Q    Can you describe in a little more detail specifically

16  where in the vehicle this is located?

17  A    It's the passenger seat --

18  Q    Actually maybe if I can take a step back for a second.

19       Your Honor, we would seek to have 32a admitted and

20  published to the jury.

21            THE COURT:  Any objection?

22            MR. BUTLER:  Yes, Your Honor.

23            THE COURT:  Overruled.  Let it be admitted.

24            (Government's Exhibit No. 32a was received into

25  evidence and published.)

1    Q    All right.  So -- sorry about that, Agent Bryant.

2         If you could now that the jury can see it, can you

3    describe specifically the location from which this was

4    taken -- or, I'm sorry, what this is showing?

5    A    This is the back -- it's the passenger seat of the

6    vehicle, SUV vehicle.  This is that seat where the passenger

7    would sit.  This is the back of the seat.

8         What we did was pull the panel off the back of the seat.

9    Once we pulled the panel off, it's like a plastic type panel

10   and we had to snap it off.  Once we got that off, this is what

11   we observed.

12   Q    Without going into what you were told, is this consistent

13   with the information that you had received?

14   A    Yes, sir.

15   Q    Now if you were sitting in the driver's seat, would you

16   be able to reach back and touch these firearms?

17   A    Yes, sir.

18         MR. KAUFMAN:  Your Honor, may I approach Ms. Hankins

19   for a moment?

20         THE COURT:  You may.

21         MR. KAUFMAN:  Your Honor, I'm preparing two firearms

22   to show to the witness.  I would just note that they have no

23   ammunition in them.  They have been checked by and cleared by

24   the U.S. Marshals Service.  There is a band going through the

25   device so it cannot be used in this current condition.

1    THE COURT:  All right.

2    Q    (Mr. Kaufman) Now, were you the seizing agent for the two

3    firearms?

4    A    Yes, sir.

5    Q    I'm sorry.

6    A    Yes, sir.

7    Q    And when you seized them, was there any paperwork that

8    you completed?

9    A    Yes, sir.

10   Q    Are you familiar with the term 6051?

11   A    Yes, sir.

12   Q    What is that?

13   A    It's the evidence sheet, custody sheet for Homeland

14   Security and Customs Enforcement.

15   Q    Is that a document that you create and maintain in the

16   regular course of business?

17   A    Yes, sir.

18   Q    I'd like to show you what's been marked as 17a for

19   identification.  It's a two-page document.  Do you recognize

20   the first page?

21   A    Yes, sir.

22   Q    What is it?

23   A    It's a 6051 as we just spoke of.

24   Q    And specifically do you recognize this one?

25   A    Yes, sir.

1    Q    Sorry?

2    A    You asked me, did I recognize this one?

3    Q    Yes, sir.

4    A    Yes, sir.

5    Q    How do you recognize it?

6    A    That's my signature on line 15.  And this is the weapon

7    that I would have taken into custody and documented.

8    Q    And near the middle there's a line that says line item

9    001.  And then just below that line of writing it has SN.

10   What's SN mean?

11   A    Serial number.

12   Q    And what's that serial number for?

13   A    For that weapon, that particular weapon that was seized.

14   Q    And I'm showing you page 2.  Do you recognize that?

15   A    Yes, sir.

16   Q    What's that?

17   A    That's another 6051 custody receipt.

18   Q    Do you recognize this particular one?

19   A    Yes, sir.

20   Q    What is it?

21   A    That's one that I would have completed.  Again, line item

22   15, that's my signature.  And it's what I would have filled

23   out when I took custody of the gun.

24   Q    And this is the other gun from November 16, 2010?

25   A    Yes, sir.

1          MR. KAUFMAN:  Your Honor, at this time we seek to

2    admit and publish 17a.

3          THE COURT:  Any objection?

4          MR. BUTLER:  Objection.

5          THE COURT:  Let it be admitted.  You may publish.

6          MR. KAUFMAN:  Thank you, Your Honor.

7          (Government's Exhibit No. 17a was received into

8    evidence and published.)

9    Q   (Mr. Kaufman) And so on the first page, this is for what

10   type of weapon and what serial number?

11   A    That's a .45 caliber Smith and Wesson handgun.

12   Q    And is the serial number BEM 2191 as indicated on the

13   form; is that right?

14   A    Yes, sir.

15   Q    And then on page 2, the other weapon that you seized?

16   A    It's a .9 mm.

17   Q    And is that serial number 8499?

18   A    Yes, sir.

19   Q    I'd like to show you, again, both have been recently

20   rendered so not fireable in court, what have been marked as 17

21   -- 17b and c.

22          MR. KAUFMAN:  May I approach, Your Honor?

23          THE COURT:  You may.

24   Q    If you can review 17b.  Do you recognize it?

25   A    Yes, sir.

1    Q    What is it?

2    A    It's one of the handguns that was found in the back seat

3    in the back panel of the seat.

4    Q    And I'll be right back.  So going to page 1 of 17a, how

5    does the serial number compare -- and the actual exhibit 17b,

6    what's the make of the firearm?

7    A    17b?

8              MR. BUTLER:  I'm sorry.  I can't hear.

9              THE COURT:  17b.  What's the make of the firearm?

10             THE WITNESS:  Smith and Wesson.

11   Q    (Mr. Kaufman) And can you see the serial number on it?

12   A    Yes, sir.

13   Q    How does it compare with what's on 17a page 1?

14   A    It matches.

15   Q    And can you do the same analysis for page 2 of 17a which

16   I'll put on screen as well as Government's 17c.

17        How do they compare Agent Bryant?

18   A    They match.

19             MR. KAUFMAN:  Your Honor, at this time we seek to

20   have Government's 17b and c admitted and published to the

21   jury.

22             THE COURT:  Any objection?

23             MR. BUTLER:  Objection.

24             THE COURT:  No objection?

25             MR. BUTLER:  Objection, Your Honor.

1    THE COURT:  Overruled.  Let them be admitted.  You

2  may publish.

3    MR. KAUFMAN:  Thank you, Your Honor.

4    (Government's Exhibits No. 17b and 17c were received

5  into evidence and published.)

6  Q   (Mr. Kaufman) And Agent Bryant, were both weapons loaded?

7  A   At least one was, if I recall right, sir.

8  Q   Agent Bryant, when you say one was loaded, are you saying

9  loaded in terms of the chamber, or in the magazine, and what

10 about the other one?

11 A   If I recall right, at least one had one in the chamber,

12 which made it ready to fire at the squeeze of the trigger.

13     The other had bullets inside of the clip, magazine, which

14 was not loaded, but could quickly be racked and loaded and

15 ready to fire.

16 Q   And so the one that didn't have a round in the chamber,

17 was the magazine inside of the weapon?

18 A   Yes, sir.

19 Q   So what would -- what's all that would be required in

20 order to fire the weapon at that moment?

21 A   At that point in time you would just have to load it into

22 the chamber which would be racking the barrel back and letting

23 it go and releasing it.  It would be ready to fire at that

24 time.

25 Q   And just to clarify which seat you were discussing when

1   you seized it.  Is there a front seat and a back seat in the

2   SUV?

3   A    There's a front seat and a back seat.

4   Q    And was it the back of the front seat or the back of the

5   back seat?

6   A    No, it's the back of the front seat, but the passenger

7   side.

8   Q    Okay.  So after you found the firearms, what happened

9   next?

10  A    That particular time I took custody of them after taking

11  pictures.

12  Q    All right.

13  A    I took custody of them secured them in my vehicle.

14  Q    And I believe that your testimony was that you were

15  ultimately there to effect the arrest of Parker Coleman?

16  A    Yes, sir.

17  Q    Did in fact that happen that day on November 16?

18  A    Yes, sir it did.

19  Q    Can you describe what happened?

20  A    We received information that he would be en route.

21  Again, sat and waited.  We observed a vehicle pull into the

22  lot with two subjects inside of it.  We waited for Mr. Coleman

23  to go inside, contact management or associates.  He squared

24  away his bill and went back out to the parking lot.  The

25  driver of the vehicle he arrived in actually got into his

1    vehicle.

2    Q    May I stop you for a moment?

3    A    Yes, sir.

4    Q    First of all, you mentioned that he was with somebody

5    else.  Did you get a good view of that person?

6    A    Not at that time.  After the arrests I realized who he

7    was.

8    Q    Okay.  So you're saying, like, when Mr. Coleman was

9    arrested, so was the other person?

10   A    Yes, sir.

11   Q    I'd like to show you what's been marked as 22t for

12   identification.  Do you recognize this person?

13   A    Yes, sir.

14   Q    And who is this person?

15   A    That's -- I can't remember -- Darty is the guy he was

16   with.

17   Q    And so is this the person you're saying he was with that

18   you ultimately arrested later?

19   A    Yeah.

20   Q    Is this a fair and accurate depiction of what he looked

21   like?

22   A    Yes, sir.

23             MR. KAUFMAN:  Seek to have this admitted and

24   published, Your Honor.

25             THE COURT:  Any objection?

1          MR. BUTLER:  No objection.

2          THE COURT:  Let it be admitted.

3          (Government's Exhibit No. 22t was received into

4    evidence and published.)

5    Q    Now you stated that Mr. Coleman settled up the bill or

6    something words to that effect.  Can you explain what you mean

7    by that?

8    A    He settled up the bill, talked with management, received

9    the paperwork to release his vehicle.  After that he walked

10   outside and --

11   Q    When he -- well, let me ask you.  Did you see where the

12   keys for the vehicle were?

13   A    Not at that time I didn't see the keys, no, sir.

14   Q    Okay.  So did you see if anybody received the keys for

15   the vehicle?

16   A    From my location I couldn't see who received the keys.

17   Q    Okay.

18   A    Coleman was the only one who walked in.

19   Q    When you say Coleman, do you see him in the courtroom

20   today?

21   A    Yes, sir.

22   Q    Where is he and what's he wearing?

23   A    He's the gentleman sitting beside attorney Norman Butler

24   with the white shirt on.

25          MR. KAUFMAN:  Your Honor, may the record reflect a

1   correct in-court identification of the defendant.

2           THE COURT:  Can you point to the person you are

3   referring to?

4           THE WITNESS:  Sitting to the right of Mr. Norman

5   Butler.

6           THE COURT:  It will.

7           MR. KAUFMAN:  Thank you, Your Honor.

8   Q    So what happened next?

9   A    After he received the keys, the passenger -- the driver

10  of the other vehicle door, they got inside of Mr. Coleman's

11  vehicle, the Porsche.  And as they proceeded out of the lot --

12          MR. BUTLER:  I object, Your Honor.

13          THE WITNESS:  -- we effected the arrest.

14          THE COURT:  Basis?

15          MR. BUTLER:  Well, there's a lack of personal

16  knowledge as to ownership.

17          THE COURT:  I'll sustain the objection as to whose

18  vehicle.

19  Q   (Mr. Kaufman) So if you could describe without describing

20  whose ownership of the vehicle was.  Just who went into what

21  vehicles and what happened?

22  A    Mr. Darty got into the Porsche.  The white SUV is the

23  Porsche.  And Mr. Coleman got into the vehicle in which they

24  arrived, which I believe was a Volkswagen.  And they proceeded

25  to leave out of the lot.

1   Q    Were you in a position, by the way, to see an exchange of

2   keys or anything?

3   A    No, sir.

4   Q    Were you still located inside the dealership?

5   A    Correct.  I was inside the dealership.

6   Q    All right.  And then what happened?

7   A    After they attempted to leave the parking lot, myself and

8   several other officers blocked them in and effected an arrest

9   of Mr. Coleman and Mr. Darty.

10  Q    Let me ask you, were you involved the next day in the

11  arrest of Shaunda McAdoo?

12  A    Yes, sir.

13  Q    And was any evidence seized from her on that date?

14  A    That particular day I believe some suitcases were seized

15  from her, cellphones, and maybe some documents.

16  Q    I'd like to show you what's been marked as Government's

17  Exhibit 28a for identification purposes.  Do you recognize

18  this?

19  A    Yes, sir.  I recognize it.

20  Q    What is it?

21  A    It's another 6051, a customer receipt for our agency.

22  Q    And what is it for?

23  A    It's for a cellphone that was seized from Ms. McAdoo.

24  Q    And is this for one of the phones you just briefly

25  described had been seized during her arrest?

1   A     Yes, sir.

2   Q     And whose signature is it in block 15, if you know?

3   A     That's my signature.

4         MR. KAUFMAN:  Your Honor, we'd seek to have 28a

5   admitted and published.

6         THE COURT:  Any objection?

7         MR. BUTLER:  No objection.

8         THE COURT:  Let it be admitted.  You may publish.

9         MR. KAUFMAN:  Thank you, Your Honor.

10        (Government's Exhibit No. 28a was received into

11  evidence and published.)

12  Q     Now earlier I had asked you if you recognized Exhibit 15,

13  which was a call that involved Mr. Davis and a female.

14        Do you -- when you reviewed that audio at the later date,

15  did you recognize that voice, the female voice?

16  A     Yes, sir.

17  Q     Whose voice was that?

18  A     Mrs. McAdoo, Shaunda McAdoo.

19  Q     And you recognize that from having had conversations with

20  her during her arrest on November 17th?

21  A     Yes, sir.

22  Q     Thank you.  With regard to the suitcases, were you able

23  to detect anything coming from the suitcases?

24  A     Coming from -- one of the suitcases in the garage had a

25  particular odor of marijuana coming from them.

1   Q     Now you say that you seized them.  Did you actually take

2   them into custody, or did you just observe them on that date?

3   A     I observed them.  Someone else might have seized -- it

4   was several officers out there.  I ended up taking Ms. McAdoo

5   downtown.  I took her in custody.  She was placed in my

6   vehicle.  I ended up taking her downtown.

7   Q     Okay.  So you seized the phone.  But is it accurate that

8   your testimony is that you didn't actually personally seize

9   those suitcases?

10  A     Correct.  I don't recall seizing the suitcases, someone

11  else might have.

12          MR. KAUFMAN:  Nothing further, Your Honor.

13          THE COURT:  Any cross?

14          MR. BUTLER:  Yes, Your Honor.

15                      CROSS EXAMINATION

16  BY MR. BUTLER:

17  Q     Good afternoon, Agent Bryant.

18  A     How you doing, Mr. Butler?

19  Q     I'm fine.  Now Agent Bryant, you indicated that you

20  assisted in the arrest of Ms. McAdoo; is that right?

21  A     Yes, sir.

22  Q     Okay.  And you talked about some suitcases.  But you

23  recall that you didn't seize those suitcases; is that right?

24  A     Yes, sir.  I can't recall myself physically seizing them.

25  Q     Now was it you that seized the cellphone from her?

1    A    Yes, sir.

2    Q    How many cellphones did you seize from Ms. McAdoo?

3    A    At least that one, Mr. Butler.  It might have been

4    another one.  I can't recall.  It might have been two, but at

5    least that one I know of.

6    Q    So you say but at least one, it might have been two?

7    A    Yes, sir.

8    Q    Do you know if -- well, as a part of this investigation,

9    you were aware that Ms. McAdoo was stopped and detained on

10   November 2nd of 2010; is that right?

11   A    Yes, sir.  I think I might have known that.

12   Q    And do you recall whether or not a cellphone was seized

13   from her on that date?

14   A    I was not at the location where she was stopped and

15   detained.  I was at another location, but I remember a

16   conversation or hearing on the radio they might have been

17   detained.  But I did not physically make contact with her that

18   day.

19   Q    Now on the 2nd of November, you were at the location

20   where Mr. Davis was, Jerry Davis; is that right, at some

21   point?

22   A    At some point, yes, sir.

23   Q    And I believe you indicated that you had talked to

24   Mr. Davis on that occasion, correct?

25   A    Yes, sir.

1  Q    November the 2nd, 2010?

2  A    Yes, sir.

3  Q    And did you talk to him about cooperating?

4  A    Yes, sir.

5  Q    And did you give him your normal explanation about

6  cooperating and how, you know, you could or couldn't promise

7  him anything?

8  A    The time I set him in my car it appeared that he had his

9  mind made up.

10  Q    I'm sorry.

11  A    The time I set him in my car it appeared he had his mind

12  made up based on what he wanted to do.

13  Q    Okay.  And were you present when a suitcase full of what

14  appeared to be marijuana was located in his vehicle, in the

15  back part of the -- I believe it was a Tahoe?

16  A    I showed up after -- yes, sir.  I was in the area, yes,

17  sir.

18  Q    Now -- and subsequently you all went to Mr. Davis'

19  apartment.  I believe you testified already this afternoon

20  that there was an additional 30 to 40 pounds of marijuana at

21  the apartment?

22  A    Yes, sir.

23  Q    Did you personally go to the apartment?

24  A    I did go to the apartment as well.

25  Q    And do you recall seeing the safe that he had at the

1   apartment?

2   A     I do recall seeing a safe somewhere in the apartment.

3   Q     Did anybody on the second of November of 2010, ask him

4   about the safe, the contents therein?

5   A     Yes, sir.

6   Q     Was that you or someone else?

7   A     I think I was in the room.  I don't think it was myself.

8   It might have been -- might have been Officer James Beaver

9   about the safe.  Again, it was several officers and/or agents

10  in the apartment.  I can't remember who all had talked to

11  Mr. Davis.

12  Q     Do you recall whether or not the safe was open?

13  A     Mr. Butler, I believe it was open.  I believe it was

14  open.

15  Q     Do you recall what was in it?

16  A     I want to say -- not exactly, sir.  It might have been

17  some baseball cards or some kind of baseball paraphernalia.  I

18  can't recall exactly, sir.

19  Q     Now on the occasion of going out to Hendrick's Porsche,

20  that was the 16th of November of 2010, correct?

21  A     Yes, sir.

22  Q     And -- Agent Bryant, will you look at Government's 17a on

23  the screen.  I believe you described that as a 6051 form; is

24  that right?

25  A     Yes, sir.

1   Q    That's the custody receipt of seized property in

2   evidence, correct?

3   A    Yes, sir.

4   Q    Now on this -- on 17a, you want to be as accurate as

5   possible, correct?

6   A    Yes, sir.

7   Q    When you record things, you want to be accurate; is that

8   correct?

9   A    Yes, sir.

10  Q    Okay.  Now, in -- on line nine it says, "seized from

11  Parker Coleman."  Do you see that?

12  A    Yes, sir.

13  Q    Okay.  Who wrote that?

14  A    That probably would have been myself.

15  Q    Okay.  And you're talking about the .45 caliber Smith and

16  Wesson handgun; is that right?

17  A    True.

18  Q    But now that's not true, is it?

19  A    The information we have is the guns belong to Parker

20  Coleman, yes, sir.

21  Q    Well, I'm not talking about the information.  My question

22  is, you did not seize the .45 caliber Smith and Wesson handgun

23  from Mr. Coleman, did you?

24  A    Physically take it off him?  No, sir.

25  Q    And you didn't take it from his -- from close proximity

1   to him, did you?

2   A    From close proximity to him?

3   Q    Yes, sir.  I mean, he wasn't sitting in the car?

4   A    Oh, no, sir.

5   Q    Okay.  And you don't know how long that .45 caliber Smith

6   and Wesson handgun had been in that vehicle, do you?

7   A    I do not know.

8   Q    And you don't know who put it in the vehicle, do you?

9   A    No, sir.  I do not know.

10  Q    And what about the other weapon, I believe it was a .9

11  mm?

12  A    Correct.

13  Q    Do you see the 6051 form that's displayed on the screen

14  now, Agent Bryant?

15  A    Yes, sir.

16  Q    And that refers to the .9 mm handgun; is that right?

17  A    Yes, sir.

18  Q    And again, did you write this information?

19  A    Yes, sir.  I'm sure that's my handwriting.

20  Q    Okay.  And you signed it and -- on line 15 as the seizing

21  officer; is that correct?

22  A    That's correct.

23  Q    You dated November 16th of '10, correct?

24  A    Yes, sir.

25  Q    And again, you indicated it was seized from Parker

1  Coleman?

2  A    That is correct.

3  Q    Okay.  But that's not true, is it?

4  A    Physically taking it off his person?  No, sir.  I did not

5  physically take it off his person.

6  Q    Okay.  In fact, you seized it from a vehicle; isn't that

7  correct?

8  A    I seized it from a vehicle known to be Mr. Parker

9  Coleman's vehicle.

10 Q    Okay.  Well, now -- but now, did you have any type of

11 registration information that indicates that that Porsche was

12 Mr. Parker Coleman's?

13 A    I have multiple hours of surveillance that put him in

14 that vehicle.

15 Q    Okay.  But that was not my question.  Do you have any --

16 A    No, sir.

17 Q    Okay.

18 A    No.

19 Q    And now, so you -- you surveilled that vehicle for

20 multiple hours; isn't that right?

21 A    Not myself, as an agency and officers working with, he

22 was placed in that vehicle.  Yes, sir.

23 Q    Okay.  But there were other people placed in that

24 vehicle, too; isn't that right?

25 A    Yes, sir.

1   Q    Mr. Darty was driving it on the 16th; isn't that right?

2   A    That's correct.

3   Q    Of -- November 16, 2010, correct?

4   A    Yes, sir.

5   Q    And do you have any information regarding whether or not

6   Stephanie Peppers drove that vehicle?

7   A    I have no idea if she drove it.

8   Q    Do you have any information whether or not Shaunda McAdoo

9   drove that vehicle?

10  A    No, sir.

11  Q    But there may be some information to that effect?  But

12  you just don't have it; is that right?

13  A    I don't have it.  I just go by what we observed.

14            MR. BUTLER:  If I could have a minute, please, Your

15  Honor?

16            THE COURT:  You may.

17            (Pause.)

18  Q    Now Agent Bryant, wouldn't it be fair to say that you've

19  never -- well, on November 16 of 2010, you didn't see any

20  marijuana in that vehicle, did you?

21  A    No, sir.

22  Q    In fact, you've never seen any marijuana in that Porsche

23  Cayenne; isn't that correct?

24  A    That is correct.

25  Q    And the Volkswagen that Mr. Coleman was driving on the

1   16th of November, a couple years ago, there was no contraband,

2   marijuana, weapons, anything like that in that vehicle, was

3   there?

4   A    I have not -- I did not search that vehicle.  I have no

5   idea, Mr. Butler.

6   Q    So which of the two individuals did you assist in to

7   effectuate the arrest, Mr. Darty or Mr. Coleman?

8   A    Mr. Darty.

9   Q    Mr. Darty?

10  A    Yes, sir.

11  Q    Did you see any suitcases in the Porsche or the

12  Volkswagen?

13  A    I can't speak on the Volkswagen.  The Porsche definitely

14  did not have any suitcases in it.

15  Q    Now you've had contact with Mr. Davis since November 2nd

16  of 2010, have you not; Jerry Davis?

17  A    Yes, sir.  After November 2nd I did have contact with

18  Mr. Davis, yes, sir.

19  Q    Do you recall the most recent time you've had contact

20  with Mr. Davis?

21  A    For me, it's probably been nine or 10 months ago, maybe a

22  year ago.  I haven't -- I haven't seen Mr. Davis -- I might

23  have spoken to him briefly on the phone, maybe eight, nine

24  months ago.  Other than that, I, myself, have not had contact

25  with Mr. Davis.

1   Q    Do you remember getting a text message from him?

2   A    Yes, sir.

3   Q    How would you describe the text message?

4   A    I can remember a text message, Mr. Butler.  I can't

5   remember the contents of it.  I can remember getting text

6   message from him, I can't think of what it was pertaining to,

7   Mr. Butler.

8   Q    Now, did you have any involvement with the arrest of Leah

9   Davis at the airport on 2nd of November of 2010?

10  A    No, sir.

11  Q    How about of Nolan Robertson?

12  A    I don't believe so.

13  Q    Did you assist in the execution of the search warrant

14  over at the Closeburn Road address?

15  A    No, sir, I did not.

16  Q    So now did you -- once you discovered these weapons

17  behind the seat, you took possession of them then; is that

18  right?

19  A    Yes, sir.

20  Q    But now at some point Agent MacDonald, who's seated by

21  Mr. Kaufman, did you all place the guns back in the seat?

22  A    I did not.  That particular day I would have seized the

23  guns, secured them in my vehicle until we effected the arrest.

24  At some point in time later on that evening it might have even

25  jumped to the next day, I would have given the guns to Agent

1    MacDonald.  For them to do what they needed to do with them,

2    but I did not put them back into the vehicle.

3    Q    So when you seized them, you put them in your vehicle?

4    A    I put them in the trunk of my vehicle, yes, sir.

5    Q    Okay.  And were they in the gun boxes that they're in

6    today or not?

7    A    No, sir.  I put them in evidence bags.

8    Q    Okay.

9    A    And because of what else we had going on, they would have

10   been secured in a lock box in my vehicle, which also holds

11   guns.  It would have been secured in those until we effected

12   the arrest, and I was able to deal with that particular

13   evidence, then I would have dealt with it.

14   Q    But you do recall giving them to Agent MacDonald?

15   A    At some point in time, yes, sir.

16   Q    Now you indicated that guns are tools of the drug trade,

17   I think is what you --

18   A    Yes, sir.  Tools of the drug trade, yes, sir.

19   Q    Okay.  But now in regards to Mr. Coleman, you have no

20   personal knowledge of him ever possessing, actually possessing

21   one or both of those weapons, do you, of your own personal

22   knowledge seeing him do it?

23   A    Seeing him?

24   Q    Yes, sir.

25   A    No, sir.  Not seeing him.

1   Q    All right.

2              MR. BUTLER:  If I could have a moment, please, Your

3   Honor?

4              THE COURT:  You may.

5              (Pause.)

6   Q    Now Agent Bryant, were you aware that a part of this

7   investigation, this alleged conspiracy involved people from

8   California, from Los Angeles -- the Los Angeles area?

9   A    Yes, sir.  I was made aware of that.

10  Q    And were you also aware that one of the essential -- what

11  I would describe as essential --

12             MR. KAUFMAN:  Objection.

13             THE COURT:  What is the basis of the objection?

14             MR. KAUFMAN:  Counsel is characterizing evidence.

15             THE COURT:  I'll sustain as to form.  Ask you to

16  rephrase your question.

17             MR. BUTLER:  Yes, sir.

18  Q    You were aware were you not, Agent Bryant, that at least

19  one, if not more, TSA agents were assisting in facilitating

20  suitcases of marijuana to be flown to Charlotte?

21  A    Mr. Butler, I'm not sure about that.  I wasn't the case

22  agent on the case.

23  Q    Okay.

24  A    Special Agent MacDonald is.  All I did was assist on this

25  case as needed.  So I'm not aware of all the ins and outs of

1   what Agent MacDonald and TFO James Beaver would know, because

2   they ran the case.

3       Again, if they asked me to come out and assist with

4   surveillance or an arrest, I came out.  As far as the -- I

5   knew California was involved.  As far as all the persons or

6   defendants, I can't tell you all.  And with the TSA thing, I'm

7   not sure if I ever heard that or not.  I just don't know all

8   about their particular case.

9   Q    Well did you know that Davon Harris was from California?

10  A    Davon who?

11  Q    Harris?

12  A    Harris?

13  Q    Davon Harris.

14  A    I don't know if I was aware of that.  I'm not even sure

15  who that is, Mr. Butler.

16  Q    Well, did you -- were you a part of the, what I would

17  describe as the takedown team that detained Shaunda McAdoo,

18  Mr. Harris, and Mr. McKneely at the bank, Bank of America

19  branch?

20  A    No, sir.  I assisted with the arrest of Ms. Shaunda

21  McAdoo, Mr. Coleman, Mr. Darty, and one other defendant, a

22  female defendant at a restaurant.  I can't even recall her

23  name right now.  That was all the arrests I assisted in.

24  Q    I'm sorry.

25  A    That was the only arrest I assisted in on this

1    investigation.

2    Q    But you are aware that Mr. Darty is from California,

3    correct?

4    A    Yes, sir.  I did know that.

5    Q    Okay.  Was it Ms. Peppers, Stephanie Peppers that you

6    assisted in her arrest?

7    A    I'm not sure, Mr. Butler.  I don't think it was.  I can't

8    remember the name of the female.  Again, me and another agent

9    in a marked unit, CMPD, Charlotte-Mecklenburg unit was asked

10   to go to the restaurant to look for this female.  We found

11   her, took her into custody.  I notified Special Agent

12   MacDonald he had us bring her to the office.  I didn't

13   interview her.  That might have been her, Mr. Butler, I'm not

14   even sure.

15   Q    What restaurant was it, do you recall?

16   A    Goodness, I can't even think of the name of the

17   restaurant, Mr. Butler.  It's over off the west side of town.

18   Small little restaurant I can't even think of the name of the

19   restaurant, sir.  But it was just a simple walk in, had her

20   identified.  We brought her back to the office.

21   Q    So once you relinquish possession of the weapons to Agent

22   MacDonald, you don't know whether they were dusted for prints

23   or swabbed for DNA or anything like that, do you?

24   A    No, sir.  At that particular time he do with them as

25   needed for his case.

1          MR. BUTLER:  If I could just have a moment?

2          THE COURT:  You may.

3          (Pause.)

4          MR. BUTLER:  Thank you, very much.  I have nothing

5    further.

6          THE COURT:  Redirect?

7          MR. KAUFMAN:  Yes, sir.

8                    REDIRECT EXAMINATION

9    BY MR. KAUFMAN:

10   Q    Agent Bryant, are you familiar with the Samantha Jo

11   Schmidlin?

12   A    I believe I heard that name, yes, sir.

13   Q    How do you know that name?

14   A    That might have been the female I assisted with the

15   arrest of in the restaurant.

16   Q    Now Agent Bryant, the defense lawyers asked you several

17   times about Mr. Coleman possessing the firearms from

18   November 16th.  Are you familiar with the term, "constructive

19   possession"?

20   A    Yes, sir.

21   Q    And can you describe how that might relate to the

22   circumstance on November 16?

23          MR. BUTLER:  Objection, Your Honor.

24          THE COURT:  I'll do that later on.  I'll sustain the

25   objection --

1          MR. KAUFMAN:  Yes, Your Honor.

2          THE COURT:  -- to any legal interpretation by the

3     witness.

4     Q     Agent Bryant, you were asked several questions about

5     document that's been admitted as 17a, and how you have Parker

6     Coleman and the address listed up there.

7          Let me ask you, on November 16th, who was driving the

8     Volkswagen up to the Porsche dealership?

9     A     I did not see who was driving.  I known it to be --

10         MR. BUTLER:  Objection.

11         THE COURT:  Sustained.

12         MR. KAUFMAN:  Present sense impression, Your Honor.

13         THE COURT:  Overruled -- I mean, I'll sustain the

14    objection.

15    Q     And who was it who went into the dealership to settle up

16    the business?

17    A     Mr. Parker Coleman.

18    Q     So is the fact that he was settling up for that vehicle

19    consistent with your methodology of including him on this

20    6051?

21         MR. BUTLER:  Objection.

22         THE COURT:  Overruled.

23         THE WITNESS:  Yes, sir.

24    Q     Now, have you had any cases that involved guns where the

25    firearms were not physically in the hands or in the waistband

1    of a defendant at the time that it was seized?

2    A    That is correct.

3    Q    And how do you fill out the 6051s when an individual is

4    arrested and there's a firearm in the vehicle but not

5    physically touching that person?

6    A    If -- you would link it to that person, the same with a

7    vehicle.  If this had been a vehicle seized, a vehicle that we

8    know to belong to someone --

9    Q    I'm asking about a firearm.

10   A    Yes, sir, I understand.  But again, it would be linked to

11   our knowledge as to who it belonged to.

12   Q    So when there's a firearm that's not physically in

13   physical contact with an individual, what's your standard

14   operating procedure for filling out 6051?

15             MR. BUTLER:  Objection.

16             THE COURT:  Overruled.

17             THE WITNESS:  Who we known it to belong to.  Because

18   there's a petition part involved.  If someone wants to

19   petition for their property back, it's got to be who you link

20   it to.

21             So if it's linked to Mr. Coleman and if he wants to

22   petition through our department to get his guns back, it's got

23   to have the correct name on it who we believe it to belong to.

24             MR. KAUFMAN:  Nothing further, Your Honor.

25             MR. BUTLER:  If I could, just a quick question.

1        THE COURT:  Very briefly.

2        MR. BUTLER:  Thank you.

3                    RECROSS EXAMINATION

4   BY MR. BUTLER:

5   Q    Well, Agent Bryant, now there was never a petition by Mr.

6   Coleman concerning those guns, was there?

7   A    I'm sorry, Mr. Butler.  Say it again, sir?

8   Q    There was never a petition by Mr. Coleman for those guns;

9   isn't that right?

10  A    I have no idea, Mr. Butler.  I don't know.

11  Q    And so basically what -- am I correct your

12  understanding -- what you're saying is, you all would just

13  link it to somebody, isn't that right?  You said you link it

14  to the person; is that right?

15  A    With the knowledge that we know of, yes, sir.  If it's

16  identified to that person, you would fill out that particular

17  form, or that number to that person.  That's whether it be a

18  bicycle or a gun or whatever.  You link it to the person.

19  Q    But isn't it true that it would be more accurate seized

20  from the Porsche, but not the person; isn't that correct?

21  A    No, sir.  A report would document physically where it

22  came from, but the name Porsche is not a human being, you

23  can't --

24  Q    I understand that.  But it doesn't -- but you seized it

25  from the Porsche, correct?

1    A    Physically removed it from the Porsche, yes, sir.

2         MR. BUTLER:  Okay.  Thank you.  I have no further

3    questions.

4         THE COURT:  You may step down, be excused.

5         Call your next witness.

6         MR. KAUFMAN:  We next call Detective Dwayne Spears.

7         DWAYNE SPEARS, GOVERNMENT WITNESS, SWORN

8              DIRECT EXAMINATION

9    BY MR. KAUFMAN:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    If you could introduce yourself to the jury, please.

13   A    My name is Detective Dwayne Spears.

14   Q    How do you spell your last name?

15   A    S-P-E-A-R-S.

16   Q    And you're a detective with CMPD?

17   A    Correct, sir.

18   Q    How long have you been with CMPD?

19   A    Thirteen years, sir.

20   Q    And how long have you been in law enforcement in

21   totality?

22   A    Thirteen years, sir.

23   Q    Are you also cross sworn as a task force officer with the

24   Organized Crime Drug Enforcement Task Force?

25   A    Yes, sir.

1   Q    How long have you been such a task force officer?

2   A    Four years, sir.

3   Q    Of your 13 years with CMPD, how many of those years have

4   involved narcotics investigations?

5   A    Seven years, sir.

6   Q    Now in those -- in your entire career, approximately how

7   many search warrants have you executed?

8   A    Fifty or more, sir.

9   Q    Do you have experience -- well, you say you got narcotics

10  experience.  Do you have experience, for example, working as

11  an undercover officer?

12  A    Yes, sir.

13  Q    Can you just very briefly describe what that means?

14  A    Basically purchasing narcotics from different individuals

15  that's selling drugs.

16  Q    And in terms of marijuana investigations and arrests, how

17  many of those have you taken part in?

18  A    I've been in part of well over 500 or more drug arrests.

19  Q    Like to turn your attention to an investigation that

20  involved, among other things, the area of Closeburn Road near

21  South Park, Charlotte.  Did you conduct surveillance as part

22  of the investigation?

23  A    Yes, sir.

24  Q    I'd like to turn your attention to October 29th of 2011.

25  Did you conduct surveillance in that area on that date?

1    A    Yes, sir.

2    Q    Can you tell us what happened?

3    A    Yes, sir.  Special Agent MacDonald asked me to assist him

4    with a surveillance.  I was sitting in the parking lot of Park

5    Road park near the tennis courts, which is approximately about

6    a block away from Closeburn Road.  When I was sitting in the

7    parking lot, I observed Mr. Coleman meet -- he was driving a

8    silver Infiniti.  And I observed him meet with two black males

9    that were driving a white Chevy SUV, sir.

10   Q    I would like to show you what's already been marked -- or

11   sorry -- admitted as Government's 7d.  Just drawing your

12   attention to the vehicle.  Do you recognize this vehicle?

13   A    Yes, sir.  It's gonna be the Infiniti that I observed in

14   Park Road park.

15   Q    Now, is there a license plate visible on this picture?

16   A    No, sir, it's not.

17   Q    But in terms of the overall view of the vehicle, it looks

18   like it's consistent with what you observed on October 29th?

19   A    Yes, sir.

20   Q    Detective Spears, I would like to now turn your attention

21   to November 2nd of 2010.  Did you -- were you involved in the

22   investigation at 5425 Closeburn Road?

23   A    Yes, sir.

24   Q    And did it involve unit 115?

25   A    Yes, sir.

1    Q    What was your involvement?

2    A    I applied for a search warrant for that residence, sir.

3    Q    With whom?  Like, to whom did you apply?

4    A    For the residence, 5425 Closeburn, unit 115, and for

5    Parker Coleman, sir.

6    Q    Who issued that search warrant?

7    A    The Mecklenburg County magistrate court officer.

8    Q    Tell us about your involvement that day, leading up to

9    and including and through the execution of the search warrant?

10   A    Once again, I applied for a search warrant after a

11   vehicle was stopped and marijuana was located.  I went back to

12   the office and began typing up a search warrant.

13        Once I got the search warrant done, I went down to the

14   Mecklenburg County jail, that is where the magistrate office

15   is located, and I applied for a search warrant.

16        After receiving the search warrant, I let agents and

17   detectives that were still conducting surveillance on the

18   residence let them know that I had a search warrant and that

19   they could go ahead and execute the search warrant.

20   Q    Did you go on scene yourself?

21   A    Yes, sir I did.

22   Q    What happened?

23   A    Once I got there, sir, went inside.  I read the search

24   warrant to Mr. Coleman, and at that time Detective Beaver

25   began interviewing Mr. Coleman while I took care of collecting

1    evidence, sir.

2    Q    And in addition to law enforcement and Mr. Coleman, was

3    there anybody else who was in the residence?

4    A    No, sir.

5    Q    Is there anything that caught your attention when you got

6    to the residence in terms of your senses?

7    A    Yes, sir.  Once inside the residence I could smell a

8    strong odor of marijuana coming from the residence, sir.

9    Q    And what type of marijuana?

10   A    Fresh marijuana, sir.

11   Q    Did you review the kind of personal items that were

12   located in the apartment?

13   A    Yes, sir.

14   Q    How would you characterize those belongings?

15   A    There was one bed and male clothes that was inside that

16   particular room.  And then a closet there was -- you could

17   tell that it was only a male that was living there in the

18   residence.

19            MR. BUTLER:  Objection.

20            THE COURT:  Overruled.

21   Q    Were there any female clothes that you saw anywhere or

22   any other female items that you observed?

23   A    No, sir.

24   Q    Did you play a role in the actual search itself?

25   A    Yes, sir I did.

1    Q    What did you do?

2    A    As people was finding evidence, sir, I took -- I

3    collected and gathered the evidence and took pictures of it as

4    well, sir.

5    Q    Detective Spears, when evidence was seized, were you

6    involved in the processing of that evidence?

7    A    Yes, sir.

8    Q    What did you do?

9    A    Once all the evidence was collected, Detective Beaver and

10   myself went down to the Law Enforcement Center, which is

11   located at the law enforcement at -- property control, which

12   is located at the Law Enforcement Center.  And at that time we

13   processed all the evidence, made copies and was placed in

14   evidence envelopes and turned in as evidence, sir.

15   Q    All right.  I would like to hand you an evidence bag,

16   it's marked 33168 at the top.  Do you recognize this?

17            THE COURT:  What exhibit number?

18            MR. KAUFMAN:  Well, there's the exhibit inside that

19   will be Exhibit 14g for identification.

20   Q    Do you recognize this?

21   A    Yes, sir.

22   Q    And what is it?

23   A    Picture, sir.

24            MR. BUTLER:  I'm sorry.  I'm having problems

25   hearing.

1     THE COURT:  Detective Spears --

2     THE WITNESS:  A picture, sir.

3     THE COURT:  A picture?

4     THE WITNESS:  Yes.

5   Q   (Mr. Kaufman) And where -- do you remember seeing this

6   picture before?

7   A    It was -- I think inside the residence, sir.

8   Q    Okay.  And is it a fair and accurate depict -- is it

9   actually the photograph that you saw in the residence during

10  the search warrant execution?

11  A    Yes, sir.

12     MR. KAUFMAN:  We would seek to have Government's 14g

13  admitted and published.

14     THE COURT:  Any objection?

15     MR. BUTLER:  Yes, Your Honor.  We would object.

16     THE COURT:  Basis.

17     MR. BUTLER:  For the reason that we had indicated in

18  pretrial motion.

19     THE COURT:  All right.  Overruled.

20     (Government's Exhibit No. 14g was received into

21  evidence and published.)

22     MR. KAUFMAN:  Now showing the jury 14g.

23  Q    Do you recognize anybody in this photograph?

24  A    Mr. Coleman, sir.

25  Q    And where is he located in relation to the four people?

1    A    Right on the left, wearing the red shirt.

2    Q    Okay.  Thank you.

3         Next I would like to show you -- while I'm pulling out

4    the contents of this brown bag, do you recognize the brown bag

5    itself?

6    A    Yes, sir.  It's going to be the evidence bag that I

7    placed evidence from the search warrant that day, sir.

8    Q    How do you recognize it?

9    A    The complaint numbers, the address, the date, my

10   initials, and the date and time that I turned it in, sir.

11   Q    And is this a standard CMPD method of packaging evidence

12   seized during search warrant?

13   A    Correct, sir.

14   Q    I'm showing you what's been marked as 14h, do you

15   recognize this envelope?

16   A    Yes, sir.

17   Q    What is it?

18   A    That's gonna be documents that was found in a dresser in

19   the kitchen.

20   Q    And do you recognize your writing or signature on it?

21   A    Yes, sir.

22        MR. KAUFMAN:  We move to -- well, I'll move in a

23   moment.

24   Q    Okay.  Next I have what's been marked as 14i, also 14j, k

25   and l, all coming from the same overall brown bag.  Do you

1   recognize these as well?

2   A    Yes, sir.  All documents that was taken from the

3   residence, sir.  All with my initials on it when I turned them

4   in.

5           MR. KAUFMAN:  Your Honor, at this time we seek to

6   have government's h through -- well h, i, j, k and l admitted

7   and published at a later date -- at a later point in trial.

8           MR. BUTLER:  Objection.

9           THE COURT:  Overruled.  They will be admitted.

10          (Government's Exhibits No. 14h, 14i, 14j, 14k and

11  14l were received into evidence and published.)

12  Q    From the next brown bag, and again, do you recognize the

13  brown bag?

14  A    Yes, sir.

15  Q    For the same reason as the prior one?

16  A    Yes, sir.

17  Q    And from inside of that is Exhibits 14m, n, o and p.  Do

18  you recognize those?

19  A    Once again, it's going to be documents that was located

20  during the search warrant.  And all of them have my name and

21  initials on them, sir.

22          MR. KAUFMAN:  Thank you.

23          Your Honor, we seek to admit and publish at a later

24  time 14m, 14n, 14o and 14p.

25          THE COURT:  Any objection?

1    MR. BUTLER:  Objection.

2    THE COURT:  Overruled.  Let it be admitted.

3    (Government's Exhibit No. 14m, 14n, 14o, 14p were

4    received into evidence.)

5    Q    In addition to the documents, Detective Spears, what else

6    did you find in the residence?

7    A    We also located a money counter with paraphernalia, money

8    wrappers and stuff.  We also located a handgun, a Glock 17

9    with three magazines and 29 bullets.  And also a small amount

10   of marijuana, and a large amount of U.S. currency.  I think it

11   was approximately about $92,000.

12   Q    Where was the money located?

13   A    The money was located in the master bedroom in a safe in

14   the kitchen area and in a closet, as well, near the front

15   door.

16   Q    And did you take photographs during the search warrant

17   execution?

18   A    Yes, sir, I did.

19   Q    Now I'd like to -- when you processed the -- you

20   mentioned that there was a handgun found.  How did you process

21   that?

22   A    We handled it with gloves, and it was placed in the box.

23   And it was turned in as evidence.  And I think at a later date

24   Detective Beaver put it in to be tested, sir.

25   Q    Like to show you what's been marked as Government's

1   Exhibit 10a for identification purposes.  Do you recognize

2   what this is?

3   A    Yes, sir.  This is gonna be the property sheet, sir.

4   Q    And the property sheet for what?

5   A    For the handgun.

6   Q    The one from November 2nd?

7   A    Yes, sir.

8         MR. KAUFMAN:  Your Honor, we would seek to have 10a

9   admitted and published to the jury.

10        THE COURT:  Any objection?

11        MR. BUTLER:  If I could have a moment, please, Your

12  Honor.

13        (Pause.)

14        MR. BUTLER:  Objection, Your Honor.

15        THE COURT:  Overruled.  Let it be admitted.

16        MR. KAUFMAN:  Thank you, Your Honor.

17        (Government's Exhibit No. 10a was received into

18  evidence.)

19  Q    If you look at the middle of the document, Detective

20  Spears, do you recognize the named signature?

21  A    Yes.

22  Q    Whose that?

23  A    Going to be my signature, sir.

24  Q    And you mentioned it was what type of firearm?

25  A    A Glock 17.

1   Q    And on the form did you indicate the type of weapon and

2   its serial number?

3   A    Yes, sir.

4              MR. KAUFMAN:  Your Honor, again, 14a for

5   identification purposes.  The U.S. Marshals have cleared the

6   weapon and ensured and currently put it in a status that it

7   cannot be used.

8              THE COURT:  All right.

9   Q    All right.  Detective Spears, I'm showing you what's been

10  marked as Government's Exhibit 14a.  Do you recognize it?

11  A    Yes, sir.

12  Q    How do you recognize it?

13  A    It's gonna be the Glock 17 that I seized that day with

14  the serial number N David Paul 747.

15             MR. KAUFMAN:  Thank you.

16             Your Honor, we seek to have Government's 14a

17  admitted and published.

18             MR. BUTLER:  Objection.

19             THE COURT:  Overruled.  Let it be admitted.  You may

20  publish.

21             (Government's Exhibit No. 14a was received into

22  evidence and published.)

23  Q    And also I'd like to show you separately what have been

24  marked as Government's Exhibit 14b, 14c, 14d and 14e.  Do you

25  recognize these?

1   A    Yes, sir.  This is gonna be the magazines and the bullets

2   that were recovered during that search warrant.

3   Q    Is this consistent with the 29 bullets there was -- there

4   should be 29 bullets in 14e, base on what's been admitted as

5   Government's Exhibit 10a?

6   A    Correct, sir.

7        MR. KAUFMAN:  Your Honor, we seek to have 14b, 14c,

8   d and e admitted.

9        MR. BUTLER:  Objection.

10       THE COURT:  Overruled.  Let it be admitted -- let

11  them be admitted.

12       (Government's Exhibits No. 14b, 14c, 14d & 14e were

13  received into evidence.)

14  Q    Now Detective Spears, in 14e there are 29 bullets.  Where

15  were the bullets located when you actually seized them on

16  November 2nd?

17  A    The weapon was loaded, sir, and I think it was all

18  located underneath the bedroom -- I mean, the bed, in the

19  master bedroom, sir.

20  Q    I would like to show you some photographs, 19a -- I'm

21  sorry -- 9a, 9c, 9d, 9e, 9f, 9g, 9h, 9i, 9j, 9k, 9l, 9m, 9n,

22  9o, 9p, 9q, 9r, 9s, 9t, 9u.

23       Do you recognize the photographs I've just shown you?

24  A    Yes, sir.

25  Q    How do you recognize them?

1    A    Of pictures that were taken during the search warrant,

2    sir.

3    Q    Are they fair and accurate photographs of what was

4    observed during the search warrant?

5    A    Yes, sir.

6             MR. KAUFMAN:  Your Honor, we would seek to have 9a,

7    then 9c through 9u admitted and published.

8             MR. BUTLER:  Objection.

9             THE COURT:  Overruled.  Let them be admitted.  You

10   may publish.

11            (Government's Exhibits No. 9a, 9c through 9u were

12   received into evidence.)

13   Q    Nine-a, what is this showing?

14   A    Mr. Coleman, sir.

15   Q    This was at the time of the arrest?

16   A    Yes, sir.

17   Q    Nine-c.

18   A    U.S. mail.

19   Q    And to what address is it sent and whom?

20   A    Mr. Parker Coleman 5425 Closeburn Road, Apartment 115.

21   Q    Was there other mail addressed to Mr. Coleman at that

22   address?

23   A    Yes, sir.

24   Q    Nine-d, what's this?

25   A    That's gonna be U.S. currency located in the kitchen

1   area, sir.

2   Q    Nine-e.

3   A    A close-up shot.

4   Q    Nine-f.

5   A    That's gonna be U.S. currency that was in the Crown Royal

6   bag.

7   Q    That was also depicted in the earlier shot of 9-d.

8   A    Yes, sir.

9   Q    Nine-g.

10  A    It's gonna be other U.S. mail.

11  Q    It's blurry, but can you tell what the name and address

12  is?

13  A    Parker Coleman 5425 Closeburn Road, 115.

14  Q    Nine-h.

15  A    Gonna be U.S. currency that was seized in the closet in a

16  computer box.

17  Q    Nine-i.

18  A    Close-up shot.

19  Q    Nine-j.

20  A    In the kitchen area, Ziploc bags.

21  Q    Now based on your training and experience, is this

22  relevant to your investigation.

23  A    Yes, sir.

24  Q    How so?

25  A    Marijuana is sometimes repackaged in Ziploc baggies.

1    Q    Why is that?

2    A    For sale.

3    Q    Why is it packaged in ziploc bags?

4    A    To hide -- well, as much as you can, the odor, mask the

5    odor, and just to put it in something smaller.

6    Q    Nine-k.

7    A    That's gonna be an ID.

8    Q    Was this ID found during the execution of the search

9    warrant?

10   A    Yes, sir, in the master bedroom.

11   Q    Nine-l.

12   A    It's gonna be pictures in the master bedroom closet.

13   Q    Nine-m.

14   A    It's gonna be a money counter that was located in the

15   master bedroom closet as well.

16   Q    What I'm now increasing in size, that's the money

17   counter?

18   A    Yes, sir.

19   Q    What's this?

20   A    That's gonna be pictures of the handgun that was located

21   underneath the bed in the master bedroom.

22   Q    Is this showing how it was when it was found?

23   A    Yes, sir.

24   Q    Nine-o.  And in fact, is this what has already been

25   admitted as the firearm that you found during the execution of

1   the search warrant?

2   A    Yes, sir.

3   Q    Has it been opened for purposes of taking the photograph

4   and taken out from under the bed?

5   A    Correct.

6   Q    Nine-p.

7   A    U.S. currency, sir, that was located in the bag.

8   Q    Do you remember off the top of your head where the bag

9   was located?

10  A    No, sir.  Not right off the top of my head.

11  Q    Nine-q.

12  A    That's U.S. currency that was found inside a coat pocket

13  inside the master bedroom pocket.

14  Q    Is it wrapped somehow?

15  A    It's folded up and a rubber band is around it.

16  Q    Based on your training and experience, is the way that

17  it's been packaged here, is that relevant?

18  A    It's just folded up and was stored in -- like it was

19  might have been forgot about.

20          MR. BUTLER:  Objection.  Move to strike.

21          THE COURT:  Sustained as to what it might have been.

22  Ask the jury to disregard that.

23  Q    (Mr. Kaufman) Based on your training and experience, do

24  drug traffickers do anything in particular with their currency

25  so it makes it easier to count?

1          MR. BUTLER:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  Fold it up and have it kind of already

4    know what it is, the amount.

5    Q    When you say the amount, you mean the total amount in a

6    particular banded cluster?

7    A    Could be, yes, sir.

8    Q    Nine-r.  Nine-r.  What's this showing?

9    A    This is gonna be rubber bands and money wrappers, sir.

10   Q    Can you see what it says in terms of denominations?

11   A    Like $2,000 stacks -- well, slips.

12   Q    And the yellow ones?

13   A    I can't make it out, sir.

14   Q    Nine-s.

15   A    Gonna be male clothes and shoes at the top.

16   Q    Is that still in the master bedroom where the safe was

17   showing in the earlier picture?

18   A    Yes, sir.  This is gonna be a picture of male shoes in

19   the same closet on the top shelf.

20   Q    That's 9-t.  Moving on to 9-u.

21   A    That's gonna be a picture of U.S. currency that was

22   seized from the safe.

23   Q    Did you seize any phones during the search?

24   A    Yes, sir, we did.

25   Q    Do you recall how many?

1    A    Three cellphones that was located in the master bedroom

2    as well.

3    Q    Like to show you what's been marked as Government's

4    Exhibit 41b.  Do you recognize what this is?

5    A    Yes, sir.  It's gonna be the property sheet from November

6    2nd, 2010.

7    Q    And what is it showing?

8    A    Showing the cellphones and the cellphone charges that was

9    located during the search.

10   Q    And is that your signature on the form in the middle?

11   A    Yes, sir, it is.

12            MR. KAUFMAN:  Your Honor, we'd seek to admit and

13   publish 41b.

14            MR. BUTLER:  Objection.

15            THE COURT:  Overruled.  Let it be admitted.

16            (Government's Exhibit No. 41b was received into

17   evidence and published.)

18            MR. KAUFMAN:  Nothing further, Your Honor.

19            THE COURT:  Any cross?

20            MR. BUTLER:  Yes, Your Honor.  Thank you.

21                        CROSS EXAMINATION

22   BY MR. BUTLER:

23   Q    Good afternoon, Detective Spears.

24   A    Good afternoon.

25   Q    Now Detective Spears, you applied for this search

1  warrant; is that right?

2  A    Correct, sir, I did.

3  Q    In making your application, you had to present certain

4  information to the magistrate; is that correct?

5  A    Correct, sir.

6  Q    Now you were looking for marijuana; isn't that correct?

7  A    Correct, sir.

8  Q    But you didn't find much marijuana, did you?

9  A    Correct, sir.

10 Q    How much did you find if you recall?

11 A    I think it was .6 grams that was inside the residence,

12 sir.

13 Q    Point 6 grams?

14 A    Correct, sir.

15 Q    Where was it?

16 A    It was near to the front closet, near the -- kind of

17 where you go in there was a closet right there at the front.

18 Q    I'm sorry?

19 A    Kind of in a closet, sir, near the front -- front of the

20 residence near the front door.

21 Q    Well, of course, now, you indicated you had -- there was

22 a strong smell of fresh marijuana; is that right?

23 A    Correct, sir.

24 Q    Are you saying that was it, the .6 grams?

25 A    No, sir.

1  Q    Okay.  Well you didn't find any other than the .6 grams,
2  correct?

3  A    Correct.

4  Q    Okay.  Now, do you recall what time you executed the
5  search warrant?

6  A    Not right off hand, sir.  It was mid-afternoon, sir.

7  Q    Were you aware that the unit 115 at Closeburn Road was
8  leased to Ms. Stephanie Peppers?

9  A    No, sir.  I don't recall.

10 Q    When you went to the unit, Mr. Coleman was asleep, wasn't
11 he?

12 A    Agents and detectives had already entered the residence,
13 sir, before I got there.  So when I got there he was all -- I
14 mean, he was awake.  I'm not sure if he was asleep or not,
15 sir.

16 Q    Okay.  Okay.  So you called and said I have a search
17 warrant.  You all go ahead and do what you do, is that pretty
18 accurate?

19 A    Once I got the search warrant, I called them and
20 advised -- cause rush hour time, it was gonna take -- to get
21 out there.  As I said, I had the search warrant signed, and
22 the supervisor on scene advised me -- I told them they could
23 go ahead and execute the search warrant at that time.

24 Q    Now when you left -- strike that.

25      Before you left to apply for the search warrant, you were

1   conducting surveillance of that building; is that right?

2   A    Not the building.  I was in the area.  I think Agent

3   MacDonald had the eye -- what we call the eye that was

4   watching the actual building.  And I was probably about,

5   anywhere from about a half mile to a mile away.

6   Q    Well somebody was watching?

7   A    Correct, sir.

8   Q    You believe it was Agent MacDonald?

9   A    Yes, sir.

10  Q    And would it be fair to say based on your training and

11  experience, the building was under surveillance until you let

12  them know that you had search warrant, correct?

13  A    Correct, sir.

14  Q    So nobody could come and go without law enforcement

15  observing them; is that correct?

16  A    Well, if I could elaborate a little bit.  You could only

17  see the front of the building.  Once they go inside the

18  building, you can't tell which unit they're going to.

19  Q    Exactly.  So you're saying that once you get inside, you

20  don't know where a person goes?

21  A    Correct, sir.

22  Q    Is that right?

23  A    Correct.

24  Q    So you can't see the individual units from the outside;

25  is that right?

1   A    Correct, sir.

2   Q    And can you describe the hallway inside?

3   A    Once you go into -- I think it was on the first floor.

4   Once you go inside the floor, you go and make a hard left, and

5   then his door was right there in front of you, sir, all the

6   way down a hallway.

7   Q    How many units were on that floor, do you recall?

8   A    No, sir, I don't.

9   Q    And how many units would you say, or how many floors in

10  the building?

11  A    I don't know, sir.

12  Q    But it was a high-rise building?

13  A    Correct.

14  Q    Was it 10 floors or you just don't know?

15  A    I just don't know right off hand.  I know it was probably

16  more than two or three.

17  Q    Now did you know who -- who lived there?

18  A    We had information that Mr. Coleman was living there.

19  Q    Okay.  And didn't you have information that Ms. Peppers

20  lived there, too?

21  A    No, I didn't, sir, no.

22  Q    Okay.  But that doesn't mean that somebody didn't,

23  correct?

24          MR. KAUFMAN:  Objection.  Asked and answered.

25          THE COURT:  Overruled.

1   Q    You just didn't, correct?

2   A    Correct.

3   Q    Okay.  How many -- how many -- to your knowledge how many

4   agents or law enforcement officials were involved in this

5   investigation?

6   A    Throughout the year, sir, or just on this particular day?

7   Q    On this particular day?

8   A    On this particular day, at least 10, probably anywhere

9   from 10 to 20, sir.

10  Q    Okay.  And how long had you been involved in this

11  investigation?

12  A    On this particular day.

13  Q    No, entirety.  The entire time you've been involved in

14  it?

15  A    Helping Agent MacDonald and Detective Beaver out a lot

16  with surveillance, sir.

17  Q    Okay.  Can you give me a time limit, weeks, days, hours?

18  A    Several, several months.

19  Q    Several months, okay.  Now wouldn't it be fair to say

20  during this surveillance -- now, you never seized any

21  marijuana from Mr. Coleman, did you?

22  A    Correct, sir.

23  Q    Never seized any guns from Mr. Coleman, did you?

24  A    At the house, sir.

25  Q    But now the gun was at the house; isn't that right?

1   A    Correct.

2   Q    And now, it was under a bed; is that right?

3   A    Correct, sir.

4   Q    Well do you know who put it there?

5   A    No, sir.

6   Q    Do you know how long it had been there?

7   A    No, sir.

8   Q    And there's no evidence that Mr. Coleman ever tried to

9   get that gun --

10  A    Correct.

11  Q    -- on the day in question?

12  A    Correct.

13  Q    And you showed the ladies and gentlemen of the jury

14  several photographs, not a photograph with Mr. Coleman

15  possessing a firearm, is there?

16  A    Correct, sir.

17  Q    Now were you familiar with Jerry Davis?

18  A    Just on that day of surveillance, sir.

19  Q    Did you have an occasion to go to his apartment?

20  A    No, sir I didn't.

21  Q    Now the money that was in the safe, you took a picture of

22  the money; is that right, in the safe?

23  A    Correct, sir.

24  Q    Okay.  Did you count the money?

25  A    It was counted, sir.

1   Q    No.  My question is, did you count it?

2   A    Oh, no, sir.

3   Q    Who collected the money?

4   A    It was seized by agents, sir.

5   Q    Okay.  What agent?

6   A    Not sure which agent collected it, sir.

7   Q    That was an awful lot of money, wasn't it?

8   A    Correct, sir.

9   Q    Well, do you know who put the money in the safe?

10  A    In that particular safe?

11  Q    Yes, sir.

12  A    No, sir.

13  Q    (Indicating.)

14  A    No, sir.

15  Q    Know how long it had been in there?

16  A    No, sir.

17  Q    Was the safe opened or closed when you got there?

18  A    Closed, sir.

19  Q    And can you describe to the ladies and gentlemen of the

20  jury whether it was a safe with a key or a combination lock?

21  A    Combination.

22  Q    And isn't it true that Mr. Coleman didn't know the

23  combination?

24  A    Correct, sir.

25  Q    How did you all get in there?

1  A    Paperwork that was on the -- for the safe, sir.  Still

2  had a combination on there.

3  Q    I'm sorry.

4  A    Paperwork that was located during the search warrant had

5  the combination on there.

6  Q    Where was that paperwork located?

7  A    In the residence, sir.  I'm not sure where.

8  Q    You don't know where?

9  A    (Indicating.)

10  Q    So you didn't -- I mean, you didn't make a note as to

11  where the combination to the safe was; isn't that right?

12  A    No, sir.  We --

13  Q    Are you sure that that's where you got the combination

14  from, or did you break it open?

15  A    No.  We did not break it open, sir.

16  Q    Well, did you seize the combination, the pieces of

17  paperwork that had the combination on it?

18  A    We might have, sir.  I'm not sure.

19  Q    Okay.  But I thought you were the person that was

20  collecting the evidence?

21  A    Other evidence was -- once I was in charge of gathering

22  the evidence, sir, and I'm going into different rooms

23  collecting.  So a lot of times we just seized amount of

24  paperwork.  Like I said, I'm not sure if it was within there

25  or not, sir.

1   Q    So was there more than you collecting and recording the

2   evidence?

3   A    Sometimes, sir.  Yes.

4   Q    Well, what about --

5   A    I didn't see all the paperwork that was -- cause people

6   were coming towards me saying that evidence is found.  I go in

7   and I might -- not review it, but I might just -- okay, get

8   it, and put it in the evidence envelope and then save it right

9   there.

10  Q    But when you do a search warrant, the execution of the

11  search warrant, you want to be pretty meticulous in recording

12  what's seized; isn't that right?

13  A    Correct, sir.

14  Q    Okay.  You want to be -- and actually you want to be

15  correct?

16  A    Correct.

17  Q    Correct?  That's why you photograph?

18  A    Correct.

19  Q    So that you can see where it came from?  How it was

20  before you removed it; isn't that correct?

21  A    In all possible, yes, sir.

22  Q    I'm sorry?

23  A    I said, when possible, yes, sir.

24  Q    Well, who opened the safe?

25  A    I was in another part of the house helping search, sir.

1   And then when I came back, they advised that they were able to

2   get the safe open.

3   Q    Okay.  So you don't know who opened it?

4   A    Correct, sir.

5   Q    Now did you see any suitcases in the apartment unit 115?

6   A    Yes, sir.

7   Q    And how many suitcases did you see?

8   A    I think it was two, sir.

9   Q    No marijuana in those suitcases, were they?

10  A    No, sir.

11  Q    Just normal luggage, correct?

12  A    Correct, sir.

13  Q    This Glock 17 firearm, did you collect that?

14  A    Yes, sir.

15  Q    Do you recall whether or not if it was loaded?

16  A    Yes, sir.

17  Q    Was it?

18  A    Yes, sir it was.

19          MR. BUTLER:  If I could have a moment please, Your

20  Honor.

21          THE COURT:  You may.

22          (Pause.)

23  Q    Now when you walked in, Detective Spears was in the

24  bedroom -- I mean, just by walking in, I mean, you couldn't

25  see the gun box under the bed, could you?

1   A   No, sir.

2   Q   So how did you find or locate the box?

3   A   Got on my knees and looked underneath the bed, sir.

4   Q   You looked underneath the bed?

5   A   Correct.

6   Q   And in relation to the bed that was closest to you as you

7   entered, how far would you say the gun box was under the bed?

8   A   At the headboard to the right of the bed, sir.

9   Underneath the bed to the very right.

10  Q   I'm sorry?

11  A   Underneath the headboard, it was to the far right.

12  Q   To the far right.  So did you have to get on your knees

13  and reach out your hand and pull it to you?

14  A   Yes, sir.

15  Q   In regards to the mail that was shown to the ladies and

16  gentlemen of the jury, one was a Time Warner Cable bill; is

17  that right?

18  A   Correct, sir.

19  Q   And what was the other document, piece of mail?

20  A   It was blurry, sir.  I'm not sure.  It was another piece

21  of mail that was inside the house.

22  Q   Okay.  Did you have an occasion to actually open the

23  letter or bills --

24  A   No, sir.

25  Q   -- and look at them?  You didn't do that?

1   A     No, sir.

2   Q     So you don't know what date was on them; is that right?

3   A     Correct.

4   Q     There were photographs that were shown to the ladies and

5   gentlemen of the jury that depicted a closet with -- that

6   showed clothing; do you remember that?

7   A     Yes, sir.

8   Q     And looked like a lot of Jordan, Air Jordans, would that

9   be fair?

10  A     Tennis shoes, yes, sir.

11  Q     Do you know whose shoes they were?  You don't know, do

12  you?

13  A     Only person that was --

14  Q     I'm sorry.

15  A     The male subject that was inside the house, sir.

16  Q     Okay.  Well, but, did you ask Mr. Coleman, are these your

17  shoes?  You didn't ask him that, did you?

18  A     I never interviewed Mr. Coleman, sir.

19  Q     Okay.  So you're assuming that they were his; isn't that

20  right?

21  A     Correct, sir.

22  Q     Okay.  And the clothes, did you have a chance to look at

23  the size or not?

24  A     I did not.

25  Q     Sir?

1   A    I did not.

2          MR. BUTLER:  If I could have a moment please, Your

3   Honor.

4          THE COURT:  You may.

5   Q    At some point once you seized the weapon and you

6   completed your property sheet, okay, were you able to

7   determine who purchased it?

8   A    I didn't do that initial -- I filled it out and I did

9   not -- I think Detective Beaver has that information, sir.

10         MR. BUTLER:  Okay.  Mr. Kaufman, could you put the

11  property sheet back up with the weapon?

12         MR. KAUFMAN:  (Complies.)

13         MR. BUTLER:  Thank you.

14  Q    Now Detective Spears, do you see Government's 10a on the

15  screen?

16  A    Yes, sir.

17  Q    And does it appear -- I mean, you completed the top part

18  of this; is that correct?

19  A    That's correct, sir.

20  Q    And then you turn it into property control?

21  A    Correct.

22  Q    And property control is down in the police department --

23  is that the first floor or the basement?

24  A    The basement, sir.

25  Q    Okay.  Securest facility, correct?

1    A    Correct.

2    Q    Now, when you look down to the bottom at 3/9/11, do you

3    see that?

4    A    Yes, sir.

5    Q    Okay.  It says -- it says Sewell transported it to the

6    lab; is that right, about 8:30?

7    A    Yes, sir.

8    Q    Then it says, R. Scott examined it, see that?

9    A    Correct, sir.

10   Q    Look at the top part.  Did you fill this in?  It says,

11   item -- I don't know if that's 100 or 00.  Do you see that

12   down at the bottom?

13   A    Can you repeat that, sir?

14   Q    Can you bring it all the way down?

15        It says, quantity two.  Two swabs from grip of weapon.

16   Do you see that?

17        Now do you know that the weapon was swabbed?

18   A    I think that's what that means, sir.

19   Q    Okay.  And it says, offense involved was trafficking

20   marijuana, correct?

21   A    Yes, sir.

22   Q    But I thought you said it was .6 grams, right?

23   A    Yes, sir.

24   Q    Okay.

25        MR. BUTLER:  Thank you, Mr. Kaufman.

1  Q    Now you didn't seize everything in that unit, did you?

2  A    Say that again, sir?

3  Q    You didn't seize everything that was in that unit?

4  A    Correct, sir.

5  Q    Now you indicated during the direct examination that you

6  saw some Ziploc bags in the unit 115, correct?

7  A    Correct, sir.

8  Q    But you didn't see any marijuana residue around the bags,

9  did you?

10 A    Correct, sir.

11 Q    Didn't see any marijuana in the bags, did you?

12 A    Correct.

13 Q    They were just bags, correct?

14 A    Correct.

15 Q    And they were the kind of bags that normally people have

16 put sandwiches in or other types of food products or whatever

17 they want to put in; is that correct?

18 A    Yes, sir.

19 Q    (Indicating.)

20 A    Correct.

21 Q    Now they were the smaller bag, they weren't a large

22 gallon bag, were they?

23 A    I'm not 100 percent sure, sir.

24 Q    Well, it wasn't the type of bag that you could put a

25 pound of marijuana in; isn't that right?

 1  A    If I could see the picture again, sir.

 2           MR. BUTLER:  Yes, sir.  Would you, Mr. Kaufman.

 3           THE WITNESS:  That's correct, sir.

 4           MR. BUTLER:  Thank you, Mr. Kaufman.

 5  Q    And this is in the kitchen; isn't that right?

 6  A    Yes, sir.

 7  Q    Now the photograph that you -- thank you -- Mr.

 8  Kaufman -- that you identified, the photograph of Mr. Kaufman

 9  with the other -- I think it was three other people, you

10  remember that photograph?

11  A    Yes, sir.

12  Q    Well, do you know those another people?

13  A    Two of them, sir.

14  Q    Okay.  And who are the two that you know?

15  A    Mr. Davis and Darty.

16  Q    Okay.  And did you know that Mr. Davis was from

17  California?

18  A    No, sir.

19  Q    And Mr. Darty was from California?  Did you know that?

20  A    No, sir.

21  Q    But did you know Mr. Davis or Mr. Darty personally?

22  A    No, sir.

23  Q    You learned their names through this investigation; is

24  that right?

25  A    Correct, sir.

1        MR. BUTLER:  If I can just have a moment, Your

2   Honor?

3        THE COURT:  You may.

4        MR. BUTLER:  Thank you, very much, Your Honor.

5        I have no further questions.

6        THE COURT:  Any redirect?

7        MR. KAUFMAN:  Yes, Your Honor.

8                    REDIRECT EXAMINATION

9   BY MR. KAUFMAN:

10  Q    Detective Spears, going back to 9j, how much marijuana do

11  you believe you could get into one of these freezer bags?

12  A    A couple ounces, sir.

13  Q    And would it depend on whether it's Kush or regular grade

14  marijuana?

15  A    Yes.

16  Q    How would it vary?

17  A    Compressed size marijuana or what we call Mexican

18  marijuana is a little bit more compact, compressed together

19  where you could get more in there.  Kush or high-grade

20  marijuana is the -- almost like popcorn, so it is real fluffy,

21  so you may not be able to get as much in there.

22  Q    Now you were asked why on Government's Exhibit 10a, in

23  the middle, you were asked about how you'd written down

24  trafficking marijuana.  Why did you put that there?

25  A    Based on the marijuana that we seen come out of the

1   residence there.

2              MR. BUTLER:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  That was on the traffic stop, sir.

5   Q   (Mr. Kaufman) Now, the defense lawyer asked you about

6   seeing Mr. Coleman possessing firearms.  Based on the

7   circumstances of this case, are you aware of Mr. Coleman

8   possessing a firearm in his residence?

9              MR. BUTLER:  Objection.

10             THE COURT:  Sustained as to a legal conclusion.

11  I'll sustain it as to form.

12  Q   (Mr. Kaufman) Based on your training and experience and

13  the circumstances of this case, can you clarify when you were

14  asked about possession, if in fact your testimony is that Mr.

15  Coleman possessed the firearm?

16             MR. BUTLER:  Objection.

17             THE COURT:  I'll sustain the question.  Ask to you

18  move on to a different area.

19  Q   (Mr. Kaufman) How many bedrooms are in unit 115 at 5425

20  Closeburn.  Do you recall off the top of your head?

21  A    I think it was two, sir.

22  Q    And throughout the entire unit, how many beds were in all

23  of those -- all the rooms in the unit?

24  A    One bed, sir.

25  Q    Just the one bed where you found the gun?

1    A    Correct, sir.

2    Q    You were just asked about the contents of the evidence

3    bags that you seized with the documents.

4         Is it standard operating procedure to seize the documents

5    and review all the documents on scene?

6    A    No, sir.

7    Q    And does that depend also on how many documents there

8    are?

9    A    Correct.

10   Q    What is the norm when you have a large number of

11   documents?

12   A    A lot of times you seize it and then the case agent or

13   the person in charge of the case gets it and goes through all

14   the paperwork, sir.

15   Q    The defense lawyer asked you if you knew that if Mr.

16   Coleman knew the combination to the safe.

17        Are you saying that he didn't give you the combination to

18   the safe?

19   A    Correct.

20   Q    Do you actually know whether he knew the combination of

21   the safe?

22   A    No, sir.

23   Q    You were asked about the search warrant and what you were

24   trying to find during the execution of the search warrant.  Do

25   you remember that question?

1    A    Correct.

2    Q    What if anything else were you searching for during the

3    execution of the search warrant?  What was authorized, do you

4    remember?

5    A    Not right off hand, sir.  If I can see --

6    Q    I'm sorry?

7    A    If I could see the search warrant, sir.

8          MR. KAUFMAN:  It's been previously provided to

9    defense counsel, now marked as Government Exhibit 63.  I'm

10   going to add on to the list.  It's a four-page document.

11         Do you recognize this document, Exhibit 63 for

12   identification?

13   A    Yes, sir.  It's a copy of the search warrant, sir.

14   Q    And without reading from the document, can you tell me in

15   reviewing it if it refreshes your recollection as to what you

16   were authorized to search for that you were seeking

17   authorization to search for?

18   A    Yes.

19   Q    All right.  I'm retrieving 63.  If you're still

20   refreshed, can you tell the jurors what you were seeking

21   authorization for and obtained from the court?

22   A    Marijuana, firearms, beepers, cellphones, evidence of

23   ownership of the property and paraphernalia as well.

24   Q    All those items listed, why were you seeking all those

25   types of items?

1    A    That was what we call tools of the trade, sir.  Basically

2    what normal people that's involved in narcotics will probably

3    have in their residence, sir.

4    Q    You were asked about in whose name the apartment was

5    leased.  Based on your training and experience, how often do

6    you find that drug traffickers actually have an apartment

7    leased in their own name?

8    A    Very rare.

9    Q    Would that apply -- how often do you find that vehicles

10   are registered in the name of the actual drug trafficker?

11   A    Very rare, sir.

12   Q    You were asked about being able to see what was coming in

13   and out of the apartment.  And I believe you described the

14   structure of the interior of the multiple dwelling unit -- by

15   the way, about how many floors is 5425 Closeburn?

16   A    I'm not sure.

17   Q    Do you recall approximately how many were on each floor?

18   A    No, sir.

19   Q    Were you able -- were you able to see -- from the

20   exterior of the building -- were you able to see the

21   underground parking area from that vantage point?

22   A    Say that one more time, sir?

23   Q    When you're outside of 5425 Closeburn looking at the

24   building, are you able from that vantage point to see inside

25   the underground parking lot?

1    A    Yes, sir.

2    Q    And how would you look inside what was going -- if you

3    wanted to see activity inside the underground parking lot, how

4    would you -- what would you have to do to see that?

5    A    Go up to, I think it was kind of like a gate.  I think

6    you have to walk up to and look through the cracks -- through

7    the gate, sir.

8    Q    When you say the cracks or the grate, can you describe

9    what you're talking about?

10   A    I think it was -- had, like, a garage door that opens up.

11   And I think it was where you can look through and see vehicles

12   that was in the parking lot.

13   Q    And that's if you're up to the garage area with the

14   garage door opened; is that correct?

15   A    I think it could be down as well.  I think you can

16   actually see through.  It wasn't like an enclosed garage.

17   Q    At any point during the surveillance were you actually up

18   to that area to look inside of the garage?

19   A    No, sir.

20   Q    And is there a reason why you didn't do that during

21   surveillance leading up to the search warrant execution?

22   A    I never was close to the apartment, sir.  I was further

23   out.

24   Q    Is there a reason why you're aware of yourself or members

25   of your team not going up that close to the apartment?

1   A    Because Agent MacDonald had the eye.  Agent MacDonald had

2   the eye.  Was the only one in the parking lot.

3   Q    Are you familiar with the term law enforcement "being

4   burned"?

5             MR. BUTLER:  Objection.

6             THE COURT:  Sustained as to the leading.

7             MR. KAUFMAN:  I'll move on actually, Your Honor.

8   Q    I'd like to show you what's been admitted as 14g.  You

9   already identified Mr. Coleman.  If you could work from the

10  left to the right.  You stated a couple of other names.

11       Can you tell us the tallest individual, which one is

12  that?

13  A    Mr. Davis, the third guy with the gray shirt is Darty.  I

14  do not know who the other subject is.

15  Q    So Jerry Davis is in the dark shirt, the tall man with

16  the baseball cap, is that accurate?

17  A    Correct.

18  Q    And then next to him in the gray is Darren Darty?

19  A    Yes.

20  Q    Prior to November 2nd, had you seen Mr. Darty before?

21  A    Correct, yes, sir.

22  Q    When was that?

23  A    It was in the year of 2009 when he was picked up for a

24  marijuana load, sir.

25  Q    How big was that load, if you recall?

1    A    I think it was 300 -- 300 some pounds.

2              MR. BUTLER:  Objection.  Move to strike.

3              THE COURT:  Overruled.

4              MR. KAUFMAN:  Nothing further, Your Honor.

5              MR. BUTLER:  May I?

6              THE COURT:  Recross?

7              MR. BUTLER:  Yes, sir.

8                    RECROSS EXAMINATION

9    BY MR. BUTLER:

10   Q    Now, Detective Spears, now when you say you saw Mr. Darty

11   with this, I think you said 300 pounds of marijuana, you

12   didn't see Mr. Coleman, did you?

13   A    Correct, sir.

14   Q    Sir?

15   A    That's correct.  I did not see him.

16   Q    And you indicated that -- I thought you said based on the

17   marijuana that you saw come from the residence of Closeburn.

18   But you never saw any marijuana come from unit 115 on November

19   2nd of 2010, did you?

20   A    That's correct, sir.

21   Q    Because you were down how many miles away, or half a

22   mile?

23   A    Half a mile to a mile.

24   Q    Half a mile.  I'm sorry.  So you were a half a mile away

25   so you don't know what was going on at Closeburn until you got

1   there, correct?

2   A    Well --

3   Q    For your own personal knowledge?

4   A    Correct, sir.

5   Q    And your testimony concerning the garage and looking

6   through the cracks, that's based on your observation -- and

7   correct me if I'm wrong -- the only one time that you went

8   over there, and that's to execute the search warrant; is that

9   right?

10  A    Correct.  Well, I helped out that day on surveillance,

11  but --

12  Q    I'm sorry.

13  A    That's correct, sir.

14           MR. BUTLER:  All right.  Thank you.

15           I have no further questions.

16           THE COURT:  You may step down, be excused.

17           Do you have a short witness?

18           MR. KAUFMAN:  We have two witnesses that could be

19  short.

20           THE COURT:  All right.  Call them.

21           MR. KAUFMAN:  First we call Special Agent Darren

22  Solomon with Alcohol, Tobacco and Firearms.

23            DARREN SOLOMON, GOVERNMENT WITNESS, SWORN

24                       DIRECT EXAMINATION

25  BY MR. KAUFMAN:

1    Q    Good afternoon.

2    A    Good afternoon.

3    Q    Could you please tell the jury your full name and also

4    where you work?

5    A    My name is Darren Andrew Solomon.  I'm a special agent

6    with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

7    Q    How long have you been with ATF?

8    A    Since 2001.

9    Q    Prior to that do you have law enforcement experience?

10   A    I do.

11   Q    How many years were you in law enforcement before that?

12   A    I was a police officer, then later a detective with the

13   Charlotte-Mecklenburg police department for eight years.

14   Q    What are current duties with ATF?

15   A    To investigate possible violations of federal cigarette,

16   alcohol and tobacco, explosives and arson laws.

17   Q    Are you in particular knowledgeable about firearms

18   identification and places of manufacture for firearms?

19   A    Yes, I've received training in that.

20   Q    Can you describe briefly some of that training?

21   A    Sure.  The training starts when we go through the ATF

22   academy when we're first hired.  After becoming an ATF agent,

23   I became a firearm instructor and completed that training.

24   I've also completed training in firearms interstate nexus in

25   our facility in West Virginia.  I've also completed ammunition

1  nexus training which was held in various states throughout the

2  midwest.

3  Q    Can you tell the jury how one identifies the place of

4  manufacture for a firearm and determines the identification of

5  a firearm as well?

6  A    Sure.  Firearms in the United States, according to

7  federal law, have to have certain markings.  They're required

8  to have a manufacturer, a model if there is one, a serial

9  number and a caliber.  Those are to be etched into the frame.

10 If the firearm is imported, the name of the importer also has

11 to be etched into the frame.

12     So when I look at a firearm, I look initially for those

13 markings to see manufacture, make, model, serial, and caliber.

14     After I determine those markings, I'll then examine

15 for -- we call them secondary markings.  It could be a proof

16 mark from a certain factory.  It could be a particular mark

17 from a European country, or it could be a secret number that's

18 put on the firearm by the manufacture.

19 Q    All right.  Are you familiar with the definition of a

20 firearm for federal purposes under 18 U.S. Code Section 921?

21 A    I am.

22 Q    Can you actually tell us right now what that definition

23 is?

24 A    Sure.  The definition has four parts.  It's any type of

25 weapon that is designed to or could be readily assembled to

1   fire a projectile by means of an explosive.  It's also the

2   frame or receiver of any such weapon.  Any type of firearm

3   suppresser or muffler, or any type of destructive device like

4   a grenade.

5   Q   Have you been qualified previously in federal court as an

6   expert in the study of the identification of firearms and

7   place of manufacture?

8   A   I have, in both this district and the Middle District of

9   North Carolina.

10  Q   Approximately how many times?

11  A   Approximately 12.

12        MR. KAUFMAN:  Your Honor, at this time we would

13  tender Agent Solomon as expert in the identification of

14  firearms and place of manufacturer.

15        THE COURT:  Any objection?

16        MR. BUTLER:  No objection.

17        THE COURT:  He will be allowed to offer an opinion

18  in those areas.

19        MR. KAUFMAN:  Thank you, Your Honor.

20  Q   Agent Solomon, were you asked to review three firearms in

21  this case to determine if they were firearms, identifying

22  them, and determining their place of manufacture?

23  A   I was.

24  Q   I would like to show you what's been admitted already as

25  Government's 10a.  And do you recognize this form?

1    A    This looks like a Charlotte-Mecklenburg police property

2    report.

3    Q    And I'm now increasing the size of the last entry under

4    the chain of custody.  Do you recognize the name in there?

5    A    Yes.  Yes, I see my name.

6    Q    Okay.  And comparing that with what's been admitted

7    already as Government's 14a, do you recognize this firearm as

8    one of the ones that you have reviewed?

9    A    Yes, this is one.

10   Q    All right.  And on the screen I'll show you what's been

11   admitted as Government's 17a, page 1, and page 2.  And I'll

12   also show you what has already been admitted as Government's

13   17c and 17b.  And actually on screen for identification

14   purposes show you Exhibit 20.

15        Without telling us what the contents are, do you

16   recognize what's being shown on Exhibit 20?

17   A    Yes.  This a report I prepared after examining the three

18   firearms.

19   Q    And in your report, do you actually indicate what the

20   serial numbers are for the firearm?

21   A    Yes, I do on all three.

22   Q    And the -- actually I'll bring back up 14a for that

23   matter.  If you could tell us if all three of these firearm

24   serial numbers match up with the report?

25   A    Yes, they do.

1    Q    Thank you.

2         Now these firearms that you examined, did they meet the

3    definition of firearms for federal purposes?

4    A    They do.

5    Q    And did you perform your usual review of the

6    identification and place of manufacturer of these firearms?

7    A    I did.

8    Q    Did you form conclusions?

9    A    I did.

10   Q    What were those conclusions?

11   A    That the Glock pistol was manufactured in the State of

12   Georgia.  That the CZ pistol was manufactured in the country

13   of Czech Republic.  And that the Smith and Wesson was

14   manufactured in the State -- or the Commonwealth, I'm sorry,

15   of Massachusetts.

16   Q    And based on those facts, is it your opinion that they

17   traveled in and affected interstate commerce?

18   A    They did.

19        MR. KAUFMAN:  At this time, Your Honor, seek to

20   admit and publish Exhibit 20.

21        THE COURT:  Any objection?

22        MR. BUTLER:  Objection, Your Honor.

23        THE COURT:  Basis.

24        MR. BUTLER:  We would object on the grounds that

25   there's been insufficient connection to the manufacturer.

1          THE COURT:  Very well.  Overruled.  Let them be

2    admitted.

3          MR. KAUFMAN:  Thank you, Your Honor.

4          (Government's Exhibit No. 20 was received into

5    evidence and published.)

6    Q    And in addition, Agent Solomon, have you reviewed -- can

7    you explain what a gun trace is?

8    A    A gun trace is when law enforcement will contact ATF and

9    request a gun trace based on the information, usually from a

10   gun that they've recovered.

11         Our tracing facility is in West Virginia, and what

12   happens at that point is, the law enforcement official

13   contacting ATF will give one of our personnel the information

14   from the gun, information that I've previously spoken about,

15   the manufacturer, serial, the caliber, and importer, if there

16   is one.

17         Our personnel at the tracing center will then take that

18   information and they will work backwards through the retail

19   chain.  What I mean by that is, for example, we say a Colt

20   pistol, that's what the law enforcement officer wants to run a

21   trace on.  He will give the information about the Colt pistol

22   to one of our personnel.  Our personnel will then start with

23   that manufacturer, because that's the genesis of the firearm.

24   They will contact Colt and say this weapon was manufactured by

25   you.  Here's the serial number.  What happened with the

1   weapon?  Colt will then say --

2            MR. BUTLER:  Objection.

3            THE COURT:  Overruled.

4            THE WITNESS:  The personnel ask the manufacturer,

5   what happened with the gun, basically.  The manufacturer will

6   say, we had this gun and it was shipped to the following

7   location.  Either to the military, law enforcement, or to a

8   wholesaler for further progress down the retail chain.

9            Based upon that information, if it goes to a

10  wholesaler, then our personnel then call the wholesaler and

11  ask them the same questions they asked the manufacturer.  You

12  received this gun from Colt, what did you do with the gun?

13           At that point the wholesaler will do actually what

14  the manufacturer did.  We got the gun on this date.  We

15  shipped it out to this place, which is usually the retailer.

16           Our personnel will then contact the retailer and

17  say, we've been informed that you received this gun on

18  whatever date.  They will ask what they have to do with the

19  gun.

20           The retailer will then consult their records, and

21  based upon the required federal form that you have to fill out

22  when you purchase a handgun, or a long gun in the United

23  States, they will then give that information back to the

24  personnel.

25           Our ATF personnel then compile all of that

1   information from all of the parties, and they put it on a

2   trace summary and it's provided back to the law enforcement

3   official who requested it.

4   Q    And is that provided in a firearms trace summary

5   document?

6   A    Yes, it is.

7   Q    And is that document generated, maintained in the regular

8   course of business?

9   A    Yes, it's maintained by ATF.

10  Q    I would like to show you what's been marked as

11  Government's Exhibit 42a for identification purposes.  Do you

12  recognize this?

13  A    Yes.  This is an ATF arms trace summary.

14  Q    And do you recognize this particular one?

15  A    Yes.  It corresponds to the Glock pistol based on the

16  serial number.

17  Q    Is that the same Glock pistol that you just testified

18  about?

19  A    It is.

20          MR. KAUFMAN:  Your Honor, we seek admission of 42a.

21          MR. BUTLER:  Objection.

22          THE COURT:  Basis?

23          MR. BUTLER:  Same basis, Your Honor.

24          THE COURT:  Overruled.

25          (Government's Exhibit No. 42a was received into

1   evidence and published.)

2   Q    And the Glock, who was the purchaser of the Glock?

3   A    According to this trace report it was a Stephanie Ann

4   Peppers, as the first retail purchaser of this weapon.

5   Q    I would like to show you what has been marked as 42b for

6   identification and --

7            MR. KAUFMAN:  Sorry.  The Court's indulgence,

8   please.

9            May I approach Ms. Hankins for a moment, please?

10           THE COURT:  You may.

11           MR. KAUFMAN:  Is it okay if it's not a full screen

12  showing or do I need to reduce it?

13           THE COURT:  Are you asking me?

14           MR. KAUFMAN:  I'm sorry, Your Honor.  I was asking

15  Ms. Hankins.

16  Q    This has been marked as 42b.  Do you recognize -- this is

17  a three-page document.  If you want, you can tell me to scroll

18  down.

19  A    Please.  Okay.

20  Q    Do you recognize these documents?

21  A    Yes.  These are two more ATF firearm trace summaries.

22  Q    Are they for the other two firearms that you just

23  testified about?

24  A    They are.

25           MR. KAUFMAN:  At this time, Your Honor, we'd seek to

1  have Government's 42b admitted and published at a later time.

2              MR. BUTLER:  Objection.

3              THE COURT:  Overruled.  Let them be admitted.

4              MR. KAUFMAN:  And actually, if I may -- if I may now

5  publish it, too?

6              THE COURT:  You may.

7              (Government's Exhibit No. 42b was received into

8  evidence and published.)

9  Q   (Mr. Kaufman) So going back up to the Smith and Wesson.

10 Do you see the purchaser information?

11 A    Yes.  The purchaser is listed as a Michael Owen Latham.

12 Q    From South Carolina?

13 A    Correct.

14 Q    And with regard to the Czech firearm, is there any

15 purchaser listed?

16 A    No.  No purchaser information was listed because the

17 retailer did not return the records to ATF when they went out

18 of business.

19             MR. KAUFMAN:  Thank you.  Nothing further.

20             THE COURT:  Any cross?

21             MR. BUTLER:  Yes, Your Honor.

22                      CROSS EXAMINATION

23 BY MR. BUTLER:

24 Q    Good afternoon, Detective Solomon.

25 A    Good afternoon, sir.

1    Q    Now, Detective Solomon, did you have an occasion in this

2    case to become aware of a Colt .25 caliber pistol?

3    A    I did not.

4    Q    And so you were not asked to do a trace, a firearm trace

5    summary on a Colt .25 pistol that was recovered from 1809

6    Nantucket Lane, Apartment 101, the possessor was Stephanie Ann

7    Peppers.

8              MR. KAUFMAN:  Objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  I was not asked, no.

11   Q    (Mr. Butler) Now in your determination of the interstate

12   nexus, so to speak, did you talk to anyone at the alleged

13   manufacturer?

14   A    I contacted both Glock and Smith and Wesson.

15   Q    Okay.  And -- okay.  But did you talk to anyone?

16   A    I did, a telephone conversation.

17   Q    Okay.  All right.  Well, now, but then somebody else did

18   this trace summary; is that right?

19   A    Yes.

20   Q    Okay.  Who did you talk to?  Do you remember?

21   A    At which facility?

22   Q    The Smith and Wesson?

23   A    I do not remember.

24   Q    When did you talk to them?

25   A    Prior to doing this determination.

1    Q    Okay.  Well, can you give me a date?

2    A    I cannot.

3    Q    What about the .9 mm?

4    A    Which one?  Can you bring up the report on that?

5    Q    Do you see the document in front of you?

6    A    I do.

7    Q    Did you contact that manufacturer?

8    A    I did not.

9    Q    Now there's no purchaser information on this one?

10   A    That is correct.

11   Q    And are you saying that no information was turned in?

12   A    Yes.  The explanation for the gap in purchaser

13   information is narrated at the bottom of this trace, and it

14   explains why the tracing center was not allowed -- or not able

15   to fill in that purchaser information block.

16   Q    So the licensee couldn't be located or contacted; is that

17   correct?

18   A    Yes, sir.  According to that summary.  Sir.

19   Q    Yes, sir.  And now that summary was done by someone other

20   than you; is that right?

21   A    Correct.

22   Q    Now, so you didn't contact the gun shack in Walterboro,

23   South Carolina?

24   A    I did not, no.

25   Q    And on this trace summary it says, possessor was Parker

1  Antron Coleman; you see that?

2  A    No, sir.  I don't see that portion on what's on my

3  screen.

4  Q    Do you see recovery information?

5  A    Yes, sir I do.

6  Q    Okay.  But this is something that someone wrote down?

7  A    This is the information compiled by one of our tracing

8  personnel, yes.

9  Q    Do you know who that person was?

10 A    The one submitting the information?

11 Q    Yes, sir.

12 A    Or the one compiling it?

13 Q    The one that wrote down Parker Antron Coleman was the

14 possessor?

15 A    This information would have been submitted when the

16 firearm information is part of the submission.  So it looks

17 like James F. Beaver of the Charlotte-Mecklenburg police

18 department, that information would have come in through his

19 trace request.

20 Q    So that's -- so in other words, it's just somebody

21 submitted some paperwork, and somebody else taken that

22 paperwork and filling out this form?

23 A    Yes.

24 Q    Is that correct?

25 A    Yes.

1          MR. BUTLER:  If I could have a moment, please, Your

2   Honor?

3          THE COURT:  You may.

4          (Pause.)

5   Q    Now, Detective Solomon, is there a gun manufacturing

6   company in North Carolina?

7   A    Yes, there are.

8   Q    How many?

9   A    The last list I saw was approximately a year ago, and

10  there were 40 plus.

11  Q    Forty plus manufacturers in the State of North Carolina?

12  A    Yes.

13         MR. BUTLER:  Okay.  Thank you very much.

14         MR. KAUFMAN:  Nothing further, Your Honor.

15         THE COURT:  You may step down and be excused.

16         Members of the Jury, we're near enough our quitting

17  point that we'll quit a minute early tonight.  I want to

18  remind you of a couple of things, one is not to talk about the

19  case.  Your family and friends may be interested in what you

20  did in federal court, and you simply are not to talk about the

21  case until you begin your deliberation.  At that point you can

22  talk about the case with each other.

23         But when you go home tonight, don't talk about the

24  case.  Keep an open mind because you haven't heard all the

25  evidence, and you haven't gotten the instructions of the

1  Court.

2           You may from time to time see participants in the

3  trial in the corridors, because this is an old building, and

4  everybody shares the same corridors and restrooms and things

5  of that nature.

6           If the lawyers seem standoffish to you in any way,

7  it's not because they're standoffish people.  They're under

8  instructions from the Court not to have any contact with you

9  outside the courtroom.

10           And so if going home or at other points in the trial

11  you run into them and they seem reserved, that's the

12  explanation.  So don't hold it against them in any way.

13           We'll break for the evening.  If you could be back

14  in court at 9:20, ready to come back into the courtroom at

15  9:30, we'll start promptly at 9:30 tomorrow.

16           (The jury was escorted from the courtroom at

17  6:00 p.m.)

18           THE COURT:  Anything from either side before we

19  break for the evening?

20           MR. KAUFMAN:  No, Your Honor.

21           MR. BUTLER:  No, Your Honor.

22           THE COURT:  Okay.  Well let's plan to be ready to go

23  at 9:30.  If there are any legal issues we need to take up

24  before 9:30, if you would advise our chambers, we'll come in

25  early and take care of those.  But otherwise be ready to go at

1  9:30 tomorrow morning.

2          MR. KAUFMAN:  Yes, Your Honor.

3          MR. BUTLER:  Very well, Your Honor.

4          (The Court was in recess for the day at 6:00 p.m.)

5                    * * * * * *